UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| ALYSON BOTTONI, Derivatively on Behalf of FLUOR CORPORATION, | ) ) ) Case No. |
| Plaintiff, | ) ) VERIFIED STOCKHOLDER |
| v. | ) DERIVATIVE COMPLAINT FOR ) VIOLATION OF SECURITIES LAW, |
| CARLOS M. HERNANDEZ, D. MICHAEL STEUERT, ROBIN K. CHOPRA, MATTHEW J. MCSORLEY, PETER J. FLUOR, ALAN L. BOECKMANN, PETER K. BARKER, ROSEMARY T. BERKERY, ALAN M. BENNETT, ARMANDO J. OLIVERA, DEBORAH D. MCWHINNEY, MATTHEW K. ROSE, JAMES T. HACKETT, DAVID E. CONSTABLE, THOMAS C. LEPPERT, DAVID T. SEATON, BRUCE A. STANSKI, BIGGS C. PORTER, GARY G. SMALLEY, NADER H. SULTAN, LYNN C. SWANN, SAMUEL J. LOCKLEAR III, and JOSEPH W. PRUEHER, | ) BREACH OF FIDUCIARY DUTY, ) WASTE OF CORPORATE ASSETS, ) UNJUST ENRICHMENT, AND TO ) COMPEL AN ANNUAL MEETING OF ) STOCKHOLDERS ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) ) |
| -and- | ) ) |
| FLUOR CORPORATION, a Delaware Corporation, | ) ) ) ) |
| Nominal Defendant. | ) DEMAND FOR JURY TRIAL |

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for

Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust

Enrichment, and to Compel an Annual Meeting of Stockholders.  Plaintiff alleges the following

on information and belief, except as to the allegations specifically pertaining to plaintiff which are

based on personal knowledge.  This complaint is also based on the investigation of plaintiff's

counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Fluor Corporation ("Fluor" or the "Company") against certain of its officers and directors for violation of securities law, breach of fiduciary duty, waste of corporate assets, unjust enrichment, and to compel an Annual Meeting of Stockholders.  These wrongs resulted in billions of dollars in damages to Fluor's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Fluor to billions of dollars in potential liability for violations of state and federal law.

2.     Fluor is one of the largest engineering and construction companies in the United States.  Through its subsidiaries, the Company designs, constructs, and maintains large-scale projects in a variety of industries for public and private clients, both domestic and foreign.  As a contractor, Fluor submits bids while competing with other contractors in hopes of winning project awards.  In a fixed-price, lump-sum setting, Fluor submits bids for a set price that includes the estimated costs to complete the underlying project.  If awarded, Fluor's compensation is capped at that set price.  Fixed-price contracts are inherently risky because, unlike reimbursable contracts, the Company cannot recover project costs that exceed the estimated costs in the underlying bid.  These fixed-price, lump-sum contracts are vital to the Company, as they represent nearly half of Fluor's business.

3.     Estimating project costs with accuracy was imperative to the Company's operational viability and compliance with applicable law and regulation.  Specifically, without

being able to actually estimate project costs, the Company will not know how much it can bid and still make a profit.  Further, U.S. Generally Accepted Accounting Principles ("GAAP") required Fluor to estimate the costs to complete a project with a high degree of precision, and reassess and update those costs on an ongoing basis, at least every quarter.

4.      Despite the importance of cost estimations and their associated risks, however, from 2012 to at least 2018, the Individual Defendants (as defined herein) directed or permitted the Company to systematically submit fixed-price bids with underestimated costs in order to win awards and secure lucrative executive bonuses.  Then, these fiduciaries made or caused Fluor to make a series of improper statements that hid these actions.  Specifically, from August 14, 2013 to February 14, 2018, the period of wrongdoing, the Individual Defendants represented that Fluor was executing its projects in-line with expectations due to its "conservative" and "selective" bidding practices, that its internal controls over financial reporting were effective, and that its reported earnings complied with GAAP.  When the Company was forced to take charges on certain of its fixed-price projects in order to bring its aggressive bids and inflated profitability closer to reality, the Individual Defendants assured stockholders that they had identified and resolved any existing issues regarding cost estimation, concealing the drastic extent of the underestimation and bidding issues for as long as possible.

5.      The damage stemming from Fluor's improper bidding practices first started to appear through a series of incremental charges on four gas-fired power plants—the Brunswick County Plant, the Greensville County Plant, the Anderson County Plant, and the Citrus County Plant (all as defined herein, and collectively, the "Gas-Fired Plants").  On May 3, 2018, Fluor announced that its financial results had been adversely impacted by a $125 million charge relating to "forecast revisions" on one of its Gas-Fired Plants, and that it was in the process of exiting the

gas-fired power plant market.  The Individual Defendants also admitted there were "fatal flaws in the bidding process of all [the Gas-Fired Plants]" and that "estimating [was] materially different than the original baseline expectations."  On this news, Fluor's market capitalization fell more than 22%, or $13.23 per share on May 4, 2018, to close at $45.76 per share, compared to the previous day's closing of $58.99 per share, erasing $1.8 billion in market capitalization in a single day.  The fallout would have been worse if stockholders had known the full truth.

6.      The Individual Defendants prevented these revelations from fully coming to light by representing there would be no further charges on the Gas-Fired Plants, claiming that those projects have been "de-risked," that there were no problems at any of its other fixed-price projects, and that its internal controls were effective.

7.      To minimize the damaging impact on the Company's earnings resulting from the Gas-Fired Plants charges, Fluor artificially inflated its financial results by improperly recognizing claim revenue.  This claim revenue was generated through change forms requesting additional funds from the Company's fixed-price clients that the clients were not contractually obligated to pay.  Without any reasonable basis to conclude the client's approval of the request was probable, Fluor would improperly record the claim as revenue in violation of GAAP, resulting in inflated financial statements and subsequently forcing the Company to take charges on certain "unapproved change orders."

8.      On October 10, 2018, Fluor announced an additional $35 million charge resulting from forecast revisions on the Citrus County Plant, breaking the promise that there would be no further charges on the Gas-Fired Plants.  On this news, Fluor's market capitalization fell more than 17%, or $9.69 per share on October 11, 2018, to close at $46.53 per share, compared to the previous day's closing of $56.22 per share, erasing $1.3 billion in market capitalization in a single day.  The

Individual Defendants, however, continued to conceal the additional charges on its fixed-price projects, including the Gas-Fired Plants, while also inflating the Company's financial statements and claiming that its internal controls were effective.

9.      Then on May 2, 2019, Fluor announced the abrupt resignation of its Chief Executive Officer ("CEO"), defendant David T. Seaton ("Seaton"), as it further disclosed yet another $26 million charge on a Gas-Fired Plant, as well as a $53 million charge resulting from "forecast revisions" on a non-Gas-Fired Plant fixed-price project.  While the Individual Defendants remained tight-lipped on the full extent of the remaining issues and even promised improvement in the following months, Fluor's market capitalization fell more than 24%, or $9.43 per share on May 2, 2019, to close at $39.72 per share, compared to the previous day's closing of $39.15 per share, erasing $1.3 billion in market capitalization in a single day.

10.      On August 1, 2019, Fluor revealed ***$714 million*** in charges related to several fixed-price projects throughout its business segments.  On the same day, the Individual Defendants admitted "there are a few significant and common issues in many of our challenged projects."  However, they continued to conceal the full extent of the issues in its fixed-price projects and the problems in its internal controls.  On this news, Fluor's market capitalization fell by more than 26%, or $8.24 per share on August 2, 2019, to close at $22.67 per share, compared to the previous day's closing of $30.91 per share, erasing $1.1 billion in market capitalization in a single day.

11.      The truth fully emerged on February 18, 2020, when Fluor announced that the SEC had launched a probe into its past accounting practices, financial reporting, and charges.  Additionally, Fluor announced that it was conducting its own internal review of its previous financial reports and internal controls while revealing that there may be material errors in its financial statements.  The press release further stated that, "[g]iven the ongoing internal review

and recent developments on two projects, the Company does not expect to complete and file its annual report on Form 10-K prior to the end of February."   On this news, Fluor's market capitalization plunged more than 24%, or $4.75 per share, on February 18, 2020, to close at $14.79 per share, compared to the previous trading day's closing of $19.54 per share, erasing $655.8 million in market capitalization in a single day.

12.     In total, the Company's stock price plummeted by *80%*, from its January 2014 high of $83.65 per share to its December 2019 low of $16.10 per share.   On March 18, 2020, the Company's stock price sunk to a low of just $3.40 per share, representing an evaporation of *95%*, or ***$13.1 billion*** in Fluor's market capitalization since January 2014.

13.     Before the full truth was revealed, between November 2013 and November 2018, while the Company's stock price was inflated due to the improper statements, Fluor repurchased 27.3 million shares of its own common stock.   This repurchase of inflated stock cost the Company over ***$1.6 billion***.

14.     While the wrongdoing detailed herein has devastated Fluor's credibility and caused the Company to incur substantial damages, defendants did not fare nearly as poorly.   Certain of the Individual Defendants unlawfully reaped over $43 million from selling their personally held Company stock based on material, nonpublic information, while it traded at artificially inflated prices.   In addition, the Individual Defendants received millions of dollars in executive compensation and directors' fees not justified by Fluor's actual performance while under their stewardship.   Indeed, certain Officer Defendants (as defined herein) collectively pocked tens of millions dollars in bonus compensation directly linked to Fluor's underbids and damaging contract awards.

15.     Since the emergence of the full truth, investor confidence has only been further ruined, as Fluor still has not filed its Annual Report for 2019.  In addition, on May 8, 2020, Fluor disclosed that it had received a subpoena from the U.S. Department of Justice ("DOJ") seeking information relating to its charges and accounting practices.

16.     In addition to the SEC and DOJ investigations, the Individual Defendants' unlawful course of conduct has also caused Fluor to become the subject of at least two federal securities class action lawsuits filed in the U.S. District Court for the Northern District of Texas (the "Securities Class Actions").

17.     Further, the Company has not held an Annual Meeting of Stockholders since May 2, 2019, thirteen months ago.  Defendants' failure to hold such a meeting is a violation of title 8, section 211 of the Delaware General Corporation Law Code ("Section 211").  Due to this failure, the Company's stockholders have not received updates directly from Fluor's Board of Directors (the "Board") and they have been unable to voice their frustrations at an annual meeting or withhold their votes for these faithless fiduciaries.

18.     Plaintiff brings this action to hold the Individual Defendants accountable for their wrongdoing, force the annual stockholder meeting, and correct the other wrongs these defendants wrought.

## JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court  has jurisdiction over the claim asserted herein for violations of section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.  Jurisdiction is also

conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

20.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Fluor maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Fluor, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

22.     Plaintiff Alyson Bottoni was a stockholder of Fluor at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Fluor stockholder. Plaintiff is a citizen of New Jersey.

**Nominal Defendant**

23.     Nominal defendant Fluor is a Delaware corporation with principal executive offices located at 6700 Las Colinas Boulevard, Irving, Texas.  Accordingly, Fluor is a citizen of Delaware

and Texas.  Fluor is a holding company that owns the stock of a number of subsidiaries, as well as interests in joint ventures.  Through its subsidiaries, the Company provides engineering, procurement, construction, fabrication and modularization, operations, maintenance and asset integrity, and project management services.  As of December 31, 2018, Fluor had 53,349 employees.

**Defendants**

24.     Defendant Carlos M. Hernandez ("Hernandez) is Fluor's CEO and a director and has been since May 2019.  Defendant Hernandez was also Fluor's Interim CEO in May 2019; Executive Vice President, Chief Legal Officer and Secretary from at least March 2014 to May 2019; and Senior Vice President, Chief Legal Officer and Secretary from October 2007 to at least February 2014.  Defendant Hernandez is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Hernandez knowingly, reckless, or with gross negligence caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  While in possession of material, nonpublic information concerning Fluor's true business health, defendant Hernandez sold 44,054 shares of his personally held Fluor stock for proceeds of $2,893,912.  Fluor paid defendant Hernandez the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $651,346 | $2,942,476 | - | $334,200 | $124,827 | $4,052,849 |
| 2017 | $630,032 | $1,588,728 | $643,788 | $278,500 | $117,117 | $3,258,165 |
| 2016 | $630,032 | $1,533,437 | - | $380,300 | $120,558 | $2,664,327 |
| 2015 | $650,724 | $1,474,183 | $726,046 | $562,300 | $116,370 | $3,529,623 |
| 2014 | $607,084 | $1,340,212 | $660,062 | $613,500 | $109,373 | $3,336,578 |
| 2013 | $582,632 | $1,000,099 | $499,990 | $559,800 | $102,811 | $2,745,332 |

Defendant Hernandez is a citizen of Texas.

25.     Defendant D. Michael Steuert ("Steuert") is Fluor's Executive Vice President and Chief Financial Officer ("CFO") and has been since June 2019.  Defendant Steuert was also Fluor's Senior Vice President and CFO from May 2001 to May 2012.  Defendant Steuert is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Steuert knowingly, reckless, or with gross negligence caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iii) overstate the Company's earnings; (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (v) repurchase the Company's stock at artificially inflated prices; and (vi) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Defendant Steuert is a citizen of Texas.

26.     Defendant Robin K. Chopra ("Chopra") is Fluor's Senior Vice President, Principal Accounting Officer and Controller and has been since March 2016.  Defendant Chopra was also Fluor's Vice President and Controller, Commercial Operations and Controller, Asia Pacific from September 2014 to February 2016; Vice President, Internal Audit from March 2008 to August 2014; and held various other positions within the Company from 1991 to March 2008.  Defendant

Chopra is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Chopra knowingly, recklessly, or with gross negligence caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  While in possession of material, nonpublic information concerning Fluor's true business health, defendant Chopra sold 11,242 shares of his personally held Fluor stock for proceeds of $640,506.  Upon information and belief, defendant Chopra is a citizen of Texas.

27.     Defendant Matthew J. McSorley ("McSorley") is Fluor's Executive Vice President, Project Support Services and has been since February 2018.  Defendant McSorley was also Fluor's Group President, Project Support Services from August 2017 to February 2018; Senior Vice President, Execution & Resources from 2015 to 2017; President, Power Business Line from 2013 to 2015; and held various other positions within the Company from 1991 to 2013.  Defendant McSorley is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant McSorley knowingly, recklessly, or with gross negligence caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate

and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Defendant McSorley is a citizen of Texas.

28.     Defendant Peter J. Fluor ("P. Fluor") is Fluor's Lead Independent Director and has been since February 2003 and a director and has been since 1984.  Defendant P. Fluor was also Fluor's Non-Executive Chairman of the Board from January 1998 to July 1998.  Defendant P. Fluor knowingly, in bad faith, or in conscious disregard for his duties caused or allowed the Company to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  The Company paid defendant P. Fluor the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $175,000 | $155,046 | $140 | $330,186 |
| 2017 | $165,000 | $167,537 | $140 | $332,677 |
| 2016 | $160,000 | $150,042 | $5,140 | $315,182 |
| 2015 | $160,000 | $135,014 | $153 | $295,167 |
| 2014 | $160,000 | $135,066 | $1,153 | $296,219 |
| 2013 | $160,000 | $135,008 | $6,623 | $301,631 |

Defendant P. Fluor is a citizen of Texas.

29.     Defendant Alan L. Boeckmann ("Boeckmann") is Fluor's Chairman of the Board and a director and has been since May 2019.  Defendant Boeckmann was also Fluor's Non-Executive Chairman of the Board from February 2011 to February 2012; a director from March 2001 to February 2012; Chairman and CEO from February 2002 to February 2011; President and Chief Operating Officer from February 2001 to February 2002; President and CEO of Fluor Daniel, a wholly owned subsidiary of the Company from March 1999 to February 2001; Group President, Energy and Chemicals from 1996 to March 1999; President, Plastics and Fibers from 1994 to 1996; and held various other positions within the Company from 1979 to 1996 and from 1974 to 1977.  Defendant Boeckmann knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Defendant Boeckmann is a citizen of Texas.

30.     Defendant Peter K. Barker ("Barker") is a Fluor director and has been since June 2007.  Defendant Barker is a member of the Company's Audit Committee and has been since at least March 2013, and was the Chair of that committee from at least March 2016 to at least March 2019.  Defendant Barker knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation;

(iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Fluor paid defendant Barker the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $145,000 | $155,046 | $5,140 | $305,186 |
| 2017 | $140,000 | $167,537 | $5,140 | $312,677 |
| 2016 | $135,000 | $150,042 | $5,140 | $290,182 |
| 2015 | $130,000 | $135,014 | $5,153 | $270,167 |
| 2014 | $115,000 | $135,066 | $5,153 | $255,219 |
| 2013 | $115,000 | $135,008 | $23,199 | $273,207 |

Defendant Barker is a citizen of California.

31.     Defendant Rosemary T. Berkery ("Berkery") is a Fluor director and has been since June 2010.  Defendant Berkery is a member of the Company's Audit Committee and has been since at least March 2020.  Defendant Berkery knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Fluor paid defendant Berkery the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $125,000 | $155,046 | $5,140 | $285,186 |
| 2017 | $120,000 | $167,537 | $11,449 | $298,986 |
| 2016 | $115,000 | $150,042 | $5,140 | $270,182 |
| 2015 | $115,000 | $135,014 | $5,153 | $255,167 |
| 2014 | $115,000 | $135,066 | $5,153 | $255,219 |
| 2013 | $115,000 | $135,008 | $19,827 | $269,835 |

Defendant Berkery is a citizen of New York.

32.     Defendant Alan M. Bennett ("Bennett") is a Fluor director and has been since November 2011.  Defendant Bennett is Chair of the Company's Audit Committee and has been since at least March 2020, and a member of that committee and has been since at least March 2013. Defendant Bennett knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Fluor paid defendant Bennett the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $140,000 | $155,046 | $7,460 | $302,506 |
| 2017 | $135,000 | $167,537 | $7,510 | $310,047 |
| 2016 | $130,000 | $150,042 | $5,140 | $285,182 |
| 2015 | $130,000 | $135,014 | $5,153 | $270,167 |
| 2014 | $126,250 | $135,066 | $5,153 | $266,469 |
| 2013 | $115,000 | $135,008 | $5,153 | $255,161 |

Defendant Bennett is a citizen of Connecticut.

33.     Defendant Armando J. Olivera ("Olivera") is a Fluor director and has been since August 2012.  Defendant Olivera is a member of the Company's Commercial Strategies and Operational Risk Committee and has been since at least March 2020, and was a member of the Audit Committee from at least March 2013 to at least March 2015.  Defendant Olivera knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Fluor paid defendant Olivera the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $125,000 | $155,046 | $5,140 | $285,186 |
| 2017 | $120,000 | $167,537 | $5,140 | $292,677 |
| 2016 | $115,000 | $150,042 | $5,140 | $270,182 |
| 2015 | $115,000 | $135,014 | $5,153 | $255,167 |
| 2014 | $115,000 | $135,066 | $5,153 | $255,219 |
| 2013 | $115,000 | $135,008 | $153 | $250,161 |

Defendant Olivera is a citizen of Florida.

34.     Defendant Deborah D. McWhinney ("McWhinney") is a Fluor director and has been since February 2014.  Defendant McWhinney is a member of the Company's Audit Committee and has been since at least March 2019, and was also a member of that committee from at least February 2014 to at least March 2017.  Defendant McWhinney knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Fluor to: (i) operate with inadequate

internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company. Fluor paid defendant McWhinney the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $125,000 | $155,046 | $5,140 | $285,186 |
| 2017 | $120,000 | $167,537 | $5,140 | $292,677 |
| 2016 | $115,000 | $150,042 | $5,140 | $270,182 |
| 2015 | $115,000 | $135,014 | $5,153 | $255,167 |
| 2014 | $115,000 | $135,066 | $140 | $250,206 |

Defendant McWhinney is a citizen of New York.

35.    Defendant Matthew K. Rose ("Rose") is a Fluor director and has been since April 2014. Defendant Rose is a member of the Company's Audit Committee and has been since April 2014. Defendant Rose knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company. Fluor paid defendant Rose the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $125,000 | $155,046 | $140 | $280,186 |
| 2017 | $120,000 | $167,537 | $5,140 | $292,677 |
| 2016 | $115,000 | $150,042 | $140 | $265,182 |
| 2015 | $115,000 | $135,014 | $153 | $250,167 |
| 2014 | $86,250 | $135,066 | $5,102 | $226,418 |

Defendant Rose is a citizen of Texas.

36.     Defendant James T. Hackett ("Hackett") is a Fluor director and has been since August 2016, and was previously a director from March 2001 to April 2015.  Defendant Hackett is a member of the Company's Commercial Strategies and Operational Risk Committee and has been since at least March 2020.  Defendant Hackett was also the Chair of the Company's Audit Committee from at least March 2014 to April 2015, and a member of that committee from at least March 2013 to April 2015.  Defendant Hackett knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Fluor paid defendant Hackett the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $125,000 | $155,046 | $5,140 | $285,186 |
| 2017 | $120,000 | $167,537 | $5,140 | $292,677 |
| 2016 | $57,500 | - | $3,809 | $61,309 |
| 2015 | $67,500 | - | $50,051 | $117,551 |
| 2014 | $135,000 | $135,066 | $5,153 | $275,219 |

| 2013 | $130,000 | $135,008 | $153 | $265,161 |

Defendant Hackett is a citizen of Texas.

37.     Defendant David E. Constable ("Constable") is a Fluor director and has been since September 2019.  Defendant Constable is the Chair of the Company's Commercial Strategies and Operational Risk Committee and has been since September 2019.   Defendant Constable knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Defendant Constable is a citizen of Florida.

38.     Defendant Thomas C. Leppert ("Leppert") is a Fluor director and has been since September 2019.  Defendant Leppert is a member of the Company's Commercial Strategies and Operational Risk Committee and has been since September 2019, and was a member of the Company's Audit Committee in at least September 2019.  Defendant Leppert knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects;

(vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company. Defendant Leppert is a citizen of Texas.

39.     Defendant Seaton was Fluor's Chairman of the Board from February 2012 to May 2019; CEO from February 2011 to May 2019; a director from February 2011 to May 2019; Chief Operating Officer from November 2009 to February 2011; Senior Group President, Energy & Chemicals, Power and Government from March 2009 to November 2009; Group President, Energy & Chemicals from March 2007 to March 2009; Senior Vice President, Sales for Energy & Chemicals from September 2005 to March 2007 and from March 2002 to October 2004; and Senior Vice President, Chemical Business Line from October 2004 to September 2005; and held various other positions within the Company from 1985 to March 2002.  Defendant Seaton is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Seaton knowingly, recklessly, or with gross negligence caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  While in possession of material, nonpublic information concerning Fluor's true business health, defendant Seaton sold 471,745 shares of his personally held Fluor stock for

proceeds of $30,968,576.01.   Fluor paid defendant Seaton the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $1,328,029 | $9,606,359 | $500,016 | $921,000 | $318,197 | $12,673,601 |
| 2017 | $1,295,029 | $5,626,512 | $2,200,021 | $836,000 | $296,225 | $10,253,787 |
| 2016 | $1,295,029 | $5,866,758 | - | $1,150,000 | $357,004 | $8,668,791 |
| 2015 | $1,333,302 | $5,896,024 | $2,904,033 | $1,900,000 | $253,085 | $12,286,444 |
| 2014 | $1,228,310 | $5,628,271 | $2,772,039 | $2,100,000 | $238,781 | $12,011,493 |
| 2013 | $1,185,611 | $5,467,084 | $2,733,099 | $1,750,000 | $243,221 | $12,541,298 |

Defendant Seaton is a citizen of Texas.

40.     Defendant Bruce A. Stanski ("Stanski") was Fluor's Executive Vice President and CFO from August 2017 to June 2019.  Defendant Stanski was also Fluor's Group President, Government from August 2009 to August 2017.  Defendant Stanski is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Stanski knowingly, recklessly, or with gross negligence caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.   While in possession of material, nonpublic information concerning Fluor's true business health, defendant Stanski sold 63,488 shares of his personally held Fluor stock for proceeds of $4,249,001.40.   Fluor paid defendant Stanski the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $714,861 | $2,419,791 | - | $373,200 | $110,713 | $3,618,565 |
| 2017 | $647,111 | $1,007,390 | $401,257 | $291,600 | $106,183 | $2,673,541 |
| 2016 | $600,018 | $1,010,108 | - | $520,200 | $87,067 | $2,217,393 |

Defendant Stanski is a citizen of Texas.

41.     Defendant Biggs C. Porter ("Porter") was Fluor's Executive Vice President and CFO from May 2012 to August 2017.  Defendant Porter is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Porter knowingly, recklessly, or with gross negligence caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  While in possession of material, nonpublic information concerning Fluor's true business health, defendant Porter sold 58,974 shares of his personally held Fluor stock for proceeds of $3,382,461.07.  Fluor paid defendant Porter the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $841,318 | $1,824,711 | $746,290 | - | $131,508 | $3,543,827 |
| 2016 | $841,318 | $1,723,396 | - | $450,600 | $133,572 | $3,148,886 |
| 2015 | $868,965 | $1,340,081 | $660,023 | $751,000 | $128,330 | $3,748,399 |
| 2014 | $812,240 | $1,340,212 | $660,062 | $784,600 | $106,401 | $3,703,515 |
| 2013 | $788,597 | $1,466,873 | $733,294 | $728,100 | $84,264 | $3,801,128 |

Defendant Porter is a citizen of Texas.

42.    Defendant Gary G. Smalley ("Smalley") was Fluor's Senior Vice President and Controller from March 2008 to July 2015.  Defendant Smalley was also Fluor's Vice President of Internal Audit from September 2002 to March 2008, and held various other positions within the Company from 1991 to September 2002.  Defendant Smalley is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Smalley knowingly, recklessly, or with gross negligence caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  While in possession of material, nonpublic information concerning Fluor's true business health, defendant Smalley sold 15,400 shares of his personally held Fluor stock for proceeds of $1,064,925.45.  Defendant Smalley is a citizen of California.

43.    Defendant Nader H. Sultan ("Sultan") was a Fluor director from August 2009 to August 2019.  Defendant Sultan was a member of the Company's Audit Committee from at least March 2017 to at least March 2019.  Defendant Sultan knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update

project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.   Fluor paid defendant Sultan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $125,000 | $155,046 | $140 | $280,186 |
| 2017 | $120,000 | $167,537 | $140 | $287,677 |
| 2016 | $115,000 | $150,042 | $140 | $265,182 |
| 2015 | $115,000 | $135,014 | $153 | $250,167 |
| 2014 | $115,000 | $135,066 | $153 | $250,219 |
| 2013 | $115,000 | $135,008 | $153 | $250,161 |

Upon information and belief, defendant Sultan is a citizen of Kuwait.

44.    Defendant Lynn C. Swann ("Swann") was a Fluor director from October 2013 to August 2019.  Defendant Swann was a member of the Company's Audit Committee from at least March 2017 to at least March 2019.  Defendant Swann knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.   Fluor paid defendant Swann the following compensation as a director:

- 24 -

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $125,000 | $155,046 | $1,140 | $281,186 |
| 2017 | $120,000 | $167,537 | $5,140 | $292,677 |
| 2016 | $115,000 | $150,042 | $140 | $265,182 |
| 2015 | $115,000 | $135,014 | $153 | $250,167 |
| 2014 | $115,000 | $135,066 | $153 | $250,219 |
| 2013 | $28,750 | - | $26 | $28,776 |

Upon information and belief, defendant Swann is a citizen of California.

45.     Defendant Samuel J. Locklear III ("Locklear") was a Fluor director from February 2017 to August 2019.  Defendant Locklear was a member of the Company's Audit Committee from at least March 2017 to at least March 2019.  Defendant Locklear knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Fluor paid defendant Locklear the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $125,000 | $155,046 | $1,867 | $281,913 |
| 2017 | $120,000 | $167,537 | $4,601 | $292,138 |

Defendant Locklear is a citizen of Maryland.

46.     Defendant Joseph W. Prueher ("Prueher") was a Fluor director from 2003 to May 2018.  Defendant Prueher knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Fluor to: (i) operate with inadequate internal controls; (ii) systematically underestimate

- 25 -

project costs in order to win contract awards that were directly linked to executive compensation; (iii) violate GAAP by failing to adequately estimate and update project costs and by improperly recognizing claim revenue; (iv) overstate the Company's earnings; (v) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and future prospects; (vi) repurchase the Company's stock at artificially inflated prices; and (vii) pay excessive compensation to the Individual Defendants who breached their fiduciary duties to the Company.  Fluor paid defendant Prueher the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $67,500 | - | $2,682 | $70,182 |
| 2017 | $130,000 | $167,537 | $8,106 | $305,643 |
| 2016 | $125,000 | $150,042 | $5,140 | $280,182 |
| 2015 | $125,000 | $135,014 | $153 | $260,167 |
| 2014 | $122,500 | $135,066 | $5,153 | $262,719 |
| 2013 | $115,000 | $135,008 | $27,766 | $277,774 |

Defendant Prueher is a citizen of Virginia.

47.     The defendants identified in ¶¶24-27, 39-42 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶24, 28-39, 43-46 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶30, 32-36, 38, 43-45 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶24, 26, 39-42 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶24-46 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

48.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Fluor and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control

and manage Fluor in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Fluor and not in furtherance of their personal interest or benefit.

49.     To discharge their duties, the officers and directors of Fluor were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Fluor were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how Fluor conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(e)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

50.     In addition, the Company has adopted a Code of Business Conduct and Ethics for Members of the Board of Directors (the "Code") outlining the responsibilities of the Director Defendants.  The Code stresses that "[t]he Board represents the interests of shareholders, as owners of a corporation, in optimizing long-term value by overseeing management performance on the shareholders' behalf."   To satisfy their responsibilities, the Code provides that the Director Defendants were required to "make inquiries about potential problems that come to their attention and follow up until they are reasonably satisfied that management is addressing them appropriately."

**Additional Duties of the Audit Committee Defendants**

51.     In addition to these duties, the Audit Committee Defendants, defendants Barker, Bennett, Olivera, McWhinney, Rose, Hackett, Leppert, Sultan, Swann, and Locklear, owed and owed specific duties to Fluor to assist the Board in overseeing: (i) "the accounting, reporting and financial practices of the Company, including the integrity of the Company's financial statements"; and (ii) "the Company's compliance with legal and regulatory requirements."

52.     With respect to overseeing the integrity of Fluor's accounting and financial reporting, the Audit Committee Charter charges these defendants with reviewing the Company's annual and quarterly financial statements and related disclosures.  The Charter also imposes an obligation on the Audit Committee Defendants to review the Company's earnings press releases and guidance.  In addition, under the Charter, these defendants are required to review Fluor's internal audit reports, as well as assess "the adequacy and effectiveness of the [Company's] internal controls."  Specifically, the Audit Committee Charter states these defendants are required to:

> Meet to review and discuss with the independent auditor and management the annual audited and quarterly financial statements of the Company, and the independent auditor's reports related to the financial statements, including

reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

\*      \*      \*

Obtain and review, prior to each meeting, a summary of internal audit reports completed and in process and a progress report on the internal audit plan and management's responses.

Oversee and review, with the input of the independent auditor, the performance of the internal audit function of the Company, including its independence and objectivity, the reasonableness of the proposed internal audit plan for the coming year, the coordination of the internal audit plan with the independent auditor and the adequacy of staffing and budget to accomplish the internal audit plan.

Meet periodically and separately with the independent auditor, internal audit and management to review and discuss the adequacy and effectiveness of the internal controls of the Company (with particular emphasis on the scope and performance of the internal audit function).

Review and discuss with the independent auditor and management any major issues regarding the adequacy and effectiveness of the Company's internal controls and any significant changes in internal controls.

Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures with the independent auditor, internal audit and management.

\*      \*      \*

Review earnings press releases and discuss, in a general manner, the types of information to be disclosed and the type of presentation to be made in the Company's earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as financial information and earnings guidance provided to analysts and rating agencies.

53.    With respect to overseeing Fluor's legal and regulatory requirements, the Audit Committee Defendants are required to monitor and review the Company's compliance policies and procedures.  In addition, the Audit Committee Charter charges these defendants with reviewing the major risks facing the Company, including risks associated with its financial reporting and

legal and regulatory compliance, as well as the effectiveness of Fluor's risk mitigation strategies.

In particular, the Charter states the Audit Committee defendants are required to:

> Oversee the Company's compliance program with respect to legal and regulatory requirements and review the Company's policies and procedures for monitoring compliance.

> Review and assess the Company's codes of conduct and ethics that are applicable to employees and management, at least annually, and recommend proposed material changes to the Board of Directors for approval.

> *       *       *

> Review and discuss with management: (a) the Company's most significant risks, including operational and strategic risks; (b) risk issues associated with the Company's overall financial reporting, disclosure process, legal matters, regulatory compliance, cybersecurity and information technology, as well as accounting risk exposure; and (c) the Company's methods of risk assessment, risk mitigation strategies and the overall effectiveness of the Company's guidelines, policies and systems with respect to risk assessment and management, including policies and procedures for derivative and foreign exchange transactions and insurance coverage.

**Breaches of Duties**

54.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Fluor, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

55.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to: (i) operate with inadequate internal controls; (ii) disseminate improper statements to the public; and (iii) pay improper compensation to certain defendants. These improper practices wasted the Company's assets and caused Fluor to incur substantial damage.

56.     The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly see Fluor's public statements and internal control functions.

57.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Fluor, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Fluor has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Fluor, regarding the Individual Defendants' management of Fluor's operations and the Company's financial condition and compliance policies; (ii) facilitate the Insider Selling Defendants' illicit sale of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Fluor and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course

of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

60.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

61.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of securities law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to compel an Annual Meeting of Stockholders; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## APPLICABLE LAW AND REGULATION: GAAP AND SOX

64.     Consistent with their duties to safeguard the Company's legal and regulatory compliance, the Individual Defendants were required to ensure that Fluor's accounting practices complied with GAAP.[1]  In order to recognize revenue on fixed-price projects under GAAP, these fiduciaries needed to identify and estimate project costs with a high degree of precision.   In addition, the provisions of the Sarbanes-Oxley Act of 2002 ("SOX") and the SEC rules imposed an obligation on the Individual Defendants to maintain internal controls sufficient to ensure that the costs for each fixed-price project were appropriately accounted for and reported in the Company's quarterly financial statements.

**GAAP Requirements for Fixed-Price Project Accounting**

65.     The Individual Defendants stated in the Company's public filings that the percentage-of-completion method used to record revenue from construction contracts is one of Fluor's most "critical accounting policies."  To record revenue under the percentage-of-completion method, Fluor was required to prepare and assess updated quarter-end estimates of the total costs to complete each of its in-progress, fixed-price projects.   The quarter-end cost-to-complete estimate, Fluor explained, determines the amount of revenue it can recognize on fixed-price contracts.  Specifically, Fluor stated:

> *Engineering and Construction Contracts* Contract revenue is recognized on the percentage-of-completion method based on contract cost incurred to date compared to total estimated contract cost. Contracts are generally segmented between types of services, such as engineering and construction, and accordingly, gross margin related to each activity is recognized as those separate services are rendered. ***The percentage-of-completion method of revenue recognition requires the company to prepare estimates of cost to complete for contracts in progress. In making such***

---

[1] The SEC has delegated its authority to promulgate GAAP for public companies to the Financial Accounting Standards Board ("FASB").  The FASB's standards are generally contained within the FASB Accounting Standards Codification ("ASC").

*estimates, judgments are required to evaluate contingencies such as potential variances in schedule and the cost of materials, labor cost and productivity, the impact of change orders, liability claims, contract disputes and achievement of contractual performance standards. Changes in total estimated contract cost and losses, if any, are recognized in the period they are determined.*

66.     As noted above, Fluor's use of the percentage-of-completion method required the Company to make quarter-end estimates of the costs to complete its fixed-price projects which, in turn, dictated the amount of revenue Fluor could recognize.  These estimates therefore impacted billions of dollars revenue Fluor recognized on its fixed-price contracts.

**Reasonably Accurate and Dependable Cost Estimates**

67.     GAAP acknowledges that the estimated costs to complete "is a significant variable in the process of determining income earned" and therefore imposes stringent requirements on entities that use the percentage-of-completion method to record revenue.  ASC 605-35-25-44.

68.     To comply with GAAP, and as a prerequisite to using the percentage-of-completion method, Fluor was required to make sufficiently reliable estimates relating to each of the following: (i) extent of progress toward completion, (ii) contract revenue, and (iii) contract costs. *See* ASC 605-35-25-56 (stating that "[t]he use of the percentage-of-completion method depends on the ability to make reasonably dependable estimates" relating to "the extent of progress toward completion, contract revenues, and contract costs"); ASC 605-35-25-32 (requiring that "[c]ontract costs shall be identified, estimated, and accumulated with a reasonable degree of accuracy").

69.     GAAP required the Company to follow several approaches when estimating costs to complete, including routinely reviewing estimated and actual costs, and updating those costs when appropriate to reflect new information.  Specifically, ASC 605-35-25-44 required Fluor to apply the following:

a. Systematic and consistent procedures that are correlated with the cost accounting system should be used to provide a basis for periodically comparing actual and estimated costs.

b. In estimating total contract costs, the quantities and prices of all significant elements of cost should be identified.

c. The estimating procedures should provide that estimated cost to complete includes the same elements of cost that are included in actual accumulated costs. Also, those elements should reflect expected price increases.

d. The effects of future wage and price escalations should be taken into account in cost estimates, especially when the contract performance will be carried out over a significant period of time. Escalation provisions should not be blanket overall provisions but should cover labor, materials, and indirect costs based on percentages or amounts that take into consideration experience and other pertinent data.

e. Estimates of cost to complete should be reviewed periodically and revised as appropriate to reflect new information.

**Expected Losses**

70.     GAAP required the Company's quarter-end estimates of costs to complete to immediately recognize anticipated losses on its fixed-price contracts.  Specifically, if Fluor determined that the estimated contract costs exceeded estimated revenue, then, under ASC 605-35-25-45, it was required to recognize "the entire anticipated loss as soon as the loss becomes evident."  ASC 605-35-25-45 further states that "[a]n entity without the ability to update and revise estimates continually with a degree of confidence could not meet that essential requirement of GAAP."

**Change Orders and Open Claims**

71.     Change orders arise from circumstances that modify the scope of the original contract without adding new provisions.  *See* ASC 605-35-25-25.  Both contractors and customers may initiate change orders based on modifications including changes in specification, design, manner or method of performance, or facilities, equipment, or other materials.  *Id.*  Change orders

may be unpriced, approved, or in dispute.  Unpriced change orders exist when the parties have agreed to the change of scope, but the price (adjustment to contract price) is to be negotiated at a later time.  *Id.*

72.     To record revenue from unpriced change orders, GAAP first requires entities to determine whether the change order was an enforceable obligation and therefore recovery was probable.  *See* ASC 606-10-25.  The customer's written approval of the change order's scope and separate documentation that the costs are reasonable and identifiable are factors that indicate an enforceable obligation.  *Id.*  If recovery is improbable, GAAP requires contractors to treat costs attributable to unpriced change orders as costs of contract performance in the period those costs are incurred.  ASC 605-25-30.

73.     Unapproved change orders, or those where the parties have not agreed to the scope or price, are evaluated as claims.  *Id.*  Claims represent amounts in excess of the agreed contract price that a contractor seeks to collect from customers or others, normally as a result of customer-caused delays, errors in specifications and designs, or disputed or unapproved change orders.  Recognition of additional claim revenue requires both a determination that recovery of incurred costs is probable and the amounts can be reliably estimated.  ASC 605-35-25-31.  Those two requirements are satisfied only when the following conditions exist: (i) a legal basis supports the claim; (ii) additional costs were caused by unforeseen circumstances and not deficiencies in the contractor's performance; (iii) those costs are identifiable and reasonable; and (iv) the claim is supported by objective and verifiable evidence rather than management's feel for the situation or unsupported representations.  *Id.*

**Requirements Pursuant to SOX**

74.     In addition to complying with GAAP, the provisions of SOX imposed obligations on the Individual Defendants to assess Fluor's internal controls over financial reporting and disclose whether those controls were effective to prevent or detect a material GAAP misstatement. *See* SOX §302; §404.

75.     Prior to disclosing the effectiveness of internal controls, the Individual Defendants were required to evaluate the financial reporting controls over Fluor's critical accounting policies, including the cost estimation process on fixed-price contracts detailed above.   The SEC's interpretive guidance on SOX section 404 provides that this evaluation begins with management's identification and assessments of risks of potential material misstatements—here, the costs to complete estimates with the potential to impact billions of dollars in revenue or losses.   The SEC has further stated that internal controls affecting significant accounting estimates or critical accounting policies, like the percentage-of-completion method, are generally assessed as high-risk area requiring the performance of "more extensive testing."   *See* 17 C.F.R. Part 241.   As such and pursuant to SOX section 404, the Individual Defendants were required to perform testing necessary to evaluate both the design and operating effectiveness of Fluor's internal controls over quarter-end cost estimates.

<u>**COMPANY BACKGROUND AND RELEVANT FIXED-PRICE PROJECTS**</u>

76.     Fluor is a multinational holding company that provides design, engineering, procurement, construction, and management services for various industries.   The Company is on the Fortune 500 list, where it currently sits as the second largest engineering and construction company.   Fluor organizes its business operations into five principle segments: Energy & Chemicals; Mining & Industrial; Infrastructure & Power; Diversified Services; and Other.

77.     As a contractor, Fluor submits bids competing with other companies for awards to construct large-scale projects.  If the commissioning entity accepts the Company's bid, Fluor is named the engineering, procurement, and construction ("EPC") contractor and becomes responsible for completing the offered services.

78.     Fluor performs services through either "reimbursable contracts" or "fixed-price contracts."  Under a reimbursable contract, Fluor receives reimbursement for its expenses and an additional fee for its services.  Fixed-price or "lump-sum" contracts, by comparison, do not guarantee Fluor will recoup its expenses.  Under a fixed-price contract, Fluor receives a fee that is established before performing its services based on projected costs.  The Company's profit on these contracts thus depends on its ability to accurately estimate the costs of a project and to execute the project without exceeding estimated costs.  In its public filings with the SEC, Fluor explains that if it "perform[s] well under these contracts, [the Company] can benefit from cost savings; however, if the project does not proceed as originally planned, [Fluor] cannot recover cost overruns except in certain limited situations."  The American Institute of Certified Public Accountants ("AICPA") notes in the Auditing and Accounting Guide for Construction Contractors (the "AICPA Guide") that fixed-price contracts are "usually the safest option for the owner, but the riskiest for the contractor."

79.     In the construction and engineering industry, a "backlog" measures the monetary value of work that is yet to be performed on awarded contracts.  Revenue is recorded as work is completed.   In its public filings with the SEC, Fluor states that its backlog "reflects [the Company's] expected revenue" from projects that had "an executed contract or commitment with a client."

**The Brunswick County Plant**

80.     On July 31, 2012, Fluor entered into an EPC contract with Dominion Virginia Electric and Power Company ("Dominion") for the construction of the Brunswick County Power Station, a new natural gas-fired power plant located in Virginia (the "Brunswick County Plant"). Of the three bids evaluated, Fluor's cost proposal was the lowest, leading to its award of the EPC contract.

81.     The contract obligated Fluor to perform all design, engineering, procurement, construction, installation, and other services necessary to complete the project for an agreed-upon lump sum.  These obligations included installing combustion and steam turbine generators provided by Mitsubishi Hitachi Power Systems Americas, Inc. ("Mitsubishi").  The EPC contract contained liquidated damages provisions to guarantee Fluor's performance and ensure that the Brunswick County Plant was completed on time and as specified.

82.     The Brunswick County Plant's design included three Mitsubishi "G" class combustion turbine generators, three heat recovery steam generators, and on steam turbine generator.  This configuration is commonly known as a 3x1 combined-cycle.

83.     On August 14, 2013, Fluor issued a press release announcing that Dominion had provided full notice to the Company to begin construction on the Brunswick County Plant, and consequently and simultaneously recorded approximately $800 million into its backlog.

**The Radford Plant**

84.     In 2013, Fluor bid on a subcontract of a project under the Department of Defense to update the power, infrastructure, and manufacturing facilities of the U.S. Army ammunition plant in Radford, Virginia.  The Company was awarded a fixed-price contract to construct a nitrocellulose facility, gas-fired boilers, and warehouse at the plant (the "Radford Plant").  Fluor

began its design process for the Radford Plant in 2015, and on April 21, 2016, physical construction of the $60 million project officially began.

**The CPChem Project**

85.     On October 3, 2013, Fluor issued a press release that Chevron Phillips Chemical Company LP awarded it a contract for a petrochemicals project in Baytown, Texas (the "CPChem Project").  The CPChem Project consisted of an ethylene unit (cracker) and associated offsite components.  The press release stated Fluor's responsibilities under the fixed-price contract included "engineering and procurement for the outside battery limit scope as well as direct hire construction for the entire cracker project."  The press release also stated that "Fluor booked its share of the undisclosed contract value in the third quarter of 2013."

**The Anderson County Plant**

86.     In 2014, Fluor announced that Duke Energy ("Duke") had awarded the Company an EPC contract for a natural gas-fired power plant in Anderson County, South Carolina (the "Anderson County Plant").  The Anderson County Plant's design included two combustion turbine generators, two heat recovery steam generators, and one steam turbine generator.  This configuration is commonly known as a 2x1 combined-style.

**The Citrus County Plant**

87.     In October 2014, Fluor entered into a separate EPC contract with Duke for a gas-fired power plant in Citrus County, Florida (the "Citrus County Plant").  The EPC contract required Fluor to perform all design, engineering, procurement, construction, and other necessary services in exchanges for an agreed-upon, lump-sum price.  The EPC contract also contained liquidated damages provisions to guarantee Fluor's performance and ensure the Citrus County Plant was completed on time and as specified.

88.     The Citrus County Plant's design included two generating units, or "Power Blocks."
Each Power Block was configured in a 2x1 combined-style, like the Anderson County Plant.  Each
Power Block's design included two Mitsubishi "G" class combustion turbine generators, the same
turbines the Company was using at the Brunswick County Plant.

89.     On October 5, 2015, Duke gave Fluor full notice to begin construction of the Citrus
County Plant.

**The Greensville County Plant**

90.     On April 8, 2015, Fluor entered into a separate EPC contract with Dominion for a
gas-fired power plant Greensville County, Virginia (the "Greensville County Plant").  Of the four
bids evaluated, Fluor's cost proposal was the lowest, leading to its award of the EPC contract.   The
EPC contract required Fluor to perform all design, engineering, procurement, construction, and
other necessary services in exchanges for an agreed-upon, lump-sum price.  The EPC contract also
contained  liquidated  damages  provisions  to  guarantee  Fluor's  performance  and  ensure  the
Greensville County Plant was completed on time and as specified.

91.     The Greensville County Plant's design included the same 3x1 combined-style
configuration as the Brunswick County Plant, but with three Mitsubishi "J" class combustion
turbine generators.   On or about July 7, 2016, Dominion gave Fluor full notice to begin
construction of the Greensville County Plant.

**The Penguins Offshore Project**

92.     On January 16, 2018, Fluor issued a press release announcing that Royal Dutch
Shell plc had awarded the Company a contract for the "engineering, procurement, and fabrication
of Shell's Penguins floating production storage and offloading (FPSO) vessel the North Sea" (the

"Penguins Offshore Project").  The press release also disclosed that "Fluor booked the undisclosed contract value in the fourth quarter of 2017."

**The Warren Project**

93.     On December 11, 2018, the Company announced that the U.S. Army Corps of Engineers "has awarded Fluor a contract to construct a nuclear weapons storage and maintenance facility at the Frances E. Warren Air Force Base," located in Wyoming (the "Warren Project"). The press release also disclosed that "Fluor booked the $145 million contract value, which has a 40-month period of performance, in the fourth quarter of 2018."

**THE INDIVIDUAL DEFENDANTS CONSCIOUSLY FAIL TO IMPLEMENT
ADEQUATE INTERNAL CONTROLS**

**Underestimating Project Costs Threatened the Company's Operational Viability While Also
Presenting a Serious Risk of Legal Noncompliance**

94.     Throughout the period of wrongdoing, fixed-price projects represented a major portion of the Company's business.  At the end of 2018 and throughout 2019, these fixed-price or lump-sum contracts comprised nearly half of Fluor's consolidated backlog.  Accurately estimating the costs of fixed-price projects to ensure profitability was therefore vital to Fluor's business and future success.

95.     The Individual Defendants were well aware that fixed-price contracts are risky by nature.  These fiduciaries repeatedly admitted in the Company's public filings that "[t]his type of contracting presents certain inherent risks," warning that "if the project does not proceed as originally planned," then there may be cost overruns that the Company "generally cannot recover." Specifically, the Company's Annual Report on Form 10-K for the year ended December 31, 2015, filed with the SEC on February 18, 2016 (the "2015 Form 10-K") stated:

> Fixed-price contracts include both lump-sum contracts and negotiated fixed-price contracts. Under lump-sum contracts, we typically bid against our competitors on a contract based upon specifications provided by the client. ***This type of contracting***

*presents certain inherent risks* including the possibility of ambiguities in the specifications received, or economic and other changes that may occur during the contract period. Under negotiated fixed-price contracts, we are selected as contractor first, and then we negotiate price with the client. Negotiated fixed-price contracts frequently occur in single-responsibility arrangements where we perform some of the work before negotiating the total price for the project. Another type of fixed-price contract is a unit price contract under which we are paid a set amount for every "unit" of work performed. If we perform well under these types of contracts, we can benefit from cost savings; however, *if the project does not proceed as originally planned, we generally cannot recover cost overruns except in certain limited situations*.

96. The Individual Defendants repeatedly acknowledged in Fluor's public filings that estimating inaccuracies were a major risk which "may lead to cost overruns," and, in turn, "a material impact on our reputation or our financial results." These fiduciaries warned this was especially in the fixed-price contract setting in which the Company "bear[s] a significant portion of the risk." Specifically, Fluor's Annual Report on Form 10-K for the year ended December 31, 2017, filed with the SEC on February 20, 2018 (the "2017 Form 10-K") stated:

*We may experience reduced profits or losses under contracts if costs increase above estimates*.

Generally our business is performed under contracts that include cost and schedule estimates in relation to our services. Inaccuracies in these estimates may lead to cost overruns that may not be paid by our clients thereby resulting in reduced profits or losses. Unforeseen increases in or failures to properly estimate the cost of raw materials, components, equipment, labor or the ability to timely obtain them may result in such cost overruns or project delays. If a contract is significant or there are one or more events that impact a contract or multiple contracts, cost overruns could have a material impact on our reputation or our financial results, negatively impacting our financial condition, results of operations or cash flow. Approximately 37 percent of the dollar-value of our backlog is currently fixed-price contracts, where we bear a significant portion of the risk for cost overruns, and we expect this percentage of fixed-price contracts to increase in subsequent years. Reimbursable contract types, such as those that include negotiated hourly billing rates, may restrict the kinds or amounts of costs that are reimbursable, therefore exposing us to risk that we may incur certain costs in executing these contracts that are above our estimates and not recoverable from our clients. If we fail to accurately estimate the resources and time necessary for these types of contracts, or fail to complete these contracts within the timeframes and costs we have agreed upon, there could be a material impact on our financial results as well as our reputation.

97.     In addition, Fluor is vulnerable to certain risks known to exist within the construction industry, including heightened threats of fraud and accounting improprieties.  The AICPA warns in the AICPA Guide that the use of subjective cost estimates gives contractors the opportunity manipulate financial results.  In particular, the AICPA Guide states that "[b]ecause of the subjective nature inherent in estimating total costs and costs to complete, the contractor is in a unique position to influence those estimates and, as a direct consequence, the operating results for the period."

98.     The AICPA Guide demonstrates that the risk of contractors underestimating project costs in underlying bids in order to win contract awards is a well-known industry risk while pointing out that "[m]any construction contractors will do whatever it takes to get the job" and adding that to contractors, "[f]inancial reporting is considered merely a requirement."  A common occurrence and factor indicating an increased risk of or other wrongdoing occurring at a construction company includes the "[u]nderestimation of total performance obligation" resulting in "excess gross profit on the job and overstated operating results for the entity."

99.     "Profit fade" is another common occurrence in the construction industry heightening the risk of fraud, wrongdoing, internal control failures, and accounting problems.  The AICPA Guide states that profit fade, or "the reduction of the estimated gross profit over the life of the performance obligation" "is recognized as evidence of the contractor's inability to effectively estimate or manage a job, or both.  In order to prevent profit fade from appearing on an older job, contractors may attempt to inappropriately charge costs on those older jobs to newer ones."

100.     In light of these "significant" industry-specific risks, the AICPA Guide warns of the need to implement mitigating programs and controls.  These include: (i) "extensive systems for the identification and recognition of costs by job"; (ii) "sophisticated systems to assist

engineering personnel in making cost to complete estimates"; and (iii) "corporate policies" designed to "establish an environment that minimizes the risk of fraud."

101.    "Controls over estimating and bidding," the AICPA Guide specifically points out, "are necessary to provide for adequate documentation, clerical verification, overall review of estimated costs, and approval of all bids by the appropriate levels of management."  In addition, "regularly perform[ing] monitoring procedures is necessary to ensure that controls over the estimating and bidding functions are operating effectively."

102.    Fluor—one of the largest engineering and construction companies in the U.S.—had no such systems, let alone the extensive or sophisticated ones required by even the most baseline construction entity that comes under audit.

**The Individual Defendants Utterly Failed to Implement a Reasonable Information and Reporting System**

103.    Despite knowledge of the above risks, the Board undertook no efforts to ensure that a reasonable system existed for their oversight of Fluor's prospective and current projects.  In particular, the Board completely failed to implement an adequate information and reporting system designed to put them on notice of current and prospective project risks, including any estimation issues—one of the most critical risks facing the Company.  Fluor's business, as well as its compliance with accounting regulations and securities laws, was directly dependent upon accurately estimating project costs on an ongoing basis.  Yet, the Board took no steps to oversee the Company's projects and any associated issues for over six years.  Even as the Company began announcing a series of "forecast revisions" and even after defendant Seaton admitted to "improper estimating," the Board did nothing.

104.    As an initial matter, there was no Board committee charged with overseeing Fluor's project risks.  In fact, the Board had no Risk Committee whatsoever until around August 2019,

after the Company had already been buffeted by a series incremental charges on its fixed-price projects totaling $1.4 billion.  During the years Fluor amassed those crippling charges, there was no Board committee responsible for reviewing "[t]he Company's prospective and current projects, including any major operational risks with respect to such prospects and projects," the Commercial Strategies and Operational Risk Committee Charter states, thus revealing the oversight shortcomings the Board had allowed for years.  On August 1, 2019, when defendant Boeckmann announced the new committee's formation, he effectively conceded that the Board lacked "visibility into the contracting process," including "how [the Company is] approaching and executing [its] existing risk projects."

105.    In addition, the Board failed to establish a full-board process to review and address the specific risks relating to the Company's bidding practices, cost estimates, and project execution. The SEC requires companies disclose in the proxy statements "the extent of the board's role in the risk oversight of the registrant, such as how the board administers its oversight function, and the effect that this has on the board's structure."  17 C.F.R. §229.407.  Fluor's Proxy Statement on Schedule 14A filed with the SEC on March 11, 2019 (the "2019 Proxy"), reveals that the Board "discusses risks related to the Company's business strategy at the Board's annual strategic planning meeting."  A single meeting, however, is a blatantly inadequate amount of time to oversee the risks facing one of the largest engineering and construction companies in the U.S.

106.    Further, no regular processes or protocols existed to keep the entire Board informed of ongoing or developing risks most central to Fluor's business and compliance with accounting regulations and securities laws.  The Board's failure to implement a reasonable Board-level system of monitoring and reporting is evidenced by the Commercial Strategies and Operational Risk Committee Charter, which reveals that, prior to its formation in 2019, nothing existed to "[s]ee

that the Board is regularly apprised of the Company's strategic and operational risks and the associated risk mitigation policies, procedures and practices."  Additionally, although the Audit Committee was charged with establishing procedures for complaints "regarding any questionable accounting, internal accounting controls, auditing or federal securities law matters," nothing existed to ensure the Board would actually be alerted of any such reports.

107.    The systematic nature and duration of Fluor's bidding and execution issues further demonstrates the lack of a reasonable reporting system, as well as the Board's sustained oversight failure in general.  The Company took a series of pretax charges on sixteen of its fixed-projects beginning in 2015 and continuing with increased frequency and magnitude in the following years. These charges—mostly related to "forecast revisions"—occurred constantly from 2017 to 2019. In fact, the Company recognized pretax charges or losses on its fixed-price projects in eight out of nine consecutive quarters up until the second quarter of 2019, when it announced its $714 million in charges related to various fixed-price contracts.

## THE BOARD IGNORES RED FLAGS SIGNALING UNDERBIDS AND RESULTING VIOLATIONS OF LAW

108.    Even in the absence of a system of reasonable controls that the Individual Defendants failed to implement, there were more than enough yellow and red flags that had nonetheless made their way to the Board signaling the Company was systematically underbidding on fixed-price contracts and then misleading the market about its business prospects through false assurances and accounting games in violation of securities law and regulation.  The Board, however, ignored these persistent warnings.

### Fluor's History of Underbidding

109.    As an initial matter, the Company had a track record of underbidding on fixed-price projects, thus alerting the Individual Defendants that Fluor's bidding practices left it exposed to

tangible risks of cost overruns.  In fact, the Company had underperformed on *75%*, or six out of the eight, total gas-fired fixed-price projects that it had undertaken since 2003 (prior to and excluding the Gas-Fired Plants discussed herein).  The Individual Defendants thus knew there was a serious likelihood of Fluor underestimating its cost projections for the Gas-Fired Plants and fixed-price projects more generally.

**Defendant Seaton's Personal Involvement with the Gas-Fired Plants**

110.    In addition, certain of the Individual Defendants were involved with the review and approval of Fluor's bids and also monitored the construction and execution progress, making them aware of the serious issues that contradicted Fluor's glossy projections to the public.  Defendant Seaton, for example, admitted that he and his management team personally authorized Fluor's bids for the Gas-Fired Plants during the Company's May 3, 2018 earnings conference call, stating: "*We have 4 power projects that were bid by the same management team at the same time. And we accepted. We, being me and my management team, accepted those bids*, primarily because we just come off of a project in that market where we had bettered the [as sold] margin expectation." Defendant Seaton also confirmed during an August 2, 2018 Company earnings conference call that he was personally involved in project management, stating, "I hold a weekly call with the [Power segment] project team, including the president of that group."  Fluor's social media further demonstrates that defendant Seaton also personally visited the Gas-Fired Plants.  In June 2017 and January 2018, for example, Fluor posted photos on Twitter emphasizing defendant Seaton's recent visits to the Greensville County Plant and the Citrus County Plant, respectively.[2]  Through his

---

[2] *See* Exhibit A attached hereto.

- 48 -

personal involvement, defendant Seaton knew the Gas-Fired Plants were based on faulty bids and were facing cost overruns and delays.

**The Mitsubishi Action: Grave Problems Arise at the Brunswick County Plant that Signal Trouble Ahead at the Remaining Gas-Fired Plants**

111.   The Individual Defendants were put on notice that the Company had underestimated its bid for the Brunswick County Plant before it even began construction on the project.  When Fluor announced on August 14, 2013, that it received notice to begin construction on the Brunswick County Plant, the Company also stated that it had been "providing engineering and procurement services on the plant from its Charlotte, North Carolina office" for roughly a year. During this time, Fluor completed detailed design and engineering services revealing that its bid projections fell short of the Brunswick County Plant's requirements due to improper estimating.

112.   In early 2014, the Individual Defendants became aware of significant delays and additional costs facing the Brunswick County Plant, as revealed by a lawsuit Fluor subsequently brought against Mitsubishi (the "Mitsubishi Action").[3]  When executing the EPC contract with Fluor, Dominion partially assigned its existing Turbine Supply Agreement with Mitsubishi to the Company.  The agreement required Mitsubishi to supply "three combustion turbine generators, one steam turbine generator (the 'Turbines') and all equipment and materials related to and necessary for the installation of the Turbines (the 'Minor Components') that Fluor was to install on the Project."

113.   In the Mitsubishi Action, Fluor states that "Mitsubishi was chronically late in delivering these Minor Components."  Mitsubishi failed to deliver two components by the delivery

---

[3] *Fluor Enterprises, Inc. v. Mitsubishi Hitachi Power Systems Americas, Inc*., No. 3:17-cv-00622-MHL (E.D. Va.).

- 49 -

date of January 11, 2014. When Mitsubishi still had not delivered these components on April 22, 2014, Fluor sent Mitsubishi a letter informing that liquidated damages would begin to accrue under the Turbine Supply Agreement. Fluor, in turn, would face liquidated damages from Dominion under the EPC contract. To avoid this penalty, "Fluor was forced to accelerate the construction process at *great additional cost*." Additionally, Mitsubishi's deliveries "evidenced a complete lack of quality control, in that the shipments were repeatedly mislabeled as to their contents or had no labels at all, thereby requiring Fluor to expend substantial time and effort locating the components required for the current construction activities then underway." Fluor was required to take "extraordinary measures" to mitigate the adverse impact of Mitsubishi's repeated tardiness and incorrect labeling on the Brunswick County Plant, "but its efforts did not succeed entirely." According to the Company, its ability to timely complete the Brunswick County Plant was "material[ly] impact[ed]" as soon as Mitsubishi began missing its deliveries.

114.    Prior to filing the Mitsubishi Action, on March 18, 2016, Fluor sent Mitsubishi a letter demanding $207.7 million in liquidated damages. In its answer to the lawsuit, Mitsubishi denies it caused the need to accelerate construction while citing statements made by Chris Tye ("Tye"), Fluor's former Power segment president. Specifically, in Fluor's press release dated May 23, 2016, Tye boasted that, "the Brunswick County facility is a prime example of Fluor's service excellence we provide to our clients. … We are especially proud of the project team that demonstrated our ability to achieve quality completion ahead of schedule." On June 24, 2019, the Mitsubishi Action was dismissed by voluntary stipulation. The action reveals Fluor's public-facing statements were a stark departure from reality and a blow to its overall credibility. If there had been a reasonable reporting system, the Board would have been alerted about the problems

unfolding at the Brunswick County Plant, which presented the risk of a $200 million cost overrun and the need to update cost estimates in the Company's financial statements.

115.     The Brunswick County Plant fiasco foreshadowed the trouble at the other Gas-Fired Plants.  Mitsubishi would supply the turbines at the Citrus County Plant, as well as the Greensville County Plant.  The Anderson County Plant called for similar turbines, though not Mitsubishi's in particular.  At all four plants, Fluor used "next generation" turbines that it had never used before. The Company's inexperience with these turbines and the complications presented at the Brunswick County Plant warned the Individual Defendants of similar risks and issues at the other Gas-Fired Plants.  Defendant Seaton admitted these issues ran across all four of the Company's Gas-Fired Plants during Fluor's August 3, 2017 earnings conference call, stating: "all 4 projects were based on next-gen turbines or steam generators that were a first of a kind for Fluor.  The quality control and completeness of these turbines delivered to the site were not in line with our bid assumptions."

116.     The Individual Defendants were also alerted of execution issues at the Gas-Fired Plants as each of those projects progressed, typically before they were even halfway completed. During the same earnings conference call mentioned above, defendant Seaton conceded the issues generally became apparent "at about 40% – 30% to 40% [into the] construction progress."

**Defendant Seaton Admits to "Improper Estimating" and Fatally Flawed Bidding**

117.     The Board knew by 2017 at the latest that Fluor was systematically underestimating the costs of fixed-price projects in order to win contract awards.  In February 2016, Fluor disclosed a $60 million loss due to "forecast revisions" on the Brunswick County Plant and, in May 2017, it disclosed a $30 million loss on the Anderson County Plant.  These significant and unexpected charges were enough to warn the Board that Fluor had been underestimating project costs and then publicly misrepresenting its future prospects.  However, the Board did nothing about the apparent

risks of violating securities, accounting, and other related law and regulation.  And it continued to do nothing even when the warning became more explicit.

118.    On August 3, 2017, Fluor disclosed a shocking $194 million charge due to "forecast adjustments" and held an earnings conference call.  During the call, defendant Seaton stated that all four of the Gas-Fired Plants suffered from "fundamental problem[s]," adding that these fixed-price projects "did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues."  However, he promised that these issues were specific to the Gas-Fired Plants and assured that "the lion's share of our lump-sum backlog is performing extremely well."  Regardless of defendant Seaton's promises (which he had broken before at the expense of increasingly diminishing Fluor's credibility), there was still a red flag waving before the Board signaling control deficiencies relating to cost estimates, insufficient oversight with respect to those estimates, misstatements in the Company's public filings, as well as resulting and potentially mounting liability for those misstatements.  The Board, however, failed to respond to these warnings in order to protect the Company and instead allowed risks to remain in place and cause even more damage than had already been done.

119.    Beyond failing to oversee and protect Fluor from the risks it was facing, the Board also played an active role in continuing to perpetuate the falsehoods causing the damage.  On February 20, 2018, the Board signed Fluor's 2017 Form 10-K and assured that the Company's internal controls were effective, and that "risk management" was not a vulnerability but rather one of its "competitive strengths."  These fiduciaries also claimed that "our comprehensive risk management approach allows us to better control costs and schedule."

120.    On May 3, 2018, Fluor disclosed yet another charge relating to forecast revisions on a fixed-price project, this time for $125 million on the Citrus County Plant. During the

Company's earnings conference call that day, defendant Seaton stated there were "fatal flaws in the bidding process of all those [gas-fired] projects."  The Board was thus alerted of the need to review its fixed-price cost estimates and enhance its internal controls, however, they still failed to respond.

121.    Yet another warning came on October 10, 2018, when Fluor announced an additional $35 million forecast revision on the Citrus County Plant and yet again, the Board failed to respond.  When these fiduciaries signed the Company's 2018 Annual Report on February 21, 2019, they left the same statements regarding internal controls and risk management intact.

**The Highly-Experienced Board Understood that the Magnitude and Frequency of Charges Signaled Accounting Improprieties**

122.    As described above, charges, forecast revisions, and cost overruns on major fixed-price projects were announced in Fluor's Quarterly and Annual Reports with increasing magnitude and frequency.  Each of these charges individually alarmed the Board of internal control issues, accounting failures, and violations of law.  As the charges grew, so too did the volume of these alarms.

123.    The highly experienced directors comprising Fluor's Board knew that these constant revisions, charges, and "flaws" were warnings of wrongdoing and accounting errors. Several of these directors have decades-long accounting experience as a result of serving in top-level executive positions at major banks and financial institutions, including defendants Barker,[4]

_____

[4] Fluor's 2019 Proxy highlights the Board's business experiences and skills.  Defendant Barker served as the California Chairman of JPMorgan Chase & Co., a multinational investment bank and financial services company, from 2009 to 2013, and as a Partner at Goldman Sachs & Co., a multinational investment bank and financial services company he joined in 1971, until his retirement in 2002, and emphasizes that defendant Barker's forty years of "***vast experience***" "allow him to share insights with the Board," including "***accounting and financial matters***."

Bennett,[5] Berkery,[6] and McWhinney,[7] or otherwise have "extensive knowledge of financial and accounting matters," including defendant Olivera.[8]   Others, like defendants Boeckmann,[9] P. Fluor,[10] and Hackett,[11] have extensive experience and knowledge of the industry in which Fluor operates, making them highly attuned to the risks Fluor was facing.   The Board is and was almost

---

[5] Defendant Bennett was the CEO of H&R Block, Inc., a publicly traded tax, banking and business consulting services entity, and the CFO of Aetna Inc., a healthcare benefits provider.  The 2019 Proxy states defendant Bennett "brings *almost 40 years of experience in accounting* and financial matters to our Audit Committee."

[6] Defendant Berkery was the Chair of UBS Bank USA and Vice Chairman, Executive Vice President and General Counsel of Merrill Lynch & Co., Inc., both banking and financial services businesses.  The 2019 Proxy emphasizes defendant Berkery's "broad range of experience in financial, business and legal matters makes her a valued member of the Board," noting her abilities to "provide valued counsel on matters such as finance," as well as "*market risks*" while also adding that "her 35 years in the legal field make her an *excellent resource to the Board on legal and compliance matters*."

[7] Defendant McWhinney held various high-level executive positions at well-known banks and financial services companies, including CitiGroup Inc., where she served as a division's CEO, and Charles Schwab & Co., Inc., where she served as a divisions President and chair of the Global Risk Committee.  The 2019 Proxy emphasizes that her experiences "provide our Board with *special insight on matters relating to business strategy*" and "allow her to counsel our Board on non-financial risk-related matters."

[8] The 2019 Proxy notes "[defendant] Olivera's tenure as the former President and [CEO] of one of the largest electric utilities in the [U.S.] provides him with *extensive knowledge of financial and accounting matters*, as well as a keen understanding of the power industry and its regulations."

[9] Defendant Boeckmann's tenure as the Company's CEO from 2002 until 2011, "along with his 36 years of experience with the Company, give him a *deep knowledge of the industries in which the Company* operates as well as the Company's opportunities, challenges and operations."

[10] The 2019 Proxy notes "[defendant P.] Fluor has more than 45 years of experience in the energy industry, currently serving as Chairman and [CEO] of Texas Crude Energy," adding he has "vast knowledge" of the industry and "*extensive knowledge of our business operations*."

[11] "[Defendant] Hackett has *extensive knowledge* of the global oil and gas industry" and "several decades of executive experience, as well as his experience serving on other public company boards," which the 2019 Proxy states "enable[s] him to provide respected guidance on business strategy and financial matters, as well as perspective about the oil and gas and power markets."

entirely comprised of directors with former and current executive and director roles at other publicly traded companies, enhancing their understanding of fiduciary oversight obligations giving them a more discerning eye to the risks and warnings presented at Fluor.[12]

124.     The Board's experience and specific knowledge coupled with the magnitude and frequency of the Company's charges reveals the directors understood but chose to ignore the risk that Fluor was operating outside the bounds of the law.  Not only did the Individual Defendants ignore these risks, but they also furthered them through their approval of an executive compensation plan.

**Fluor's Executive Compensation Incentivized Underbidding**

125.     The Individual Defendants facilitated the Company's systematic underbidding on fixed-price projects in order to secure lucrative bonuses.  Specifically, Fluor's executives received handsome "performance" compensation that was directly dependent upon the Company's achievement of new contract awards, regardless of whether Fluor could actually achieve the underlying bid assumptions and even if the project would turn out a loss.  As a result, certain of the Individual Defendants approved or directed risky bids on fixed-price contracts underestimating the actual costs in order to win the award and, in turn, increase compensation.

126.     Since at least 2012, Fluor's executive compensation plan has been made up of base salary, an annual incentive award, and long-term incentives, with long-term incentives comprising as much as 75% of the total compensation.  These long-term incentives include a Value Driver

---

[12] Like the directors mentioned above, defendant Rose also held various high-level executive and director roles.  The 2019 Proxy states defendant Rose's "extensive leadership experience obtained from overseeing a large, complex and highly regulated organization, his considerable knowledge of operations management and business strategy and his ***deep understanding of public company oversight***."

Incentive ("VDI") award component based on performance measures that purportedly create "long-term company value." From 2012 to 2014, the sole performance measure was "new awards gross margin," measured in both dollars and percentage. The Board's Organization and Compensation Committee chose this performance measure even though Fluor's financial statements do not report new awards gross margin.

127.    In the Company's Proxy Statement on Schedule 14A filed with the SEC on March 13, 2013 (the "2013 Proxy"), the Board explained that new awards gross margin measures the profit that Fluor "expects to receive as a result of projects awarded within the performance period." The 2013 Proxy acknowledged the performance metric is "measured over a relatively short period" and based on future expectations, an apparent contradiction to supposed "long-term" incentive payouts. Attempting to explain this incongruity, the Board defended that new awards gross margin measures "relate to contracts that typically will extend a number of years into the future and thus will generate, and position the company for, increased future earnings." In particular, the 2013 Proxy stated:

> New awards gross margin dollars measures the total amount of project gross margin that the company expects to receive as a result of projects awarded within the performance period. New awards gross margin percentage is the total amount of gross margin the company expects to receive as a result of projects awarded within the performance period as a percentage of expected revenue from these projects. The Committee selected these performance criteria because, although measured over a relatively short period, they relate to contracts that typically will extend a number of years into the future and thus will generate, and position the company for, increased future earnings. The Committee believes the inclusion of the two different measures is appropriate given the diversified nature of our business. The relative weightings are determined based on the company's relative business priorities and may be changed from time to time. These measures are not reported in our financial statements, as disclosure of the new awards gross margin targets would result in competitive harm to the company, but are set at levels intended to challenge our executives to achieve business goals established as part of the annual strategic plan.

128.   The VDI award structure encouraged the Individual Defendants to approve risky contracts, front load deals, and let the Company deal with the inevitable resulting charges at a future point without compromising their compensation.  Several of Fluor's problematic fixed-price projects on which it took subsequently took tremendous charges were awarded while this nefarious compensation scheme was in place, including the Brunswick County Plant, Greensville County Plant, Anderson County Plant, Citrus County Plant, Radford Plant, CPChem Project, Warren Project, and Penguins Offshore Project.

129.   Fluor calculated "new awards gross margin" by taking the difference between the fixed-price contract amount and the estimated costs to complete the project.  Thus, by deliberately underestimating the costs to complete a project, the Individual Defendants were able to, and did, further their own self-interests while forcing the Company to bear the resulting risk and expense. In addition to ensuring Fluor's bid would win the award, artificially lowering the costs to complete a project also increased "new awards gross margin" by creating the illusion that the contract was more profitable than it actually was.  As a result, the Individual Defendants acted against the Company's best interests and in favor of themselves to directly increase their compensation through contract awards predicated on unachievable bid assumptions.

130.   From 2012 to 2014, target long-term incentives constituted approximately 75% of total executive compensation.  These long-term incentives were paid out in roughly equal percentages of VDI performance units (paid in cash or stock), stock options, and restricted stock units.

131.   The 2013 Proxy details executive compensation for 2012, the year the Company was awarded the Brunswick County Plant.  The 2013 Proxy reported that in 2012, Fluor's achievement of new awards gross margin reached 147% of the target VDI payout level.  As a

result, defendants Seaton, Porter, Stanski, and Hernandez earned "performance units" at 1.47 times the rate of the target units granted for each named executive, as detailed by the table below:

| Named Executive | 2012 Grant Amount | Number of Units Granted[1] | Earned Units[2] |
|---|---|---|---|
| David T. Seaton | $2,371,438 | 37,943 | 55,778 |
| Biggs C. Porter | $668,020 | 11,815 | 17,370 |
| Peter W. Oosterveer | $367,438 | 5,879 | 8,644 |
| Bruce A. Stanski | $334,000 | 5,344 | 7,856 |
| Carlos M. Hernandez | $467,625 | 7,482 | 11,000 |

[1]   Based on the closing stock price on the date of grant ($62.50 for all named executives, other than Mr. Porter, whose grant occurred on a different date when the closing price was $56.54).

[2]   Calculated using a performance rating of 1.47, which units vested $1/2$ on February 28, 2013 and will vest $1/2$ on February 28, 2015.

132.   Half of these performance units vested on February 28, 2013, with the remaining half vesting three years later, on February 28, 2015.  Defendant Seaton received $1.7 million when just the first half vested, exceeding his base salary of $1.1 million, and far exceeding his salary when the second half vested for a total of $3.3 million.  Collectively, defendants Seaton, Porter, Stanski, Hernandez, and Smalley, received VDI awards of $5.7 million based on the Company's 2012 achievement of "new awards gross margin" (including from the Brunswick County Plant), as detailed by the table below:

| Defendant | Earned Units | Vesting Date | Closing Price | Sub Total | Total |
|---|---|---|---|---|---|
| Hernandez | 11,000 | - | - | - | |
| | 5,500 | 2/28/2013 | $61.90 | 340,450 | |
| | 5,500 | 2/28/2015 | $58.00 | 319,000 | $659,450 |
| Porter | 17,370 | 5/3/2015 | $58.70 | 1,019,619 | $1,019,619 |
| Seaton | 55,778 | - | - | - | |
| | 27,889 | 2/28/2013 | $61.90 | 1,726,329 | |
| | 27,889 | 2/28/2015 | $58.00 | 1,617,562 | $3,343,891 |
| Smalley | 3,528 | - | - | - | |
| | 1,764 | 2/28/2013 | $61.90 | 109,192 | $211,504 |

| | 1,764 | 2/28/2015 | $58.00 | 102,312 | |
| Stanski | 7,856 | - | - | - | |
| | 3,928 | 2/28/2013 | $61.90 | 243,143 | |
| | 3,928 | 2/28/2015 | $58.00 | 227,824 | $470,967 |
| | | | | | **$5,705,431** |

In order to maximize the value of the second half of their earned units, these defendants concealed the issues surrounding the Company's fixed-price projects, as well as the initial charge on the Brunswick County Plant. As a result, the second-half performance units vested at an artificially inflated rate of $58 per share on February 28, 2015. The day after the July 31, 2015 disclosure of the initial charge on the Brunswick County Plant, Fluor's stock traded at $46.75 per share.

133. Fluor's Proxy Statement on Schedule 14A filed with the SEC on March 11, 2014 (the "2014 Proxy"), describes executive compensation for 2013, the year the Company bid on the Radford Plant and won the CPChem Project. The 2013 executive compensation and VDI award structure was substantially similar to 2012, except for the VDI performance awards vested on the three year anniversary of the grant date, in 2016. The 2014 Proxy reported that, in 2013, Fluor's achievement of new awards gross margin reached 131% of the target VDI payout level. As a result, defendants Seaton, Porter, Stanski, and Hernandez earned "performance units" at 1.31 times the rate of the target units they were granted for the year. These shares vested on February 5, 2016, as the Individual Defendants continued to mislead the market and conceal Fluor's bidding and execution issues. Thus, defendants Hernandez, Porter, Seaton, and Stanski, were not only awarded for underbidding on the Radford Plant and the CPChem Project, but also for disseminating improper statements. When their VDI performance units vested, these defendants collectively received $4.1 million worth of Company stock, as shown by the table below:

| Defendant | Earned Units | Vesting Date | Closing Price | Total |
|---|---|---|---|---|
| Hernandez | 10,663 | 2/5/2016 | $44.84 | $478,129 |
| Porter | 15,638 | 2/5/2016 | $44.84 | $701,208 |

| | | | | |
|---|---|---|---|---|
| Seaton | 58,282 | 2/5/2016 | $44.84 | $2,613,365 |
| Stanski | 8,708 | 2/5/2016 | $44.84 | $390,467 |
| | | | | $4,183,168 |

134.     The Company's Proxy Statement on Schedule 14A filed with the SEC on March 9, 2015 (the "2015 Proxy") describes executive compensation for 2014, the year Fluor bid on the Greensville County Plant and was awarded the Anderson County and Citrus County Plants.  The VDI performance award structure and vesting schedule did not change from the previous year.  The 2015 Proxy reported that, in 2014, Fluor's achievement of new awards gross margin reached 200%, or the maximum target VDI payout.  As a result, defendants Seaton, Porter, Stanski, Hernandez, and Chopra earned twice the amount of "performance units" that they were granted for the year.  These shares vested on February 6, 2017, as the Individual Defendants continued to mislead the market and conceal Fluor's bidding and execution issues.  Upon vesting of their VDI performance units, defendants Seaton, Porter, Stanski, Hernandez, and Chopra collectively received $6.6 million worth of Company stock, as demonstrated by the table below:

| Defendant | Earned Units | Vesting Date | Closing Price | Total |
|---|---|---|---|---|
| Chopra | 3,284 | 2/6/2017 | $55.34 | $181,737 |
| Hernandez | 17,174 | 2/6/2017 | $55.34 | $950,409 |
| Porter | 17,174 | 2/6/2017 | $55.34 | $950,409 |
| Seaton | 72,132 | 2/6/2017 | $55.34 | $3,991,785 |
| Stanski | 11,164 | 2/6/2017 | $55.34 | $617,816 |
| | | | Total | $6,692,156 |

135.     On May 4, 2017, three months after the 2014 VDI performance units vested—which were rewarded in part due to the Anderson County Plant contract and its supposed profitability—Fluor disclosed a $30 million loss related to cost overruns and forecast revisions at the Anderson County Plant.  Two months later, on August 3, 2017, Fluor revealed a $194 million charge "related to forecast adjustments" on three of the Gas-Fired Plants.  The same day, defendant

Seaton admitted that all four of the Gas-Fired Plants "had a fundamental problem" and "did not meet the original baseline assumptions due to improper estimating."

136.    Collectively, defendants Seaton, Porter, Stanski, Hernandez, Smalley, and Chopra received additional compensation of *$16.5 million* in VDI performance units for 2012, 2013, and 2014—handsome "performance" rewards that were directly linked to obtaining new contracts for Fluor and supposedly creating "long-term value."  After these units vested at artificially inflated rates to securely place millions of additional dollars in defendants' pockets, it was revealed that these awards were not at all based on performance, were far less profitable than they had initially appeared, and, if anything, marked the creation of a long-term liability rather than value.

137.    In 2015 and 2016, VDI performance awards were not linked to new awards gross margin.  In the Company's Proxy Statement on Schedule 14A filed with the SEC on March 10, 2016 (the "2016 Proxy"), the Board effectively conceded that using new awards gross margin as the VDI performance metric did not reflect long-term performance and was atypical.  Specifically, the 2016 Proxy stated that "in order to better align named executive pay with long-term performance and peer company practice" the Organization and Compensation Committee replaced new awards gross margin with two different performance goals for the 2015 VDI awards. Specifically, the 2015 VDI awards and also the 2016 VDI awards were based upon earnings per share and return on operating assets employed ("ROAE").[13]  The Company's executives had less success meeting VDI payout targets when the performance goals actually measured long-term performance and value creation.  Fluor did not meet the minimum target for the 2015 VDI awards.

---

[13] Fluor calculates ROAE by dividing full-year corporate net earnings by average net assets employed for the previous five quarters.  Net assets employed is defined as total assets minus current liabilities.

For 2016, it only achieved 22% of the target.  Notably, during those years, Fluor did not bid on any fixed-price contracts that the Company later identified it needed to take charges on.

138.    Despite acknowledging that new awards gross margin fails to reflect long-term performance, the Board went back to using that performance metric in 2017, the year that Fluor was awarded the Penguins Offshore Project.  The Company's Proxy Statement on Schedule 14A filed with the SEC on March 8, 2018 (the "2018 Proxy"), touts that Fluor received $12.6 billion in new awards in 2017 and details executive compensation for that year.  The 2018 Proxy explains the 2017 VDI awards were based 70% on new awards gross margin and 30% on ROAE.  The VDI awards granted to the named executives in 2017 were subject to a three-year performance period, from 2017 to 2020, and could be increased or decreased by 25% depending upon the Company's three-year cumulative total shareholder return relative to its peers.  The 2017 VDI awarded were divided into three "tranches," each of which represented one-third of the number of shares.  The first tranche was subject to the 2017 VDI performance goals, with the remaining second and third tranches subject to performance goals established in 2018 and 2019, respectively.

139.    The Company maintained this structure for 2018, the same year it was rewarded the Warren Project.  Fluor's 2019 Proxy touts that "new awards more than doubled to $27.7 billion" in 2018 while detailing executive compensation for that year.

140.    The total 2017 and 2018 VDI target values approved by the Organization and Compensation Committee for each named executive—which would double if the Company met the maximum performance level—provided powerful incentives to increase new awards gross margin through whatever means.  As shown by the table below, these amounts were much greater than the executives' base salary:

| Defendant | Year | Base Salary | VDI Target Value |
|---|---|---|---|
| Seaton | 2017 | $1,295,000 | $4,400,071 |
| | 2018 | $1,334,000 | $4,400,000 |
| Stanski | 2017 | $700,000 | $802,581 |
| | 2018 | $717,540 | $1,300,000 |
| Hernandez | 2017 | $630,000 | $1,287,579 |
| | 2018 | $655,200 | $1,425,000 |
| Porter[14] | 2017 | $841,300 | $1,492,611 |
| | 2018 | - | - |

141. With these powerful incentives, defendants Seaton, Stanski, Hernandez, and Porter once again approved and directed bids with underestimated project costs in order to win contracts and increase new awards gross margin, and, in turn, their own compensation, without regard to the increased risk and long-term consequences to Fluor. The Penguins Offshore Project, the Warren Project, and the underestimated costs underlying those projects contributed significantly to new awards gross margin and thus the amounts of VDI units awarded in 2017 and 2018. Fluor would subsequently announce taking hundreds of millions of dollars in charges on those fixed-price projects while also damaging its stock price.

142. Although the precise amounts are unknown due to the three-year performance period and the Company's failure to file its most recent Annual Report and Proxy Statement, based on the information provided in Fluor's public filings, defendants Seaton, Stanski, Porter, and Hernandez collectively received estimated 2017 and 2018 VDI units totaling an approximate *$12.8 million*, as detailed by the table below:[15]

| Name | Award | Granted Units[A] | Granted Amount | Total Combined |
|---|---|---|---|---|
| Seaton | 2017 VDI | 79,016 | $4,321,029 | $7,435,369 |

---

[14] Defendant Porter resigned in August 2017 and therefore was not granted any 2018 VDI awards.

[15] *See* Exhibit B attached hereto for details regarding the calculation of these estimates.

| | | | | |
|---|---|---|---|---|
| | 2018 VDI | 46,914 | $3,114,340 | |
| Stanski | 2017 VDI | 14,412 | $788,132 | |
| | 2018 VDI | 13,860 | $920,083 | $1,708,215 |
| Porter | 2017 VDI | 26,804 | $1,465,772 | |
| | 2018 VDI | - | - | $1,465,772 |
| Hernandez | 2017 VDI | 23,123 | $1,264,474 | |
| | 2018 VDI | 15,194 | $1,008,639 | $2,273,113 |
| | | | **Total** | **$12,882,468** |

(A) Granted units for 2017 include tranches 1-3, with tranche 3 amounts calculated as the average of tranches 1 & 2. Granted units for 2018 include tranche 1-2, with tranche 2 amounts representing the same as tranche 1.

143.    In each of the Company's Proxy Statements, the Board assured stockholders that "[w]e design compensation programs that do not encourage behavior that could create material adverse risks to our business."  Industry standard says otherwise.  The AICPA Guide explicitly warns about performance awards being directly linked to new awards gross margin, or "[i]ncentives due to management or employee, or both, bonus arrangements, based on job profitability."  This incentive and pressure, the AICPA Guide points out, "can create a higher risk of the presence of fraud occurring at a construction entity."  Thus, due to and as additional evidence of the Board's failure to oversee the Company's risks, these fiduciaries inserted an executive compensation plan, created the risk of fraud, and furthered its actual occurrence.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF DUTY RESULTED IN A SERIES OF IMPROPER STATEMENTS

144.    To conceal their wrongdoing, secure executive bonuses, and capitalize off artificially inflated stock prices, the Individual Defendants disseminated a series of improper statements from at least August 2013 to February 2020.  Specifically, these fiduciaries downplayed the Company's bidding and execution issues, overinflated the Company's financial condition,

concealed unresolved matters and unrecorded charges, and assured that Fluor's internal controls and disclosure procedures were effective.

**Improper Statements Concerning Fluor's "Conservative" Bidding Process and Risk Management**

145.     Although the Company's bids were aggressive and unachievable due to the miscalculation of costs, the Individual Defendants went out of their way to repeatedly assure investors that Fluor was conservative in its bidding practices and could effectively manage any risks surrounding fixed-price contracts.

146.     The Individual Defendants emphasized that "Risk Management" was one of Fluor's "Competitive Strengths" in each of its Annual Reports filed with the SEC on Forms 10-K during the period of wrongdoing.[16]  The Forms 10-K from 2013 to 2018 (the "Forms 10-K") assured that the risks posed by complicated, fixed-price contracting were mitigated by Fluor's "experienced management team."   Specifically, the Forms 10-K stated in identical or substantially similar language:

> *Risk Management* We believe that our ability to assess, understand, gauge, mitigate and manage project risk, especially in difficult locations or circumstances or in a ***fixed-price contracting environment***, gives us the ability to selectively enter into markets or accept projects where we feel we can best manage risks. ***We have an experienced management team, particularly in risk management and project execution, which helps us to better anticipate and understand potential risks and, therefore, how to manage them***.  Our risk management capabilities allow us to better control costs and ensure timely performance, which in turn leads to clients who are satisfied with the delivered product.

---

[16] As specified in Exhibit C attached hereto, the Company filed its Annual Reports with the SEC on Forms 10-K on February 18, 2014 (the "2013 Form 10-K"); February 18, 2015 (the "2014 Form 10-K"); February 18, 2016 (the 2015 Form 10-K), February 17, 2017 (the "2016 Form 10-K"); February 20, 2018 (the 2017 Form 10-K); and February 21, 2019 (the "2018 Form 10-K").  The defendant signatories to the Forms 10-K are shown in Exhibit C.

147.    In addition, the Forms 10-K downplayed the risks posed by large-scale project awards.  Despite knowledge that Fluor was taking on risk by negotiating prices down in order to win project awards the Individual Defendants represented that the Company does not take on the "unusual risks" or unacceptable contracting terms like many of its competitors.  In particular, Fluor stated in identical or substantially similar language in the Forms 10-K:

> We may not win contracts that we have bid upon due to price, a client's perception of our ability to perform and/or perceived technology advantages held by others. ***Many of our competitors may be more inclined to take greater or unusual risks or terms and conditions in a contract that we might not deem acceptable***.

148.    On February 18, 2014, Fluor held an earnings conference call with analysts and investors in connection with filing the 2013 Form 10-K.  During the call, an analyst asked whether Fluor would need to "take [on] extra risk" in order to achieve the "higher levels" of margin that the Company was anticipating.  In response, defendant Seaton stated the Company's risk profile had not increased while conveying that Fluor was managing any risk stemming from its fixed-price contracts.  He further assured that the Company could profitably execute all of its fixed-price projects.  Specifically, defendant Seaton stated:

> We have not seen our risk profile increase, based on the new awards that we are booking right now. Yes, there are some that are fixed-price in nature. But I would say that ***we feel very comfortable in taking the projects that we are on the fixed price basis, and that's not just in oil and gas, but I would say across the Company***.

> We feel pretty good about our ability to execute against that. I think the increase that you are seeing is part of the mix change. But, I think it's also a recognition that we've got a value proposition that lets us get paid for the value that we provide. I feel really positive about where we are and where we are headed. ***I have great confidence in our teams to being able to deliver the profitability that we expect***.

149.    On June 5, 2014, the Company presented at the Credit Suisse Engineering & Construction Conference.  During the conference, defendant Seaton represented that, despite

competition, Fluor was both "conservative" and selective in its bids.  Specifically, defendant

Seaton stated:

> Power, as I mentioned, has just kind of been on its ear. I would suggest that that's probably one of the most competitive markets that we work in right now. We have been fairly successful on the coal-fired side. We've got a lot of proposals pending and we feel good about that.
>
> However, we have lost a few to competition who need it more than we do. One of the things that we enjoy is that diversity and it allows us -- this is going to sound arrogant, and I don't mean it that way -- *we have the ability because of that diversity to say no and make sure that we get projects that we want at the price we want, that allows us to earn the profitability we expect*.
>
> *So we are pretty conservative in how we do things like that, but it does give us I think an advantage in making sure we don't take projects that begin in a challenged nature*.

150.    On July 31, 2014, Fluor held an earnings conference call with analysts and investors

to discuss its financial results for the second quarter of 2014.  During the call, defendant Seaton

lauded Fluor's ability to win projects with conservative bids, in part due to its careful selection of

"the projects [the Company] want[s] to chase."  In particular, defendant Seaton stated during the

call:

> *We do a really good job of choosing carefully the projects we want to chase. We're conservative in how we take them in, and in those projects are holding to the schedules that we expected*.

151.    During the question and answer session, an analyst noted that "[t]here's been a lot

of discussion about pricing maybe getting a little bit more aggressive in North America from the

Western competitors," and asked what the Company was seeing there.  Defendant Seaton

responded stating although the Company had seen "some really aggressive pricing" from its

competitors, Fluor's quality bidding practices ensured it could nonetheless profitability execute.

In particular, defendant Seaton stated:

We've seen some really aggressive pricing in the power market, and in the infrastructure market.

***Again, we've got the profit expectations built into what our offering is***. And we'll let the chips fall where they may. But I would say that we've seen an increased competitive landscape in North America.

152.   On August 14, 2014, the Company presented at the Jefferies Global Industrials Conference.  During the conference, Ken Lockwood ("Lockwood"), the Company's Vice President of Investor Relations, assured that although fixed-price contracts "have a risk element," due to its effective risk management Fluor was "very comfortable with that risk."  Specifically, Lockwood stated:

> And then from a contract type, if you look at an engineering and construction company, there are basically two types of contracts, fixed-price contracts and reimbursable contracts. Reimbursable by nature, by definition, are low risk or no risk. ***Fixed-priced contracts, obviously, have a risk element that is fixed cost and fixed schedule. We tend to do those predominantly in infrastructure and in power. We are very comfortable with that risk and we are very comfortable with this risk profile***. So, really nothing noteworthy there.

153.   On November 13, 2014, Fluor held its Investor Day conference.  During the conference, defendant Seaton maintained he was confident that Fluor's strategy and "discipline" around bidding would yield profits.  Defendant McSorley added that due to its selectivity and "estimating capability," the Company executed projects within budget, on schedule, and without claims.  In particular, defendants Seaton and McSorley stated:

> [Defendant Seaton:]
>
> We do believe that some of our competitors are in a weakened state. As you've heard me say, because of that diversity, we've had an ability to say no in certain markets when our competition -- if that's the only market they're in and they have a different position. Now, I hope that doesn't sound arrogant; I certainly don't mean it that way. ***But we believe that our strategy and the discipline we have around how we bid, who we bid to, what projects are actually going to go to FID, which ones are actually going to get to the field, I think provides a lot more confidence, at least for me, in terms of insight into those longer-term earning cycles***.

*     *     *

[Defendant McSorley:]

Let's talk about some of our existing projects. As I said, our work is lump sum in the power industry. And over the past three to five years, we have really had a solid execution of our projects. Many of you in here hear about companies struggling in the power EPC space, some of them wanted to maybe even exit the space.

*All of our projects over the past four or five years: on budget, on schedule, no claims. This is largely due to our selectivity. We don't chase everything that is out there. Our estimating capability and, of course, our execution of the work.*

154.   On February 18, 2015, the Company held an earnings conference call with analysts and investors in connection with filing the 2014 Form 10-K. During the call, analysts questioned whether Fluor's purportedly "disciplined bidding" hampered its ability to gain market share in the gas-fired power plant market. Defendant Seaton conveyed it would not, reassuring analysts of Fluor's competitive advantage while concealing that, in reality, the Company would only be awarded projects by lowering its bids and weakening its bidding practices. Specifically, defendant Seaton stated:

*So regardless of the competitive situation, we feel like we are in the best position to give them the best asset at the best price and at the same time maintain the profitability that we expect.* So, I think we've kind of changed the game here and I think that is going to bode well for us for many, many years to come.

155.   Also during the call, analysts inquired into the Company's growth and risk concerning its fixed-price contracts. In response, defendant Seaton distinguished the Company from its competitors while stating that Fluor would maintain its conservative and selective approach to bidding on projects. In particular, defendant Seaton stated:

*I think over time we have been very conservative in what we take in and how confident we are in that going forward.*

*So I don't really see a lot of risk in our current backlog from a cancellation or a delay perspective.*

- 69 -

        \*      \*      \*

> Well, I think Power has become, if you can believe it, more competitive. ***There is a lot of people that don't have the diversity that we have that are forced to make some, in my opinion, some poor decisions on what they expect and what they will accept***.

> ***I do believe we are in a good position to grow backlog in Power over the short term. And I feel good about our position regardless of the fuels choice***.

156.    On March 5, 2015, Fluor issued its 2014 Annual Report.[17]  The 2014 Annual Report continued to tout the Company's selective bidding, stating: "[t]he Power group serves a geographically focused, fiercely competitive, lump-sum industry.  In this environment, we have to be highly ***selective in the projects we bid***. We had an active year, winning and progressing projects in the gas, renewables and nuclear sectors."

157.    On April 30, 2015, the Company held an earnings conference call with analysts and investors to discuss its financial results for the first quarter of 2015.  During the call, an analyst asked about Fluor's "disciplined bidding" practices, noting the existence of "competitors trying to get more competitive on pricing in an attempt to fill volumes."  In response, defendant Seaton reaffirmed the Company's commitment to disciplined bidding, conveying that, in contrast to its competitors, Fluor would refuse to lower its bids in order to obtain awards.  In particular, defendant Seaton stated:

> ***Well I'm sure they will, I'm sure they will. That's the normal herd mentality I think that damages our industry. I think what we've proven is that we focused on a better delivery model, and therefore, we don't have to have margin suffer because we're competitive in other ways***.

> ***But there's always somebody that's going to drop their price to ensure that they have the volumes that they want***. And frankly, there's nothing I can do about that. I'm going to focus and our people are going to focus on continuing to improve our

---

[17] The Company issues an "Annual Report" to its stockholders distinct from its Forms 10-K filed with the SEC.

offering and meet my expectation and your expectation in terms of creating shareholder value through enhanced margin performance. *So we're just going to stick to our knitting and let others do what they think they need to do to meet their needs*.

158.    On June 4, 2015, Fluor presented at the Credit Suisse Engineering & Construction Conference.   During the conference, defendant Porter stated that Fluor would maintain its conservative bidding approach without compromising profits in response to analyst concerns that the Company's profit margins were threatened by the increase in fixed-price work and a competitive bidding environment.   Specifically, defendant Porter stated:

> No, *we're not changing our approach at all. I think we've proven over the last two years that we have kind of changed how we look at projects, and have the ability to deliver those things on a more cost-effective basis. That does not mean that we are dropping margin*.
>
> And I think it's kind of one of these things where our diversity is a positive overall, but it also puts us in an awkward position sometimes where many of our competition, depending on whatever market it is, that that's all they do. *We kind of have the ability to say no. And we'll continue to do that on these projects that are marginal*….
>
> *Two, they don't provide the profitability that we expect, or the contract is in a form that puts undue risk on our books as opposed to the balanced approach we like to see. So, we have not changed our DNA in terms of how we look at projects, and the conservative nature that we are, and the way we put things in the backlog, and how we execute things. So that hasn't changed at all*.

159.    During the conference, defendant Seaton also reiterated Fluor's commitment to conservative bidding.   In particular, he stated:

> *As I mentioned, we are* -- and I hope this doesn't come across as arrogant because I don't mean it that way -- *being able to say no, I think is the right thing in terms of shifting from a competitive price to where we are actually, as an industry, accepting liabilities that should be borne by the customer or somebody else. So, we are seeing some of those types of behaviors again. And we'll stick to our knitting*.

160.    On November 10, 2015, Fluor presented at the Robert W. Baird and Co. Industrial Conference.   During the conference, Geoff Telfer, the Company's Senior Vice President of

Corporate Finance, conveyed there was no reason to be concerned about Fluor's fixed-price projects. Specifically, Mr. Telfer stated:

> The lump sum plays are -- traditionally it is the power play and the infrastructure. And they were starting to see more now and especially when we work for the NOCS. They tend to like the fixed-price work. But we are not -- *we are very comfortable going fixed price on anything now. With the way that we are executing our projects with our supply chain, we are very comfortable doing fixed price*.

161.     On November 3, 2016, Fluor held an earnings conference call with analysts and investors to discuss its financial results for the third quarter of 2016. During the call, defendant Seaton touted the Company's proven ability to compete notwithstanding its ongoing commitment to disciplined bidding. In particular, defendant Seaton stated:

> And *we are going to maintain our discipline*. And there will be some folds that will do some silly things, and maybe in a few years they will regret that.

> But it is what it is. But *we're proven over time that we can compete*.

162.     On November 7, 2016, Fluor held its Investor Day conference. During the conference, an analyst inquired into "how tempting is it to sort of take on work that's maybe a little more borderline from the execution perspective or risk perspective to sort of fill in the gaps." In response, defendant Seaton stated that, rather than engage in the "stupid things" that competitors were doing, Fluor would maintain its discipline. Specifically, defendant Seaton stated:

> I'm going to kind of push part of this question along, but I think the short answer is *we're going to maintain our discipline. We're not going to do stupid things like we're starting to see in the marketplace*.

> We've proven over time that when we focus on our own knitting and changing our own world and controlling the things that we can control, we do better and we're going to continue that. So, again, in the short term, I don't see us doing things like that.

163.     On May 9, 2017, Fluor presented at the Wells Fargo Industrial and Construction Conference. During the conference, defendant Porter represented that the Company would

continue to maintain its practice of avoiding aggressive and risky bidding.  In particular, defendant

Porter stated:

> [W]e feel very good about our market share and having protected it. So it's not a
> matter of losing out. It's just a matter of the projects not moving forward at this
> point or -- once again, we expect that to change here in the foreseeable future. From
> a pricing standpoint, I wouldn't say we're pricing or looking to price business any
> differently today than we were 4 or 5 years ago. The markets that were competitive
> today are competitive -- they are the same ones that were competitive 4 or 5 years
> ago. And those largely have been the Power business more than any other. On the
> Power business, we can see as many as 5 competitors on a particular proposal.
> When you get to energy and chemicals, it may just be a couple. So it's rational. We
> haven't -- so broadly speaking, the markets are rational. We haven't seen a situation
> like there was many years ago with the Korean companies coming in and bidding
> very aggressively. I think they got punished for that, and the customers weren't
> happy with how it all turned out. And we haven't seen a return of that kind of
> environment. And so happily, it's rational. ***I believe it will stay that way, but if
> somebody did decide to be irrational, we're not going to chase it. We're not going
> to take that risk***.

164.    The above statements were improper when made because they failed to disclose

and misrepresented the following material, adverse facts, which the Individual Defendants knew,

consciously disregarded, or were reckless in not knowing: (i) the Company was unable to

"anticipate and understand potential risks," and to the extent it was able, Fluor ignored those risks

in order to win contract awards, thereby increasing its risk profile; (ii) the Company's bidding

practices were neither conservative nor selective and instead were based on ensuring Fluor would

win awards rather than expected profit; and (iii) the Company's fixed-price projects over the past

four or five years were not "on budget, on schedule, [and without any] claims," as defendants later

admitted in 2018 that "10 of the 12 [fixed-price gas-fired projects the Company had undertaken

since 2013] have underperformed our as-sold expectation, with 3 suffering losses."

**Improper Statements Concerning the Progress of the Gas-Fired Plants**

165.    While assuring stockholders of the Company's conservative yet profitable bidding

practices, the Individual Defendants also misrepresented the Gas-Fired Plants' construction and

budget progress.  In particular, these fiduciaries assured they were "quite comfortable with" and "[felt] really good about" the Company's fixed-price project execution when, in reality, the Company was encountering significant disruption and incurring additional costs.

166.    On August 14, 2013, Fluor issued a press release announcing that it had received full notice and approval to move forward with construction at the Brunswick County Plant, a new 1,358-megawatt, natural gas-fueled power station located in Virginia.  The press release touted Fluor's expected revenue on the Brunswick County Plant while pointing out that it had already "beg[u]n providing engineering and procurement services on the plant" last year.  In particular, the press release stated:

> Fluor Corporation announced today that it received full notice to proceed from Dominion Virginia Power (NYSE: D) to begin construction on the company's new 1,358-megawatt, natural gas-fueled power station in Brunswick County, Virginia. This award follows the limited notice to proceed contract that Dominion awarded to Fluor in August 2012. Fluor booked approximately $800 million into backlog during the third quarter of 2013.

> "Fluor is pleased that the project has received the approval from the Virginia State Corporation Commission to move forward with construction," said Matt McSorley, senior vice president and head of Fluor's Power business. "We look forward to continuing to provide Dominion with our full suite of engineering, procurement and construction services on this significant new power source in the eastern United States."

> ***Fluor began providing engineering and procurement services on the plant from its Charlotte, North Carolina office last year while Dominion awaited regulatory approvals to begin construction***. The project is expected to staff approximately 600 craft workers at peak during the construction phase.

167.    The above statements were improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that: (i) contrary to the Individual Defendants' rosy projects, Fluor's bid for the Brunswick County Plant was artificially low and

based on flawed assumptions; and (ii) Fluor could not achieve the "baseline assumptions" underlying its bid for the Brunswick County Plant.

168.    On February 18, 2014, the Company filed the 2013 Form 10-K.  The 2013 Form 10-K stated that Fluor's revenue in the Power segment was "65 percent higher compared to 2012, primarily attributable to a significant increase in ***project execution activities for*** a solar power project in the western United States and two ***gas-fired power plant projects*** in Texas and ***Virginia***." In addition, the 2013 Form 10-K noted that "[n]ew awards of $1.5 billion in 2013 included a natural gas-fired power plant project in Virginia."

169.    On the same day, during Fluor's earnings conference call with analysts and investors, defendant Seaton represented that Fluor's risk profile had not increased from its recently awarded fixed-price contracts while touting his confidence in the Company's project execution abilities.  In particular, defendant Seaton stated:

> ***We have not seen our risk profile increase, based on the new awards that we are booking right now.*** Yes, there are some that are fixed-price in nature. ***But I would say that we feel very comfortable in taking the projects that we are on the fixed price basis***, and that's not just in oil and gas, but I would say across the Company.
>
> ***We feel pretty good about our ability to execute against that.***

170.    On October 30, 2014, Fluor held an earnings conference call with analysts and investors to discuss its financial results for the third quarter of 2014.  During the call, an analyst asked defendant Seaton if he could "comment on how the execution is going on [Fluor's] fixed-price projects."  In response, defendant Seaton stated: "***I feel really good about where we stand [and] where we are at this stage of the game on our fixed-price projects***," including the Brunswick County Plant.

171.    On November 13, 2014, Fluor announced it was awarded contracts for the Anderson and Citrus County Plants.  On the same day, the Company held its Investor Day

conference.  During the conference, defendant McSorley touted the Company's performance on its fixed-price projects while distinguishing Fluor from competitors who were struggling in the fixed-price power EPC space and wanted to leave the market (an exit that Fluor would subsequently take).  He buttressed his claims by stating that "[a]ll of [Fluor's] projects over the past four or five years" were "on budget, on schedule," and had "no claims."  Specifically, defendant McSorley stated:

> Let's talk about some of our existing projects. As I said, our work is lump sum in the power industry. And over the past three to five years, *we have really had a solid execution of our projects. Many of you in here hear about companies struggling in the power EPC space, some of them wanted to maybe even exit the space.*
>
> *All of our projects over the past four or five years: on budget, on schedule, no claims. This is largely due to our selectivity. We don't chase everything that is out there. Our estimating capability and, of course, our execution of the work.*

172.    Also during the conference, defendant McSorley specifically touted Fluor's progress on the Brunswick County Plant, stating its construction was "*on track, on schedule and cost*."

173.    In its 2014 Annual Report issued on March 5, 2015, the Company emphasized its successful execution of gas-fired projects, in particular the Brunswick County Plant, stating that, "*[t]he project is about 40% finished, on schedule and on budget*."

174.    On April 27, 2015, the Company issued a press release announcing it had been awarded the Greensville County Plant project.  Defendant McSorley is quoted in the press release underscoring Fluor's success on the Brunswick County Plant.  In particular, he stated: "Fluor has a proven track record supporting Dominion in their goal to provide clean, reliable, and low-cost energy to their Virginia customers."

175.    On April 30, 2015, Fluor held an earnings conference call with analysts and investors to discuss its first quarter 2015 financial results.  During the call, defendant Seaton

assured stockholders that the Company was "performing very, very well in the power sector" under

its fixed-price projects.  Specifically, he stated:

> *[O]ur relationship with Dominion, I think Greensville shows that we execute for them on the projects that they need*. That's a very large project that we're going to backlog next year when we get to final notice to proceed.
>
> So I think they're kind of on a roll, and I think that we've looked at the things we need to look at around competitiveness. I think our execution approach is sharpened relative to how we do those projects. Those projects were typically lump sum, so it's how well are we performing. And I think *we're performing very, very well in the power sector*.
>
> *So I'm pretty bullish on them being able to deliver on what we've got in front of us*, but I wouldn't suggest what number projects that are out there in front for award in the next little while. But Greensville is a very, very important win and a very large project.

176.    On June 4, 2015, defendant Seaton presented at the Credit Suisse Engineering &

Construction Conference.   During the conference, defendant Seaton praised the Company's

capabilities in power projects, specifically noting its successful implementation of turbines (the

most crucial component of Fluor's gas-fired power projects).  These statements conveyed that there

had been a smooth installation of the Mitsubishi turbines at the Brunswick County Plant, and that

the Company had not, and would not, face installation issues at the other Gas-Fired Plants.

Specifically, defendant Seaton stated:

> You go to power, *we are seeing a big uptick in power. I feel good about where we are there. We are probably one of the few that can actually implement the gas cycle regardless of what the turbine choice is*. And we see a significant uptick in terms of project load as we go into the next couple of years.

177.    The above statements were improper when made because they failed to disclose

and misrepresented the following material, adverse facts, which the Individual Defendants knew,

consciously disregarded, or were reckless in not knowing: (i) Fluor was not executing on schedule

or on budget; (ii) the installation of the Mitsubishi turbines was a fiasco causing the Company to

"accelerate the construction process at great additional cost"; (iii) Fluor could not "implement the gas cycle regardless of what the turbine choice is"; (iv) all of the turbines the Company used at the Gas-Fired Plants were "next generation" turbines with which Fluor was inexperienced and that were the same or substantially similar to the Mitsubishi turbines used at the Brunswick County Plant and therefore presented the same risks at the other Gas-Fired Plants; (v) the Brunswick County Plant faced significant delays and cost overruns due to "issues with labor productivity"; and (vi) Fluor's bids for the other Gas-Fired Plants were artificially low and based on faulty assumptions.

178.   On October 29, 2015, the Company issued a press release announcing its financial results for the third quarter of 2015.  At this point, the Individual Defendants could no longer fully suppress the problems mounting against the Brunswick County Plant.  Fluor revealed that it had recorded a $21 million charge related to the plant.  However, the Individual Defendants concealed the remaining issues and costs facing not only the Brunswick County Plant, but also the Company's other fixed-price projects.

179.   During the Company's earnings conference call with analysts and investors held on the same day, Fluor's executives reassured stockholders the charge was an isolated incident despite knowledge it was just the tip of the iceberg.  During the call, an analyst hinted concern that the Brunswick County Plant issues suggested organizational defects and thus problems for Fluor's other gas-fired power plant projects and fixed-price contracts in general.  Defendant Seaton responded by affirmatively stating the Brunswick County Plant issues "[are] not symptomatic within the organization."  Defendant Porter echoed these assurances while adding that Fluor had "done well" on its gas-fired projects.  In particular, the analyst asked defendants Seaton and Porter responded:

[Analyst:]

Related to Brunswick County, David, you've been very careful on setting up the organization to manage these fixed-price projects to minimize risk. And I do remember that this plant had been competitively bid. Just trying to get comfortable with the fixed-price mix that's in the rest of the backlog now. Is there something different about the way the organization was structured for Brunswick County versus the other gas-fired power plants you have in backlog and you're going to put in there? And then more broadly, the other oil and gas projects now you have in backlog on a fixed-price basis, just trying to be comfortable with the fixed-price now.

[Defendant Seaton:]

That's a great question. ***I would put the Brunswick situation in three categories. None of which, do I believe are embedded in how we've done any of the others***. ***And in fact, we've learned from this and have implemented some of those learnings as we bid some of these other programs***. It falls into three categories. One is the weather that we experienced was a huge factor. As you remember, last winter was the coldest winter in a long, long time, maybe in history. And certainly Appalachia, I come from not too far from there, it can be really, really cold. And we had issues associated with weather. ***Secondly, we had issues with labor productivity, something that is both in and outside of our control. But in terms of the learnings, I think that's where we've learned the most. The third piece is that Mitsubishi machine, that's the first time it's been installed in the United States, and the learnings from that put us in I think a better position going forward***.

***So it's not symptomatic within the organization***. You are correct; we've taken a very measured look at many of the programs and projects we're doing, including the ones that are fixed-price. And I don't see a fly in the ointment, so to speak, and I guess that's kind of what you were getting at, relative to what we've got in backlog or the competitive nature of our offerings.

[Defendant Porter:]

The power projects have been competitively bid for the last many years, and ***we've done well on them over the last several that were competitive bids***. I wouldn't put something in a distinct category just because it happened to be competitively bid. ***It's more attributable to the things David just described, as opposed to it being a competitive situation***.

180.   On February 18, 2016, Fluor filed the 2015 Form 10-K.  The 2015 Form 10-K

disclosed a fourth quarter $31 million pretax loss resulting from forecast revisions to the

Brunswick County Plant, and further stated that the Power segment "profit for 2015 included a

loss of $60 million (including the reversal of previously recognized profit) resulting from forecast revisions for a large gas-fired power plant in Brunswick County, Virginia."

181.    The above statements were improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing: (i) the turbine and craft labor issues at the Brunswick County Plant were in fact symptomatic of Fluor's other Gas-Fired Plants; (ii) all of the Company's Gas-Fired Plants had "fundamental problem[s]" and were afflicted by the same "improper estimating, craft productivity and equipment issues"; and (iii) Fluor had not "done well" on gas-fired projects, but instead underperformed on ten out of twelve that it had undertaken since 2013.

182.    On May 4, 2017, Fluor filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q").  The Q1 2017 Form 10-Q revealed a $30 million charge on the Anderson County Plant resulting from cost overruns.  In particular, the Q1 2017 Form 10-Q stated: "The decrease in segment profit was driven by cost increases and forecast revisions of approximately $30 million, primarily for a gas-fired power plant in South Carolina."  The Individual Defendants, however, remained tight-lipped about the extent of the problems facing the Anderson County Plant and the other Gas-Fired Plants.

183.    During Fluor's earnings conference call with analysts and investors held on the same day, defendant Seaton downplayed Fluor's execution problems at the Anderson County Plant while suggesting it was even possible for the Company to reverse its future losses.  Specifically, defendant Seaton stated:

> [T]he South Carolina project is nearing completion, and *there are some issues there that I really don't want to talk about because we've got some opportunities, hopefully, to maybe reverse some of that*.

184.   On August 3, 2017, Fluor issued a press release announcing its financial results for the second quarter ended June 30, 2017 and filed with the SEC its Quarterly Report on Form 10-Q (the "Q2 2017 Form 10-Q").  The press release and the Q2 2017 Form 10-Q revealed that the Company recorded a $194 million pretax charge related to three of its fixed-price gas-fired power plants.  In particular, the press release stated:

> The Industrial, Infrastructure & Power segment reported a segment loss of $168 million, compared to a segment profit of $51 million in the second quarter of 2016. **Results for the quarter include approximately $194 million in pre-tax project expenses related to forecast adjustments on** three gas-fired power projects.

185.   On the same day, the Company held an earnings conference call with analysts and investors to discuss its financial results.  Defendant Seaton began the call with an update on the Gas-Fired Plants and admitted that each of them "had a fundamental problem."  Specifically, defendant Seaton stated:

> I want to start our call today discussing the issues we are experiencing in our Industrial, Infrastructure & Power segment, specifically the concerns on 3 gas-fired projects currently under construction. **All 3 projects, 4 if you include the Brunswick project that incurred a charge in 2015, had a fundamental problem**. The projects did not meet the original baseline assumptions due to improper estimating, craft productivity and equipment issues. All of these projects were bid in 2014 by the same pursuit team. In addition, all 4 projects were based on next-gen turbines or steam generators that were first of a kind for Fluor. The quality control and completeness of these turbines delivered to the site were not in line with our bid assumptions and we are pursuing our options.

186.   Although they admitted the Gas-Fired Plants had problems, the Individual Defendants continued to conceal from stockholders the extent of those problems while offering assurances that Fluor was on the right path to eliminating future charges.  Defendant Seaton continued his opening remarks by stating that a new management team had reviewed the Gas-Fired Plants, that the updated forecast reflected any problems within those plants, and the

Company was "confiden[t] that these types of earnings adjustments [will be] diminished and less frequent."  In particular, defendant Seaton stated:

> So where are we today? Of the 3 currently active projects, 1 is 92% complete, with an expected mechanical completion in Q4. One is 45% complete, with an estimated completion date of Q2 2018. And the last project [the Citrus County Plant] is 42% complete, and is expected to be complete in Q4 2018. I'd make a comment that those are construction completion percentages, not overall project percent completes. So this is specifically related to the construction scope.

> I've discussed the problems, and now I'd like to talk about we've changed. After we had the initial charge last quarter, we changed the Power leadership team and brought in Simon Nottingham as the President of that group -- of the Power group. Simon comes from our oil and gas group, and he brings to this role his extensive background in project and program management. ***He and his team, in*** coming to this role, led a review of the 3 projects in the second quarter and ***developed a path forward that is reflected in our current estimates***. Some members of the Power management team have exited Fluor. We also informed our employees that we are closing our Charlotte office and consolidating Power operations in Greenville, where it will be closer to our other businesses and leadership.

> *     *     *

> In addition to the changes in management of Power group, our strategic evaluation of the gas-fired power market, ***we're also implementing other changes to give us greater confidence that these types of earnings adjustments are diminished and less frequent***.

> *     *     *

> ***We -- as I said, we've changed the review process to where there's more cold eyes review. And I feel reasonably good about where we are***.

187.   On February 20, 2018, Fluor issued a press release announcing its fourth quarter 2017 financial results and reported a $41 million charge related to the Citrus County Plant. However, the Individual Defendants continued to conceal the other ongoing problems and mounting costs at the Citrus County Plant and at the Company's other fixed-price projects.

188.   On May 3, 2018, Fluor filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018 (the "Q1 2018 Form 10-Q").  The Q1 2018 Form 10-Q

disclosed an additional $125 million charge related to the Citrus County Plant, stating: "The decrease in segment profit was primarily driven by forecast revisions of approximately $125 million for estimated cost growth for the [Citrus County] fixed-price, gas-fired power plant project."

189.    On the same day, the Company held an earnings conference call with analysts and investors to discuss these results.   During the call, defendant Seaton explained that "[c]raft productivity and estimating were materially different than the original baseline expectations we made in the initial charge on the [Citrus County Plant] last year."  Specifically, defendant Seaton stated:

> Let's start off by discussing the challenges that we are experiencing on the same gas-fired power project we discussed last quarter and the steps we're taking to complete this project and in Fluor's participation in the specific end market. ***Craft productivity and estimating were materially different than the original baseline expectations we made in the initial charge on this project last year. While those factors were included in our initial charge, the majority of the $125 million charge taken this quarter is driven by extremely low ongoing productivity and the financial impact that this has relative to initial expected timing of when the 2 units would be available for power production based on the current outlook***.

190.    During the question and answer session, an analyst challenged defendant Seaton as to whether "there [was] anything else [he] could do on the projects to assure investors that they can invest … in Fluor until the projects are done?"  Defendant Seaton responded by pointing out that he had visited the Citrus County Plant twice in the past year and the he was confident the project would complete within its new estimate.  Specifically, the analyst asked and defendant Seaton responded:

> [Analyst:]
>
> …So David, the power project is 86% done, you've said. I think you have one more project in backlog of the same A-grade. And it is probably the same level done. Is there anything else you could do on the projects to assure investors that they can invest, really for the next couple of quarters, in Fluor until ***the projects are done***? I

think I remember back in the day, Alan Boeckmann saying he was going to visit his embassy problem project every week toward the end of it. Can you do that? Shouldn't you do that? Anything more you can do.

*       *       *

So I just said that -- yes, back in, I think it was 2006 or something, I'm showing my age. But Alan Boeckmann had said that he was going to go visit the embassy project, his problem projects literally every week until it's done. *So as a* CEO, what more can you do, David? Like we always get the question, "Can I invest in Fluor until these problem projects are done?" How would you answer that?

[Defendant Seaton:]

Yes, I mean, I've been in the project site twice this year, and I have personally directed different resources there. And I am -- *I hate to even say confident, but I am in the ability of the project to complete within this number*, as well -- and look, we used an abysmal productivity rate in setting the number that we wrote down. *So I have confidence that we'll be able to finish*. As you said, we're high 80s percentage. We're starting to turn over systems to the customer on unit 1. Unit 2, I think, will be an easier finish than unit 1 has been. So I feel pretty good about the team that's there now, Yes, I'm not going to say that I will be there every week, but I'm going to be there on a routine basis, and I have already taken *personal review of this project*. With regard to the other one, and this is a hell of it, is the project in Virginia is going very well. It is in the same kind of completion percentage. *And those guys have done a better job relative to managing that craft and making the progress that they need to make. So I feel very good about that project and what that team is doing. But yes, I mean when things go bad, the boss has got to be there, and I get that. And I have been and will be as we finish this project*.

191.     In his closing remarks, defendant Seaton reiterated that the most recent charge

encompassed all of issues and costs associated with the Gas-Fired Plants.  In particular, he stated:

Despite a disastrous quarter and our disappointment, I'm really excited about the future. No one's more disappointed than I am relative to where we are on a very finite sample of projects. *And we do know where the end is, and we believe we've captured that*.

192.     Further, the Individual Defendants stated that "[t]he underperforming gas-fired

projects have been *de-risked*" in a slide presented during the earnings conference call.

193.     Then, on August 2, 2018, the Company disclosed yet another charge on the Citrus

County Plant, this time for $16 million, as it issued a press release announcing its financial results

for the second quarter of 2018.  The press release stated: "Results for the quarter include a pre-tax charge of $16 million for forecast revisions on a gas-fired power project."  The Individual Defendants, however, failed to disclose the remaining problems and costs confronting the Company's other fixed-price projects.

194.    On the same day, the Company held an earnings conference call with analysts and investors to discuss its financial results.  During the call, an analyst asked defendant Seaton how comfortable he was on "the problem projects[.]"  In response, defendant Seaton confirmed he was personally involved in project management while assuring that the rest of the projects would be completed within their new estimates and that it was even possible to reverse losses with execution improvements and workarounds.  Specifically, he stated:

> *I'll start with the power project. I hold a weekly call with the project team, including the president of that group, which is almost resident at the site. I can't overstate the importance of first fire today because it supports the schedules that we have, notwithstanding the charge that we had. The charge that we had this quarter was (technical difficulty) both in terms of material and labor associated with it, which on other projects, that would have been handled by contingency. And because this thing's out in lights, everything stands out, and that's why we had to announce it. I still believe that because of the schedule, there's a positive adjustment at the end of the year available to us, assuming that we continue to perform*. But my accounting friends have made us report it the way that we've reported it…. *But that project is all but done. So I think these legacy issues, as we get to December, will be -- are behind us*.

195.    The Individual Defendants, however, continued to conceal that there were still further issues plaguing the remaining gas-fired plants.  Instead, defendant Seaton assured that "we've done everything in our power to lessen that risk and give us better insight and surety in terms of our performance going forward."

196.    The above statements were improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing: (i) Fluor had not "developed a path

forward" that was reflected in its then current estimates and the Citrus County Plant was encountering costly schedule delays; (ii) the Citrus County Plant had not been "de-risked" and continued to face execution problems resulting in additional costs; and (iii) the charges taken during the first quarter of 2018 did not "capture[]" the Company's possible future losses on the Gas-Fired Plants, which the Company would continue to take significant charges on in each of the following five quarters.

**Improper Statements Concerning Revenue and Earnings**

197.    While downplaying Fluor's bidding and execution issues, the Individual Defendants overstated the Company's financial condition.  Specifically, these fiduciaries inflated the Company's financial statements by improperly recognizing millions of dollars in claim revenue.  In addition, Fluor reported financial metrics on a consolidated and segment-by-segment basis, including revenue, earnings, new awards, and backlog, without disclosing that those results were produced by underbidding on fixed-price contracts and threatened by the risk of subsequent charges.

198.    On February 18, 2016, the Individual Defendants filed the 2015 Form 10-K.  The 2015 Form 10-K reported revenue of $18.1 billion and stated that Fluor had recorded claim revenue of $30 million as of the end of 2015.  In the 2015 Form 10-K, the Individual Defendants stated the Company recognizes claim revenue for unapproved change orders "when it is probable that the cost will be recovered through a change in the contract price."  Specifically, the 2015 Form 10-K stated:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue, but not profit, for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) when it is determined that recovery of incurred costs is probable and the amounts can be reliably estimated. Under ASC 605-35-25, these requirements are satisfied when (a) the contract or other evidence provides a legal basis for the claim,

(b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. Cost, but not profit, associated with ***unapproved change orders is accounted for in revenue when it is probable that the cost will be recovered through a change in the contract price***. In circumstances where recovery is considered probable, but the revenue cannot be reliably estimated, cost attributable to change orders is deferred pending determination of the impact on contract price. If the requirements for recognizing revenue for claims or unapproved change orders are met, revenue is recorded only to the extent that costs associated with the claims or unapproved change orders have been incurred. The company periodically evaluates its position and the amounts recognized in revenue with respect to all its claims. ***As of December 31, 2015 and 2014, the company had recorded $30 million and $21 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract work in progress***. Additional costs are expected to be incurred in future periods. The company believes the ultimate recovery of incurred and future costs related to these claims is probable in accordance with ASC 605-35-25.

199.   In discussing the Company's revenue in 2015, the Individual Defendants emphasized the positive impact of "increased project execution activities" in certain of the Gas-Fired Plants.  In particular, the 2015 Form 10-K stated:

Revenue in 2015 decreased 6 percent compared to 2014, principally due to a decrease in project execution activities for a solar energy project in California and a large gas-fired plant in Brunswick County, Virginia. The overall revenue decline was partially offset by increased project execution activities for several projects in the early stages of project execution, including a gas-fired power plant in Greensville County, Virginia and two large gas-fired power plants in South Carolina and Florida.

200.   In addition, the 2015 Form 10-K reported consolidated new awards of "$21.8 billion compared to $28.8 billion in 2014 and $25.1 billion in 2013," with the Individual Defendants adding that, "[t]he Oil & Gas and Power segments were the major contributors to the new award activity during 2015."  Fluor also reported consolidated backlog of "$44.7 billion as of December 31, 2015, $42.5 billion as of December 31, 2014, and $34.9 billion as of December 31,

2013[,]" adding that, "[t]he higher backlog at the end of 2015 was primarily due to significant new awards in the Power segment…."

201.    On May 5, 2016, Fluor filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2016 (the "Q1 2016 Form 10-Q").  The Q1 2016 Form 10-Q reported revenue of $4.4 billion and net earnings of $119 million.  In addition, Fluor disclosed that it had recorded $36 million in claim revenue as of the end of the quarter.  The Individual Defendants claimed in the Q1 2016 Form 10-Q that Fluor recognizes claim revenue when it determines "that recovery of incurred costs is probable."  Specifically, the Q1 2016 Form 10-Q stated:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue, but not profit, for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) when it is determined *that recovery of incurred costs is probable* and the amounts can be reliably estimated. Under ASC 605-35-25, these requirements are satisfied when (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. The company periodically evaluates its position and the amounts recognized in revenue with respect to all its claims. *As of March 31, 2016 and December 31, 2015, the company had recorded $36 million and $30 million, respectively, of claim revenue* for costs incurred to date and such costs are included in contract work in progress. Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future quarters. The company believes the ultimate recovery of incurred and future costs related to these claims is probable in accordance with ASC 605-35-25.

202.    In the Q1 2016 Form 10-Q, the Individual Defendants credited the Power segment's growth with offsetting revenue declines.  In particular, the Q1 2016 Form 10-Q stated:

> Consolidated revenue of $4.4 billion for the three months ended March 31, 2016 decreased slightly compared to $4.5 billion for the three months ended March 31, 2015. Revenue in the Energy, Chemicals & Mining segment decreased in the current year period due to reduced levels of project execution activities in the mining and metals business line and for certain large upstream projects progressing

to completion. Revenue growth in the Industrial, Infrastructure & Power segment due to increased project execution activities for several power projects, as well as revenue contributions from the Stork acquisition, largely offset this revenue decline.

\*        \*        \*

Revenue for the three months ended March 31, 2016 increased by 52 percent compared to the three months ended March 31, 2015 primarily due to increased project execution activities in the power business line for several projects in the early stages of project execution including two nuclear projects and several gas-fired power plants in the southeastern United States.

203.    The Q1 2016 Form 10-Q also reported consolidated new awards of $4.7 billion, compared to $4.4 billion during the previous year's quarter, adding that "[t]he Government and Industrial, Infrastructure & Power segments were the major contributors to the new award activity." In addition, the Q1 2016 Form 10-Q reported consolidated backlog of "$46.0 billion compared to $41.2 billion as of March 31, 2015," adding that, "[t]he increase in backlog was primarily due to significant new awards booked after the first quarter of 2015 in the Industrial, Infrastructure & Power segment."

204.    On August 4, 2016, Fluor filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2016 (the "Q2 2016 Form 10-Q"). The Q2 2016 Form 10-Q reported revenue of $4.8 billion and net earnings of $120 million. In addition, Fluor disclosed that it had recorded $49 million in claim revenue as of the end of the quarter. The Individual Defendants claimed in the Q2 2016 Form 10-Q that Fluor recognizes claim revenue when it determines "that recovery of incurred costs is probable." Specifically, the Q2 2016 Form 10-Q stated:

The company has made claims arising from the performance under its contracts. The company recognizes revenue, but not profit, for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) when it is determined *that recovery of incurred costs is probable* and the amounts can be reliably estimated. Under ASC 605-35-25, these requirements are

satisfied when (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. The company periodically evaluates its position and the amounts recognized in revenue with respect to all its claims. ***As of June 30, 2016 and December 31, 2015, the company had recorded $49 million and $30 million, respectively, of claim revenue*** for costs incurred to date and such costs are included in contract work in progress. Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future quarters. The company believes the ultimate recovery of incurred and future costs related to these claims is probable in accordance with ASC 605-35-25.

205.    The Q2 2016 Form 10-Q noted the Power segment's revenue growth while claiming that the segment favorably offset lowered earnings in other segments.  Fluor explained that the Power segment's profit had significantly increased from the previous year's quarter, "primarily due to higher contributions associated with the project execution activities for several power business line projects in the early stages of project execution."  In particular, the Q2 2016 Form 10-Q stated:

Consolidated revenue of $4.9 billion and $9.3 billion for the three and six months ended June 30, 2016, respectively, was essentially flat when compared to consolidated revenue of $4.8 billion and $9.4 billion for the three and six months ended June 30, 2015. During both periods, revenue growth in the Industrial, Infrastructure & Power, Government and Maintenance, Modification & Asset Integrity segments were offset by revenue declines in the Energy, Chemicals & Mining segment. The revenue growth in both periods resulted primarily from increased project execution activities for several power projects, as well as revenue contributions from the Stork acquisition.

*        *        *

Net earnings attributable to Fluor Corporation were $102 million and $206 million for the three and six months ended June 30, 2016, respectively, compared to net earnings attributable to Fluor Corporation of $149 million and $293 million, respectively, for the corresponding periods of 2015. The three and six month periods of 2016 reflect lower earnings contributions from the Energy, Chemicals & Mining segment compared to the prior year periods, partially offset by higher contributions from power projects in the Industrial, Infrastructure & Power segment.

206.    The Q2 2016 Form 10-Q reported consolidated new awards of $6.4 billion and backlog of $47.3 billion and credited the Power segment with driving those figures.  Specifically, the Q2 2016 Form 10-Q stated:

> Consolidated new awards were $6.4 billion and $11.1 billion for the three and six months ended June 30, 2016, respectively, compared to new awards of $4.3 billion and $8.7 billion for the three and six months ended June 30, 2015. The Industrial, Infrastructure & Power and Government segments were the major contributors to the new award activity in the first half of 2016.
>
> *       *       *
>
> Consolidated backlog as of June 30, 2016 was $47.3 billion compared to $41.6 billion as of June 30, 2015. The increase in backlog was primarily due to new awards booked after the second quarter of 2015 in the Industrial, Infrastructure & Power segment

207.    On November 3, 2016, Fluor filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q").  The Q3 2016 Form 10-Q reported revenue of $4.76 billion and net earnings of $17.4 million.   In addition, Fluor disclosed that it had recorded $56 million in claim revenue as of the end of the quarter.   The Individual Defendants claimed in the Q3 2016 Form 10-Q that Fluor recognizes claim revenue when it determines "that recovery of incurred costs is probable."  Specifically, the Q3 2016 Form 10-Q stated:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue, but not profit, for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) when it is determined ***that recovery of incurred costs is probable*** and the amounts can be reliably estimated. Under ASC 605-35-25, these requirements are satisfied when (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. The company periodically evaluates its position and the amounts recognized in revenue with respect to all its claims. ***As of September 30, 2016 and December 31, 2015, the company had recorded $56 million and $30 million, respectively, of claim***

*revenue* for costs incurred to date and such costs are included in contract work in progress. Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future quarters. The company believes the ultimate recovery of incurred and future costs related to these claims is probable in accordance with ASC 605-35-25.

208.    The Q3 2016 Form 10-Q noted the Power segment's revenue growth while claiming that the segment favorably offset earnings declines in other segments.  Fluor explained that the Power segment's profit had significantly increased from the previous year's quarter, "primarily due to the higher volume of project execution activities." Specifically, the Q3 2016 Form 10-Q stated:

> Consolidated revenue for the three months ended September 30, 2016 increased 9 percent from $4.4 billion to $4.8 billion compared to the three months ended September 30, 2015. Consolidated revenue for the nine months ended September 30, 2016 increased 2 percent from $13.7 billion to $14.0 billion compared to the first nine months of the prior year. During both periods, revenue growth in the Industrial, Infrastructure & Power, Government and Maintenance, Modification & Asset Integrity segments were partially offset by revenue declines in the Energy, Chemicals & Mining segment. The revenue growth in both periods resulted primarily from increased project execution activities for several power projects, as well as revenue contributions from the Stork acquisition.

> \*       \*       \*

> Revenue for the three and nine months ended September 30, 2016 increased by 89 percent and 72 percent, respectively, compared to the three and nine months ended September 30, 2015 primarily due to increased project execution activities in the power business line for several projects, including two nuclear projects and several gas-fired power plants in the southeastern United States, as well as increased project execution activities in the infrastructure business line for several projects in the early stages of project execution.

> \*       \*       \*

> Earnings from continuing operations attributable to Fluor Corporation were $5 million and $211 million for the three and nine months ended September 30, 2016, respectively, compared to earnings from continuing operations attributable to Fluor Corporation of $176 million and $469 million, respectively, for the corresponding periods of 2015. Earnings from continuing operations attributable to Fluor Corporation for the three and nine month periods of 2016 were adversely affected by after-tax charges of $154 million and $170 million, respectively, related to forecast revisions for estimated cost increases on a petrochemical project in the Energy, Chemicals & Mining segment, which were partially offset by higher

contributions from power projects in the Industrial, Infrastructure & Power segment.

\*       \*       \*

[Power] [s]egment profit for the three and nine months ended September 30, 2016 significantly increased from the corresponding periods in 2015 primarily due to the higher volume of project execution activities for the power projects mentioned above, as well as the adverse impact on segment profit for the prior year periods resulting from forecast revisions on a large gas fired power plant.

209.    The Q3 2016 Form 10-Q reported consolidated new awards of $7 billion and backlog of $44.3 billion, both representing an increase from the previous year's third quarter.  Fluor credited the Power segment with driving these increases.  In particular, the Q3 2016 Form 10-Q stated:

Consolidated new awards were $7.0 billion and $18.1 billion for the three and nine months ended September 30, 2016, respectively, compared to new awards of $5.3 billion and $14.0 billion for the three and nine months ended September 30, 2015. The Energy, Chemicals & Mining, Industrial, Infrastructure & Power and Government segments were the major contributors to the new award activity in the first nine months of 2016.

\*       \*       \*

Consolidated backlog as of September 30, 2016 was $44.3 billion compared to $41.7 billion as of September 30, 2015. The increase in backlog was primarily due to new awards booked after the third quarter of 2015 in the Energy, Chemicals & Mining and Industrial, Infrastructure & Power segments partially offset by a current period adjustment for a liquefied natural gas project that was suspended in the third quarter.

210.    On the same day, the Company held an earnings conference call with analysts and investors to discuss its financial results for the third quarter of 2016.  Defendant Seaton began the call by noting that the Company had taken a "significant charge" on its "fixed-price project for CPChem in the Gulf Coast[.]"  However, he assured stockholders that future charges would be prevented by changes in Fluor's internal processes.  Specifically, defendant Seaton stated:

[W]e took a really hard look at this, almost a conservative look at this, because of what we knew we had to get done.

I will mention that this project was bid prior to some of the changes that we've made and some of the innovations that we've applied in the integrated solutions model. So when you look at where we are going, we shouldn't have these kinds of issues in our backlog or in the projects that we win.

211.   On February 17, 2017, Fluor filed the 2016 Form 10-K.  The 2016 Form 10-K reported revenue of $19 billion and net earnings of $281.4 million.  The 2016 Form 10-K also disclosed that Fluor had recorded claim revenue of $61 million as of December 31, 2016.  In the 2016 Form 10-K, the Individual Defendants stated the Company recognizes claim revenue for unapproved change orders "when it is probable that the cost will be recovered through a change in the contract price."  Specifically, the 2016 Form 10-K stated:

The company has made claims arising from the performance under its contracts. The company recognizes revenue, but not profit, for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) when it is determined that recovery of incurred cost is probable and the amounts can be reliably estimated. Under claims accounting (ASC 605-35-25), these requirements are satisfied when (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. Cost, but not profit, associated with *unapproved change orders is accounted for in revenue when it is probable that the cost will be recovered through a change in the contract price*. In circumstances where recovery is considered probable, but the revenue cannot be reliably estimated, cost attributable to change orders is deferred pending determination of the impact on contract price. If the requirements for recognizing revenue for claims or unapproved change orders are met, revenue is recorded only to the extent that costs associated with the claims or unapproved change orders have been incurred. Back charges to suppliers or subcontractors are recognized as a reduction of cost when it is determined that recovery of such cost is probable and the amounts can be reliably estimated. Disputed back charges are recognized when the same requirements described above for claims accounting have been satisfied. The company periodically evaluates its positions and amounts recognized with respect to all its claims and back charges. *As of December 31, 2016 and 2015, the company had recorded $61 million and $30 million, respectively, of claim revenue* for costs incurred to date and such costs are included in contract work in progress. Additional

costs, which will increase the claim revenue balance over time, are expected to be incurred in future periods. The company had also recorded disputed back charges totaling $41 million as of December 31, 2016. The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 605-35-25.

212.    In the 2016 Form 10-K, the Individual Defendants attributed Fluor's revenue growth to the Power and Government segments, and credited the Power segment with offsetting earnings declines in other segments.  In particular, the 2016 Form 10-K stated:

> Consolidated revenue for 2016 was $19.0 billion compared to $18.1 billion for 2015. During 2016, revenue growth in the Industrial, Infrastructure & Power, Government and Maintenance, Modification & Asset Integrity segments were partially offset by a revenue decline in the Energy, Chemicals & Mining segment. The revenue growth resulted primarily from increased project execution activities for several power projects, as well as revenue contributions from the acquired Stork business.

*       *       *

> Revenue in 2016 increased 81 percent compared to 2015, primarily due to increased project execution activities in the power business line for several projects, including two nuclear projects and several gas-fired power plants in the southeastern United States….

> Segment profit increased significantly in 2016 compared to 2015 primarily due to the higher volume of project execution activities for the power projects mentioned above, as well as the adverse impact in the prior year of a loss of $60 million resulting from forecast revisions on a large gas-fired power plant in Brunswick County, Virginia.

213.    The 2016 Form 10-K reported consolidated new awards of $21 billion and backlog of $45 billion, with the Individual Defendants continuing to credit the Power segment with driving these metrics.  Specifically, the 2016 Form 10-K stated:

> Consolidated new awards for 2016 were $21.0 billion compared to $21.8 billion in 2015 and $28.8 billion in 2014. The Energy, Chemicals & Mining; Industrial, Infrastructure & Power; and Government segments were the significant drivers of new award activity during 2016, including an award for the Tengiz Oil Expansion Project in Kazakhstan that was awarded in the third quarter.

*       *       *

Consolidated backlog was $45.0 billion as of December 31, 2016, $44.7 billion as of December 31, 2015, and $42.5 billion as of December 31, 2014. The higher backlog at the end of 2016 was due to significant new awards and project adjustments in the Energy, Chemicals & Mining and Industrial, Infrastructure & Power segments, partially offset by an adjustment for a liquefied natural gas project that was suspended in the third quarter.

214.    On May 4, 2017, Fluor filed the Q1 2017 Form 10-Q.  The Q1 2017 Form 10-Q reported revenue of $4.8 billion and net earnings of $77.3 million.  The report also disclosed that Fluor had recorded claim revenue of $66 million as of the end of the quarter.  The Individual Defendants claimed in the Q1 2017 Form 10-Q that Fluor recognizes claim revenue when it determines "that recovery of incurred costs is probable."  Specifically, the Q1 2017 Form 10-Q stated:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue, but not profit, for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) when it is determined *that recovery of incurred costs is probable* and the amounts can be reliably estimated. Under claims accounting (ASC 605-35-25), these requirements are satisfied when (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. Similarly, the company recognizes disputed back charges to suppliers or subcontractors as a reduction of cost when the same requirements have been satisfied. The company periodically evaluates its positions and the amounts recognized with respect to all its claims and back charges. *As of March 31, 2017 and December 31, 2016, the company had recorded $66 million and $61 million, respectively, of claim revenue* for costs incurred to date and such costs are included in contract work in progress. Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future periods. The company had also recorded disputed back charges totaling $41 million as of both March 31, 2017 and December 31, 2016. The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 605-35-25.

215.    The Individual Defendants continued to tout the Power and Government segments' performance in the Q1 2017 Form 10-Q, attributing the Company's revenue growth to "increased

project execution activities for several power projects."  In particular, the Q1 2017 Form 10-Q

stated:

>Consolidated revenue of $4.8 billion for the three months ended March 31, 2017 increased compared to $4.4 billion for the three months ended March 31, 2016. Revenue growth in the Industrial, Infrastructure & Power; Government; and Diversified Services segments were partially offset by revenue declines in the Energy, Chemicals & Mining segment. The revenue growth resulted primarily from increased project execution activities for several power projects, as well as revenue contributions from the Stork acquisition.
>
>    *        *        *
>
>Revenue for the three months ended March 31, 2017 increased by 44 percent compared to the three months ended March 31, 2016 primarily due to increased project execution activities for several power projects, including two nuclear projects for Westinghouse and two gas-fired power plants in the southeastern United States, as well as increased project execution activities for several life sciences and advanced manufacturing projects in the early stages of project execution.
>
>Segment profit for the three months ended March 31, 2017 decreased significantly compared to the corresponding period in 2016. The decrease in segment profit was driven by cost increases and forecast revisions of approximately $30 million, primarily for a gas-fired power plant in South Carolina.
>
>    *        *        *
>
>Net earnings attributable to Fluor Corporation were $61 million and $104 million for the three months ended March 31, 2017 and 2016, respectively. The first quarter of 2017 reflects lower earnings contributions from the Energy, Chemicals & Mining segment…. The decrease in earnings was further driven by cost increases and forecast revisions on certain Industrial, Infrastructure & Power projects, primarily for a gas-fired power plant in South Carolina, as well as lower earnings contributions from the Diversified Services segment when compared to the prior period. These declines were partially offset by higher earnings contributions from the Government segment and lower corporate general and administrative expenses….

216.    The Q1 2017 Form 10-Q also reported consolidated new awards of $2.3 billion,

with the Power segment being a major contributor.  Unlike Fluor's previous filings, however, the

Q1 2017 Form 10-Q's discussion of backlog made no mention of the Power or Government segments. Specifically, the Q1 2017 Form 10-Q stated:

> Consolidated new awards were $2.3 billion for the three months ended March 31, 2017 compared to new awards of $4.7 billion for the three months ended March 31, 2016. The Energy, Chemicals &Mining; Industrial, Infrastructure & Power; and Government segments were the major contributors to the new award activity in the first quarter of 2017 including the A10 Zuidasdok project in Amsterdam and two refinery projects in Texas.

> \*       \*       \*

> Consolidated backlog as of March 31, 2017 was $41.6 billion compared to $46.0 billion as of March 31, 2016. The decrease in backlog primarily resulted from an adjustment for a liquefied natural gas project in Canada that was suspended in the third quarter of 2016 and an adjustment made in the first quarter of 2017 to limit the contractual term of the Magnox RSRL Project to a five year term, as well as new award activity being outpaced by work performed in the Energy, Chemicals & Mining segment.

217.    On August 3, 2017, Fluor filed the Q2 2017 Form 10-Q. The Q2 2017 Form 10-Q reported revenue of $4.7 billion and a net loss of $6.6 million. In addition, the Q2 2017 Form 10-Q reported that Fluor had recorded claim revenue of $75 million for the quarter. The Individual Defendants claimed in the Q2 2017 Form 10-Q that Fluor recognizes claim revenue when it determines "that recovery of incurred costs is probable." In particular, the Q2 2017 Form 10-Q stated:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue, but not profit, for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) when it is determined ***that recovery of incurred costs is probable and the amounts can be reliably estimated***. Under claims accounting (ASC 605-35-25), these requirements are satisfied when (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. Similarly, the company recognizes disputed back charges to suppliers or subcontractors as a reduction of cost when the same requirements have been satisfied. The company periodically evaluates its positions and the

amounts recognized with respect to all its claims and back charges. ***As of June 30, 2017 and December 31, 2016, the company had recorded $75 million and $61 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract work in progress***. Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future periods. The company had also recorded disputed back charges totaling $41 million as of both June 30, 2017 and December 31, 2016. The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 605-35-25.

218.    The Q2 2017 Form 10-Q also noted revenue growth in the Power and Government segments.  Specifically, the Q2 2017 Form 10-Q stated:

> Consolidated revenue of $4.7 billion for the three months ended June 30, 2017 decreased 3 percent compared to $4.9 billion for the three months ended June 30, 2016. During the three month period, revenue declines in the Energy, Chemicals & Mining and Diversified Services segments were partially offset by revenue increases in the Government segment. Consolidated revenue of $9.6 billion for the six months ended June 30, 2017 increased 3 percent compared to $9.3 billion for the six months ended June 30, 2016. During the six month period, revenue growth in the Industrial, Infrastructure & Power and Government segments were partially offset by revenue declines in the Energy, Chemicals & Mining segment.

> *        *        *

> Revenue for the three and six months ended June 30, 2017 increased by 2 percent and 21 percent, respectively, compared to the three and six months ended June 30, 2016. Revenue growth for both periods, which primarily resulted from increased project execution activities for several life sciences and advanced manufacturing projects and two nuclear projects for Westinghouse, was adversely affected by forecast revisions for three fixed-price, gas-fired power plant projects in the southeastern United States.

> Segment profit and segment profit margin for the three and six months ended June 30, 2017 were adversely affected by charges totaling $194 million and $219 million, respectively, resulting from forecast revisions for estimated cost growth at the three fixed-price, gas-fired power plant projects mentioned above.

219.    The Q2 2017 Form 10-Q reported consolidated new awards of $3.2 billion and backlog of $37.6 billion.

220.    On the same day, the Company held an earnings conference call with analysts and investors to discuss its financial results for the second quarter of 2017.  During the call, defendant

Seaton assured stockholders that although Fluor had taken a $194 million charge related to three of the Gas-Fired Plants, it was improving its internal controls in order to make future charges "diminished and less frequent."  Specifically, defendant Seaton stated:

> In addition to the changes in management of Power group, our strategic evaluation of the gas-fired power market, ***we're also implementing other changes to give us greater confidence that these types of earnings adjustments are diminished and less frequent***.

> \*       \*       \*

> ***We have significantly increased the independent review of critical projects. We are improving our estimating system. And we're also making significant investments in applying data analytics to projects so that we can identify challenges earlier, which would allow us to mitigate problems sooner***. We believe all these actions will minimize downside risk and allow for greater upside opportunities.

> \*       \*       \*

> We have -- we do review all these big projects on a routine basis. And we do have cold eyes or different lenses that look at them.

> \*       \*       \*

> I would argue that the lion's share of our lump-sum backlog is performing extremely well. And that's about as far as I really want to go with that. But ***we're improving our tools and systems. We -- as I said, we've changed the review process to where there's more cold eyes review***.

> \*       \*       \*

> [W]e're looking at ourselves in terms of what we need to do. We just -- I don't think it's going to take long. I think that my expectation, and I've kind of coined this phrase, is flawless personal performance. And what that -- it doesn't mean I'm looking for perfection, but what it does mean I'm looking for is accountability and execution excellence. And we started that process when we found the problem in the CPChem, and we're continuing to do those reviews and make the changes necessary so that we don't have a repeat of what we've had here. And I'm -- I can tell you that -- I guess that we've dinged our credibility with you guys and we got to rebuild that.

221.     On November 2, 2017, Fluor filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q").  The Q3 2017 Form 10-Q reported revenue of $4.9 billion and net earnings of $112.8 million.  In addition, the Q3 2017 Form 10-Q reported that as of September 30, 2017, Fluor had recorded claim revenue of $80 million.  The Individual Defendants claimed in the Q3 2017 Form 10-Q that Fluor recognizes claim revenue when it determines "that recovery of incurred costs is probable."  Specifically, the Q3 2017 Form 10-Q stated:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue, but not profit, for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) when it is determined *that recovery of incurred costs is probable* and the amounts can be reliably estimated. Under claims accounting (ASC 605-35-25), these requirements are satisfied when (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. Similarly, the company recognizes disputed back charges to suppliers or subcontractors as a reduction of cost when the same requirements have been satisfied. The company periodically evaluates its positions and the amounts recognized with respect to all its claims and back charges. The company periodically evaluates its positions and the amounts recognized with respect to all its claims and back charges. *As of September 30, 2017 and December 31, 2016, the company had recorded $80 million and $61 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract work in progress*. Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future periods. The company had also recorded disputed back charges totaling $43 million and $41 million as of September 30, 2017 and December 31, 2016, respectively. The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 605-35-25.

222.     In the Q3 2017 Form 10-Q, the Individual Defendants commented on revenue growth in the Power segment and reported consolidated new awards of $3.8 billion and backlog of $32.9 billion.  In particular, the Q3 2017 Form 10-Q stated:

Consolidated revenue of $4.9 billion for the three months ended September 30, 2017 increased 4 percent compared to $4.8 billion for the three months ended September 30, 2016. During the three month period, revenue increased in the Energy, Chemicals & Mining and Government segments, while revenue from the Industrial, Infrastructure & Power and Diversified Services segments was consistent with prior year levels. Consolidated revenue of $14.5 billion for the nine months ended September 30, 2017 increased 3 percent compared to $14.0 billion for the nine months ended September 30, 2016. During the nine month period, revenue growth in the Industrial, Infrastructure & Power; Government; and Diversified Services segments was partially offset by a revenue decline in the Energy, Chemicals & Mining segment.

*       *       *

Consolidated new awards were $3.8 billion and $9.3 billion for the three and nine months ended September 30, 2017, respectively, compared to new awards of $7.0 billion and $18.1 billion for the three and nine months ended September 30, 2016. All business segments contributed to the new award activity in 2017.

*       *       *

Consolidated backlog as of September 30, 2017 was $32.9 billion compared to $44.3 billion as of September 30, 2016. The decrease in backlog primarily resulted from the removal of two nuclear power plant projects for Westinghouse Electric Company LLC ("Westinghouse") in South Carolina ("V.C. Summer") and in Georgia ("Plant Vogtle") and an adjustment made in the first quarter of 2017 to limit the contractual term of the Magnox nuclear decommissioning project in the United Kingdom ("Magnox RSRL Project") to a five year term, as well as new award activity being outpaced by work performed.

223.   On February 20, 2018, Fluor filed the 2017 Form 10-K.  The 2017 Form 10-K reported revenue of $19.5 billion, net earnings of $191.4 million, and claim revenue of $124 million.  In the 2017 Form 10-K, the Individual Defendants stated the Company recognizes claim revenue for unapproved change orders "when it is probable that the cost will be recovered through a change in the contract price."  Specifically, the 2017 Form 10-K stated:

The company has made claims arising from the performance under its contracts. The company recognizes revenue, but not profit, for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) when it is determined that recovery of incurred cost is probable and the amounts can be reliably estimated. Under claims accounting (ASC 605-35-25), these requirements are satisfied when (a) the contract or other evidence provides a

legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. Cost, but not profit, associated with ***unapproved change orders is accounted for in revenue when it is probable that the cost will be recovered through a change in the contract price***. In circumstances where recovery is considered probable, but the revenue cannot be reliably estimated, cost attributable to change orders is deferred pending determination of the impact on contract price. If the requirements for recognizing revenue for claims or unapproved change orders are met, revenue is recorded only to the extent that costs associated with the claims or unapproved change orders have been incurred. Back charges to suppliers or subcontractors are recognized as a reduction of cost when it is determined that recovery of such cost is probable and the amounts can be reliably estimated. Disputed back charges are recognized when the same requirements described above for claims accounting have been satisfied. The company periodically evaluates its positions and amounts recognized with respect to all claims and back charges. ***As of December 31, 2017 and 2016, the company had recorded $124 million and $61 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract work in progress***. Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future periods. The company had also recorded disputed back charges totaling $18 million and $41 million as of December 31, 2017 and 2016, respectively. The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 605-35-25.

224.    In the 2017 Form 10-K, the Individual Defendants touted revenue growth in the

Power and Government segments and reported consolidated new awards of $12.6 billion and

backlog of $30.9 billion.  In particular, the 2017 Form 10-K stated:

Consolidated revenue was $19.5 billion, $19.0 billion and $18.1 billion during 2017, 2016 and 2015, respectively. During both 2017 and 2016, revenue growth in the Industrial, Infrastructure & Power, Government and Diversified Services segments was partially offset by revenue declines in the Energy, Chemicals & Mining segment.

*        *        *

Consolidated new awards in 2017 were $12.6 billion compared to $21.0 billion in 2016 and $21.8 billion in 2015. All business segments contributed to the new award activity in 2017, including a mining project in Chile, a power restoration project in Puerto Rico, a contract extension for the LOGCAP IV program, a propylene oxide project in Texas and infrastructure projects in the United States and the Netherlands.

*     *     *

Consolidated backlog was $30.9 billion as of December 31, 2017, $45.0 billion as of December 31, 2016, and $44.7 billion as of December 31, 2015. The decrease in backlog at the end of 2017 primarily resulted from the removal of two nuclear power plant projects for Westinghouse Electric Company LLC ("Westinghouse") and an adjustment to limit the contractual term of the Magnox nuclear decommissioning project in the United Kingdom (the "Magnox RSRL Project") to a five year term, as well as new award activity being outpaced by work performed.

225.    On May 3, 2018, Fluor filed the Q1 2018 Form 10-Q.  The Q1 2018 Form 10-Q reported revenue of $4.8 billion and a net loss of $17.5 million.  In addition, the Q1 2018 Form 10-Q reported that as of March 31, 2018, Fluor had recorded claim revenue of $134 million.  The Individual Defendants claimed in the Q1 2018 Form 10-Q that Fluor recognizes claim revenue "when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur."  In particular, the Q1 2018 Form 10-Q stated:

The company has made claims arising from the performance under its contracts. The company recognizes revenue for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) **when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur**. The company estimates the amount of revenue to be recognized on claims using the expected value (i.e., the sum of a probability-weighted amount) or the most likely amount method, whichever is expected to better predict the amount. Factors considered in determining whether revenue associated with claims should be recognized include the following: (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable.  Similarly, the company recognizes disputed back charges to suppliers or subcontractors as a reduction of cost when the same requirements have been satisfied. The company periodically evaluates its positions and the amounts recognized with respect to all its claims and back charges. **As of March 31, 2018 and December 31, 2017, the company had recorded $134 million and $124 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract assets**. Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future periods. The company had also recorded disputed back charges totaling $18 million as of both March 31, 2018 and December 31,

2017, respectively. The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 606.

226.    In the Q1 2018 Form 10-Q, the Individual Defendants touted revenue growth in the

Government segment and reported consolidated new awards of $2.5 billion and backlog of $29.1

billion.  Specifically, the Q1 2018 Form 10-Q stated:

> Consolidated revenue of $4.8 billion for the three months ended March 31, 2018 remained flat compared to the three months ended March 31, 2017. Revenue growth in the Government and Diversified Services segments was offset by revenue declines in the Mining, Industrial, Infrastructure & Power and Energy & Chemicals segments.
>
> *        *        *
>
> For the three months ended March 31, 2018, the company recognized a net loss attributable to Fluor Corporation of $18 million compared to net earnings attributable to Fluor Corporation of $61 million for the three months ended March 31, 2017. During the first quarter of 2018, losses in the Mining, Industrial, Infrastructure & Power and lower earnings contributions from the Diversified Services segments were partially offset by higher earnings contributions from the Government and Energy & Chemicals segments. Earnings in the first quarter of 2018 and 2017 were adversely affected by after-tax charges totaling approximately $96 million and $22 million, respectively, resulting from forecast revisions for estimated cost growth on certain fixed-price projects.
>
> *        *        *
>
> Consolidated new awards were $2.5 billion for the three months ended March 31, 2018 compared to new awards of $2.3 billion for the three months ended March 31, 2017. The Mining, Industrial, Infrastructure & Power and Energy & Chemicals segments were the major contributors to the new award activity in the first quarter of 2018.
>
> *        *        *
>
> Consolidated backlog as of March 31, 2018 was $29.1 billion compared to $41.6 billion as of March 31, 2017. The decrease in backlog primarily resulted from the removal of two nuclear power plant projects for Westinghouse Electric Company LLC ("Westinghouse") as well as new award activity being outpaced by work performed.

227.    On August 2, 2018, Fluor filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2018 (the "Q2 2018 Form 10-Q").  The Q2 2018 Form 10-

Q reported revenue of $4.8 billion and net earnings of $114.8 million.  In addition, the Q2 2018

Form 10-Q reported that as of June 30, 2018, Fluor had recorded claim revenue of $132 million.

The Individual Defendants claimed in the Q2 2018 Form 10-Q that Fluor recognizes claim revenue

"when it is probable that a significant reversal in the amount of cumulative revenue recognized

will not occur."  In particular, the Q2 2018 Form 10-Q stated:

> The company has made claims arising from the performance under its
> contracts. The company recognizes revenue for certain claims (including change
> orders in dispute and unapproved change orders in regard to both scope and price)
> ***when it is probable that a significant reversal in the amount of cumulative
> revenue recognized will not occur***. The company estimates the amount of revenue
> to be recognized on claims using the expected value (i.e., the sum of a probability-
> weighted amount) or the most likely amount method, whichever is expected to
> better predict the amount. Factors considered in determining whether revenue
> associated with claims should be recognized include the following: (a) the contract
> or other evidence provides a legal basis for the claim, (b) additional costs were
> caused by circumstances that were unforeseen at the contract date and not the result
> of deficiencies in the company's performance, (c) claim-related costs are
> identifiable and considered reasonable in view of the work performed, and
> (d) evidence supporting the claim is objective and verifiable.  Similarly, the
> company recognizes disputed back charges to suppliers or subcontractors as a
> reduction of cost when the same requirements have been satisfied. The company
> periodically evaluates its positions and the amounts recognized with respect to all
> its claims and back charges. ***As of June 30, 2018 and December 31, 2017, the
> company had recorded $132 million and $124 million, respectively, of claim
> revenue for costs incurred to date and such costs are included in contract assets***.
> Additional costs, which will increase the claim revenue balance over time, are
> expected to be incurred in future periods. The company had also recorded disputed
> back charges totaling $18 million as of both June 30, 2018 and December 31, 2017,
> respectively. The company believes the ultimate recovery of amounts related to
> these claims and back charges is probable in accordance with ASC 606.

228.    In the Q2 2018 Form 10-Q, the Individual Defendants commented on revenue

growth in the Power and Government segments, and reported consolidated new awards of $5.4

billion and $29.3 billion, adding that the Power segment was a "major contributor[] to the new

award activity."  Specifically, the Q2 2018 Form 10-Q stated:

> Consolidated revenue of $4.9 billion for the three months ended June 30, 2018
> increased 4 percent compared to $4.7 billion for the three months ended June 30,

2017. Revenue growth in the Mining, Industrial, Infrastructure & Power, Government and Diversified Services segments was partially offset by revenue declines in the Energy & Chemicals segment. Consolidated revenue of $9.7 billion for the six months ended June 30, 2018 increased slightly compared to $9.6 billion for the six months ended June 30, 2017. Revenue growth in the Government and Diversified Services segments was offset by revenue declines in the Energy & Chemicals and Mining, Industrial, Infrastructure & Power segments.

*     *     *

Consolidated new awards were $5.4 billion and $7.9 billion for the three and six months ended June 30, 2018 compared to new awards of $3.2 billion and $5.5 billion for the three and six months ended June 30, 2017. The Mining, Industrial, Infrastructure & Power and Energy & Chemicals segments were the major contributors to the new award activity in the first half of 2018.

*     *     *

Consolidated backlog as of June 30, 2018 was $29.3 billion compared to $37.6 billion as of June 30, 2017. The decrease in backlog primarily resulted from the removal of a nuclear power plant project for Westinghouse Electric Company LLC ("Westinghouse") as well as new award activity being outpaced by work performed.

229.    On November 1, 2018, Fluor filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2018 (the "Q3 2018 Form 10-Q"). The Q3 2018 Form 10-Q reported revenue of $4.6 billion and net earnings of $77.3 million. In addition, the Q3 2018 Form 10-Q reported that as of September, 2018, Fluor had recorded claim revenue of $156 million. The Individual Defendants claimed in the Q3 2018 Form 10-Q that Fluor recognizes claim revenue "when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur." In particular, the Q3 2018 Form 10-Q stated:

The company has made claims arising from the performance under its contracts. The company recognizes revenue for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) *when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur*. The company estimates the amount of revenue to be recognized on claims using the expected value (i.e., the sum of a probability-weighted amount) or the most likely amount method, whichever is expected to better predict the amount. Factors considered in determining whether revenue

associated with claims should be recognized include the following: (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable.   Similarly, the company recognizes disputed back charges to suppliers or subcontractors as a reduction of cost when the same requirements have been satisfied. The company periodically evaluates its positions and the amounts recognized with respect to all its claims and back charges. *As of September 30, 2018 and December 31, 2017, the company had recorded $156 million and $124 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract assets.* Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future periods. The company had also recorded disputed back charges totaling $18 million as of both September 30, 2018 and December 31, 2017, respectively. The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 606.

230.    In the Q3 2018 Form 10-Q, the Individual Defendants commented on revenue growth in the Power and Government segments, and reported consolidated new awards of $9.6 billion and backlog of $34.9 billion, with the Power and Government segments being "the major contributors to the new award activity."  Specifically, the Q3 2018 Form 10-Q stated:

> Consolidated revenue of $4.7 billion for the three months ended September 30, 2018 decreased 6 percent compared to $4.9 billion for the three months ended September 30, 2017. Revenue declines in the Energy & Chemicals and Diversified Services segments were partially offset by revenue growth in the Mining, Industrial, Infrastructure & Power and Government segments.

*        *        *

> Consolidated new awards were $9.6 billion and $17.6 billion for the three and nine months ended September 30, 2018, respectively, compared to new awards of $3.8 billion and $9.3 billion for the three and nine months ended September 30, 2017. The Mining, Industrial, Infrastructure & Power and Government segments were the major contributors to the new award activity in the first nine months of 2018.

231.    On February 21, 2019, Fluor filed the 2018 Form 10-K.  The 2018 Form 10-K reported revenue of $19.1 billion and net earnings of $224.8 million.  In addition, the 2018 Form 10-K reported that, as of December 31, 2018, Fluor had recorded $166 million of claim revenue.

The Individual Defendants claimed in the 2018 Form 10-K that Fluor recognizes claim revenue "when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur."  In particular, the 2018 Form 10-K stated:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) *when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur*. The company estimates the amount of revenue to be recognized on claims using the expected value (i.e., the sum of a probability-weighted amount) or the most likely amount method, whichever is expected to better predict the amount. Factors considered in determining whether revenue associated with claims should be recognized include the following: (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable.  Similarly, the company recognizes disputed back charges to suppliers or subcontractors as a reduction of cost when the same requirements have been satisfied. The company periodically evaluates its positions and the amounts recognized with respect to all its claims and back charges. *As of December 31, 2018 and 2017, the company had recorded $166 million and $124 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract work in progress*. Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future periods. The company had also recorded disputed back charges totaling $18 million as of December 31, 2018 and 2017. The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 606.

232.    In the 2018 Form 10-K, the Individual Defendants commented on revenue growth in the Government segment and reported consolidated new awards of $27.7 billion and backlog of $40 billion, with the Power segment being a "significant driver[] of new award activity." Specifically, the 2018 Form 10-K stated:

> Consolidated revenue was $19.2 billion, $19.5 billion and $19.0 billion during 2018, 2017 and 2016, respectively. During 2018, a revenue decline in the Energy & Chemicals segment was partially offset by revenue growth in the Government segment. Revenue in the Mining, Industrial, Infrastructure & Power and Diversified Services segments remained flat compared to 2017.

\*       \*       \*

Consolidated new awards in 2018 were $27.7 billion compared to $12.6 billion in 2017 and $21.0 billion in 2016. The Energy & Chemicals and Mining, Industrial, Infrastructure & Power segments were the significant drivers of new award activity during 2018….

\*       \*       \*

Consolidated backlog was $40.0 billion as of December 31, 2018, $30.9 billion as of December 31, 2017, and $45.0 billion as of December 31, 2016. The increase in backlog in 2018 primarily resulted from the new award activity discussed above.

233.    On May 2, 2019, Fluor filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2019 (the "Q1 2019 Form 10-Q").  The Q1 2019 Form 10-Q reported revenue of $4.1 billion and a net loss of $58.4 million.  In addition, the Q1 2019 Form 10-Q reported that as of March 31, 2019, Fluor had recorded claim revenue of $175 million, thus revealing that the Company's reported quarterly revenue included $9 million for its submission of change orders.  The Individual Defendants claimed in the Q1 2019 Form 10-Q that Fluor recognizes claim revenue "when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur."  In particular, the Q1 2019 Form 10-Q stated:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) **when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur**. The company estimates the amount of revenue to be recognized on claims using the expected value (i.e., the sum of a probability-weighted amount) or the most likely amount method, whichever is expected to better predict the amount. Factors considered in determining whether revenue associated with claims should be recognized include the following: (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable.  Similarly, the company recognizes disputed back charges to suppliers or subcontractors as a reduction of cost when the same requirements have been satisfied. The company periodically evaluates its positions and the amounts recognized with respect to all

its claims and back charges. *As of March 31, 2019 and December 31, 2018, the company had recorded $175 million and $166 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract assets.* Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future periods. The company had also recorded disputed back charges totaling $18 million as of both March 31, 2019 and December 31, 2018. The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 606.

234.    On August 1, 2019, Fluor with the SEC filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2019 (the "Q2 2019 Form 10-Q"). The Q2 2019 Form 10-Q reported revenue of $4 billion and a net loss of $554.8 million. In addition, the Q2 2019 Form 10-Q reported that as of June 30, 2019, Fluor had recorded claim revenue of $196 million, thus revealing that the Company's reported quarterly revenue included $21 million for its submission of change orders. The Individual Defendants claimed in the Q2 2019 Form 10-Q that Fluor recognizes claim revenue "when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur." In particular, the Q2 2019 Form 10-Q stated:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) *when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur*. The company estimates the amount of revenue to be recognized on claims using the expected value (i.e., the sum of a probability-weighted amount) or the most likely amount method, whichever is expected to better predict the amount. Factors considered in determining whether revenue associated with claims should be recognized include the following: (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable. Similarly, the company recognizes disputed back charges to suppliers or subcontractors as a reduction of cost when the same requirements have been satisfied. The company periodically evaluates its positions and the amounts recognized with respect to all its claims and back charges. *As of June 30, 2019 and December 31, 2018, the company had recorded $196 million and $166 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract assets*. Additional costs, which will increase the claim revenue balance over time, are

expected to be incurred in future periods. The company had also recorded disputed back charges totaling $2 million and $18 million as June 30, 2019 and December 31, 2018, respectively. The company believes the ultimate recovery of amounts related to these claims and back charges is probable in accordance with ASC 606.

235.    On October 31, 2019, Fluor filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2019 (the "Q3 2019 Form 10-Q").  The Q3 2019 Form 10-Q reported revenue of $3.9 billion and a net loss of $741.9 million.  In addition, the Q3 2019 Form 10-Q reported that as of September 30, 2019, Fluor had recorded claim revenue of $205 million, thus revealing that the Company's reported quarterly revenue included $9 million for its submission of change orders.  The Individual Defendants claimed in the Q3 2019 Form 10-Q that Fluor recognizes claim revenue "when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur."  In particular, the Q3 2019 Form 10-Q stated:

> The company has made claims arising from the performance under its contracts. The company recognizes revenue for certain claims (including change orders in dispute and unapproved change orders in regard to both scope and price) ***when it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur***. The company estimates the amount of revenue to be recognized on claims using the expected value (i.e., the sum of a probability-weighted amount) or the most likely amount method, whichever is expected to better predict the amount. Factors considered in determining whether revenue associated with claims should be recognized include the following: (a) the contract or other evidence provides a legal basis for the claim, (b) additional costs were caused by circumstances that were unforeseen at the contract date and not the result of deficiencies in the company's performance, (c) claim-related costs are identifiable and considered reasonable in view of the work performed, and (d) evidence supporting the claim is objective and verifiable.   Similarly, the company recognizes disputed back charges to suppliers or subcontractors as a reduction of cost when the same requirements have been satisfied. The company periodically evaluates its positions and the amounts recognized with respect to all its claims and back charges. ***As of September 30, 2019 and December 31, 2018, the company had recorded $205 million and $166 million, respectively, of claim revenue for costs incurred to date and such costs are included in contract assets***. Additional costs, which will increase the claim revenue balance over time, are expected to be incurred in future periods. The company had also recorded disputed back charges totaling $2 million and $18 million as September 30, 2019 and December 31, 2018, respectively. The company believes the ultimate recovery of

amounts related to these claims and back charges is probable in accordance with ASC 606.

236.    The above statements were improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing: (i) the Company's earnings were inflated through improper revenue recognition; (ii) the Company's revenue included submissions of change orders that clients were under no contractual obligation to pay; (iii) as a result, the Company had no reasonable basis to conclude that it was "probable that a significant reversal in the amount of cumulative revenue recognized will not occur"; and (iv) the Company's reported financial metrics were inflated and generated by underbidding on fixed-price contracts that faced execution issues and impacted the Company's profitability.

**Improper Statements Concerning Fluor's Unresolved Change Orders, Claims, and Disputes**

237.    In each of the Company's Forms 10-K filed during the period of wrongdoing, the Individual Defendants represented that Fluor evaluates "the impact of change orders, liability claims, [and] contract disputes" when accounting for revenue.   The Individual Defendants, however, concealed the significant unresolved matters, including open claims, unapproved change orders, and unresolved disputes between the Company and its clients, subcontractors, and suppliers that existed on at least sixteen of its fixed-price projects and represented over $700 million in unrecorded contract charges.   Specifically, while concealing unresolved matters and unrecorded charges, the Forms 10-K stated in identical or substantially similar language:

> The percentage-of-completion method of revenue recognition requires the company to prepare estimates of cost to complete for contracts in progress. In making such estimates, judgments are required to evaluate contingencies such as potential variances in schedule and the cost of materials, labor cost and productivity, ***the impact of change orders, liability claims, contract disputes*** and achievement of contractual performance standards. Changes in total estimated contract cost and losses, if any, are recognized in the period they are determined.

**Improper Statements Concerning Fluor's Disclosure Controls and Procedures**

238.    The Individual Defendants confirmed that the Company's internal controls over financial reporting were effective in each of its Forms 10-K filed during the period of wrongdoing. In particular, these Forms 10-K stated:

> The company's internal control over financial reporting is a process designed, as defined in Rule 13a-15(f) under the Exchange Act, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with generally accepted accounting principles in the United States.
>
> In connection with the preparation of the company's annual consolidated financial statements, management of the company has undertaken an assessment of the effectiveness of the company's internal control over financial reporting … Management's assessment included an evaluation of the design of the company's internal control over financial reporting and testing of the operational effectiveness of the company's internal control over financial reporting. Based on this assessment, ***management has concluded that the company's internal control over financial reporting was effective*** as of [the end of the period covered by this annual report].

239.    In addition, each of the Company's Forms 10-K and 10-Q filed during the period of wrongdoing stated that Fluor's CEO and CFO had conducted an evaluation of Fluor's internal controls and disclosure procedures and determined that those controls and procedures were effective.

240.    These Forms 10-K and 10-Q contained the signed certifications of defendants Hernandez, Steuert, Seaton, Stanski, and Porter pursuant SOX attesting that: (i) each report "fairly present[ed] in all material respects the financial condition [and] results of operations"; (ii) each report "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (iii) they had "[d]esigned such disclosure controls and procedures, or

caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the [Company] … is made known to [them]"; (iv) they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; (v) they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures"; and (vi) they had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]"[18]

241.    In the Company's the Forms 10-K and 10-Q, the Individual Defendants represented that in recognizing revenue, all currently estimated fixed-price contract costs had been recognized. In particular, the Forms 10-K stated in identical or substantially similar language:

> The percentage-of-completion method of revenue recognition requires the company to prepare estimates of cost to complete for contracts in progress. In making such estimates, judgments are required to evaluate contingencies such as potential variances in schedule and the cost of materials, labor cost and productivity, the impact of change orders, liability claims, contract disputes and achievement of contractual performance standards. ***Changes in total estimated contract cost and losses, if any, are recognized in the period they are determined***.

242.    The above statements were improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing: (i) as a result of the Individual Defendants' failures, Fluor did not have adequate project governance processes and controls to

---

[18] Exhibit C details the defendants who made certifications pursuant to SOX in each of the Company's Forms 10-K and Forms 10-Q filed during the period of wrongdoing.

review projects and oversee execution; (ii) contrary to the Individual Defendants' asserting that they conducted routine project reviews, a litany of unresolved issues remained imbedded in the Company's fixed-price projects; (iii) the Individual Defendants' failure to maintain project governance processes and controls sufficient to identify and capture all evidence of contract costs on each of the Company's fixed-price contracts violated GAAP; (iv) the Company did not immediately recognize losses for any contracts in a loss position in violation of GAAP; (v) Fluor's recognition of revenue on unapproved change orders and open claims violated GAAP; (vi) as a result of the foregoing, the Company's representations concerning the effectiveness of its internal controls and certifications pursuant to SOX were improper.

## THE TRUTH SLOWLY EMERGES AS THE IMPROPER STATEMENTS CONTINUE

243.    The truth about the Individual Defendants' wrongdoing slowly emerged through a series of partial disclosures beginning when the Company was forced to reveal losses on the Gas-Fired Plants and could no longer suppress the bidding and execution issues related to those plants. As Fluor disclosed charges on these specific fixed-price projects, the Individual Defendants assured stockholders the issues were isolated incidents and did not reflect any systematic problems in Fluor's bidding, execution, and internal controls.  These assurances could no longer hold up, when, by the end of 2019, the Company had disclosed a total of ***$1.4 billion*** in charges and losses on various fixed-price projects due to forecast revisions, cost overruns, and settlements.   In February 2020, the revelations culminated with the announcement of a pending SEC investigation.

244.    The truth began to emerge on May 3, 2018, when Fluor filed the Q1 2018 Form 10-Q and disclosed that the Power segment's profit had been "adversely affected by ***forecast revisions of approximately $125 million***" for the Citrus County Plant, resulting in a net loss of $18 million. The Q1 2018 Form 10-Q also reported that Fluor was leaving the gas-fired power plant market.

In addition, the Company's earnings press release issued in conjunction with the Q1 2018 Form 10-Q slashed the Company's full-year guidance from $3.10 to $3.50 per share to a range of between $2.10 and $2.50 per share.  During Fluor's earnings conference call held with analysts and investors on the same day, defendant Seaton explained that "the majority of the $125 million charge[s]" was "driven by extremely low ongoing productivity."  In particular, defendant Seaton stated:

> Let's start off by discussing the challenges that we are experiencing on the same gas-fired power project we discussed last quarter and the steps we're taking to complete this project and in Fluor's participation in the specific end market. ***Craft productivity and estimating were materially different than the original baseline expectations*** we made in the initial charge on this project last year. While those factors were included in our initial charge, ***the majority of the $125 million charge taken this quarter is driven by extremely low ongoing productivity*** and the financial impact that this has relative to initial expected timing of when the 2 units would be available for power production based on the current outlook. As of last week, this project is 86% complete with an expected completion date in Q4 of this year.

245.    Defendant Seaton then admitted that—contrary to his repeated claims that Fluor was unlike its competitors—Fluor was also underbidding in order to win project awards, just like other contractors were.  Defendant Seaton also conceded that Fluor's bidding practices were aggressive and unachievable rather than conservative.  As a result of this improper and risk-laden bidding, defendant Seaton acknowledged, "10 of the 12 [gas-fired projects the Company has had since 2003] have underperformed our as-sold expectation, with 3 suffering losses."  Specifically, defendant Seaton stated:

> Last August, we made a number of changes to our power business. This included in -- bringing in new leadership, removing certain executives and closing our power operation office in Charlotte. I also stated that we were in the process of assessing the gas-fired market to determine if there are opportunities for risk-adjusted returns that are consistent with our expectations and long-term experience. I'd like to share with you the outcome of our review and the further actions that we are taking. I'm going to ask everyone to pay close attention.
>
> The U.S. power consumption growth rate is less than 1%. The power produces -- producers do not really need additional capacity, other than satisfying regional

needs. *We, the industry and the entire E&C community have led our clients to believe that a gas-fired power project costs approximately 650 kilowatts -- $650 per kilowatt, although virtually no one has delivered one for that value. The customers start at that figure and negotiate downward, and there's always some contractor that is willing to say okay to lower number, using some excuse to justify the win, Fluor included*.

We have had 12 gas-fired power projects since 2003. *10 of the 12 have underperformed our as-sold expectation, with 3 suffering losses*. Competition, both public and private had, had similar experiences, *with no current projects performing as expected*. Some industry leaders think these are cookie-cutter projects, but they are not. These projects have different machines, different site locations, different labor pools, all of which produce different outcomes. Craft labor in this case has been the major issue.

246.    During the question and answer session, an analyst asked about Fluor's previous charges and decision to leave the gas-fired power business.  In response, defendant Seaton further admitted that there were "*fatal flaws in the bidding process of all of those projects,* and there were execution issues that weren't properly covered."

247.    On this news, Fluor's market capitalization fell more than 22%, or $13.23 per share, on May 4, 2018, to close at $45.76 per share, compared to the previous day's closing of $58.99 per share, erasing $1.8 billion in market capitalization in a single day.

248.    Then, on October 10, 2018, Fluor issued a press release announcing its preliminary financial results for the third quarter of 2018.  The press release revealed that these results included an additional charge of "$35 million for forecast revisions on a gas-fired power project in Citrus County, Florida."  During the earnings conference call held with analysts and investors on the same day, defendant Seaton conceded that the Citrus Count Plant required "twice the amount of labor to complete the items as compared to our forecast."  Defendant Seaton also admitted that the Gas-Fired Plants were underbid, "by a bidding team that did not follow the rules."  In particular, defendant Seaton stated:

These projects, the Power project specifically, were bid at a time by a bidding team that did not follow the rules.  Those people are no longer in our company.  And so the review processes have been changed accordingly.

249.    On this news, Fluor's market capitalization fell more than 17%, or $9.69 per share, on October 11, 2018, to close at $46.53 per share, compared to the previous day's closing of $56.22 per share, erasing $1.3 billion in market capitalization in a single day.

250.    On May 2, 2019, Fluor issued a press release and filed a Current Report on Form 8-K with the SEC announcing that defendant Seaton had stepped down from his position as CEO and as a member of the Board effective immediately.  To replace him, the Form 8-K stated that the Board had appointed defendant Hernandez to serve as the Company's Interim CEO, and defendant Boeckmann to serve as the Board's Executive Chairman, effective immediately.  Fluor provided no explanation for defendant Seaton's abrupt departure.

251.    On the same day the Company announced defendant Seaton's unexpected resignation, Fluor further surprised stockholders as it filed the Q1 2019 Form 10-Q and issued a separate press release disclosing its financial results for the first quarter of 2019.  The press release slashed the Company's 2019 earnings guidance from a range of between $2.50 and $3 per diluted share to a range of between only $1.50 and $2 per diluted share.  In addition, the press release revealed that ***Fluor had incurred charges totaling over $100 million on various fixed-price projects***.  The Q1 2019 Form 10-Q elaborated on these charges.  Specifically, it reported that Fluor took an additional $26 million charge "resulting from forecast revisions for estimated cost growth at certain fixed-price, gas-fired power plant projects[,]" and stated that the Company was in a $110 million dispute with Duke concerning the costs incurred on the Citrus County Plant.  The Q1 2019 Form 10-Q also disclosed a $53 million charge in the Energy & Chemicals segment "resulting from forecast revisions for estimated cost growth on an offshore project" and another $31 million

charge in the same segment "resulting from the resolution of certain close-out matters with a customer."

252.    Also on May 2, 2019, Fluor held an earnings conference call with analysts and investors, during which defendant Hernandez provided more detail on the charges.  He explained the Company made a $53 million adjustment on an offshore project following its "reestimate" and determination that the project needed a redesign.  Defendant Hernandez also revealed, in vague terms, that the Company "recorded a $31 million charge in connection with the resolution of final closeout matters with a customers."  In addition, Fluor "experienced … $26 million in additional costs related to the punch list items for [its] legacy gas-fired power business."

253.    During the question and answer session of the call, defendant Boeckmann effectively conceded the Individual Defendants failed to oversee and mitigate the risks posed by fixed-price contracts while assuring stockholders that improvements were underway and that these disappointing results would turn around.  During the call, an analyst noted the unanticipated charges and management changes and stated she was "wondering how long this has been in the works."  Defendant Boeckmann responded in vague terms, stating, "[t]he Board has given [defendant Hernandez] full authority … to drive, I would say, some ***dramatic improvement in risk assessment***, bidding processes and project execution."  Defendant Hernandez added that management was "going to have our thumb on the pulse of every project," and would review "all the projects that we have concerns about, which are not very many."  He further stated that "project execution improvement," including the estimation and "overseeing of those projects" "will be management's primary focus so that we can deliver more consistent results."

254.    Later during the call, defendant Stanski assured that results would improve during the second half of the year.  Similarly, defendant Boeckmann stated, "I'm quite impressed with a

number of the improvements and implementation, both in strategies but also in the work processes that make those strategies even more effective. So I'm optimistic. I think this company is going to start performing, and it's going to start delivering solid results."

255. On this news, Fluor's market capitalization fell more than 24%, or $9.43 per share, on May 2, 2019, to close at $29.72 per share, compared to the previous day's closing of $39.15 per share, erasing $1.3 billion in market capitalization in a single day. The fallout would have been worse without the Company's executives promising improvement that would never be delivered. In fact, Fluor's unexpected charges and "adjustments" would only get worse.

256. On August 1, 2019, the Company filed the Q2 2019 Form 10-Q and issued an earnings press release revealing that Fluor had recorded *$714 million in pretax charges* stemming from various fixed-price projects. The press release explained "[t]hese charges were the result of an operational and strategic review of Fluor's businesses, as well as project developments during the quarter. This review included meetings with clients, subcontractors and suppliers, and settlements of outstanding claims." These charges, the press release disclosed, included a $233 million charge in the Government segment on the Radford Plant "related to cost revisions for late engineering changes, cost growth, and *ongoing assessments of unapproved change orders*." The charges also included $286 million for a fixed-price offshore project, $109 million on three gas-fired projects, $87 million for two fixed-price downstream projects, and $55 million resulting from forecast revisions on several fixed-price infrastructure projects. Defendant Hernandez is quoted in the press release noting "the magnitude of these results" and further explaining that "[t]hese charges reflect our efforts over the past few months … to evaluate and address the status of our current projects."

257.    On the same day, the Company held an earnings conference call with analysts and investors to discuss its financial results.  During his opening remarks, defendant Boeckmann reported that in connection with his appointment as Executive Chairman and defendant Hernandez's appointment as CEO, the Board "commissioned [them] to effect a complete review of the business."  He went on to state that, "for the last 3 months, we have been relentless in looking into every aspect" of the Company's backlog, bidding and execution strategies, and leadership and governance.  Defendant Boeckmann announced that the Board reappointed defendant Steuert, who served as the Company's CFO from 2001 to 2012, to the same position, and also appointed a strategic advisor.  Defendant Boeckmann went on to acknowledge that "***the issues we are discussing about today are serious***," and that "[the] Board absolutely recognizes the gravity of this announcement."  He also effectively conceded that the Board had failed to fulfill its risk oversight responsibilities, was not regularly monitoring compliance, and lacked the qualifications and experience that Fluor required.  In particular, defendant Boeckmann stated:

> ***Our Board absolutely recognizes the gravity of this announcement*** and has taken steps to improve our visibility into the contracting process, including the risks that we're assuming in new projects as well as how we are approaching and executing our existing risk projects.
>
> At yesterday's board meeting, the Board formed a risk committee, led by Jim Hackett. This committee's role is to assist the Board in fulfilling its risk oversight responsibilities. It will oversee and review with management the risk framework and regularly monitor compliance. We believe this committee will enhance the Board's exercise of its duties in keeping with our mandate of good corporate governance.
>
> And lastly, while we have a very strong board, the challenges and market conditions that Fluor is facing today require that we initiate a process to bring on individuals who have additional capital project and industry expertise. We will not be increasing the size of the Board, but expect to announce at least 2 new members by the end of September.

258.     Defendant Hernandez also commented on the Company-wide review during his opening remarks while effectively admitting that, contrary to the Individual Defendant' repeated assurances, Fluor did not have adequate project governance processes and controls.  He revealed that, "there are a few significant and common issues in many of [Fluor's] challenged projects."  In light of these systematic problems, defendant Hernandez stated it was "exceedingly clear" that the Company "must take a more disciplined approach to risk management on [its] projects." Specifically, defendant Hernandez stated:

> **It has become apparent to me that there are a few significant and common issues in many of our challenged projects**. In May, we immediately implemented a more rigorous framework to our pursuit process. We have already enacted changes in our bid/no bid process so that our future backlog will be comprised of high-quality projects with a contract structure and execution approach that will generate improved risk-adjusted margins.
>
> \*         \*         \*
>
> With regard to our current backlog, one thing that has become exceedingly clear to me is that **we must take a more disciplined approach to risk assessment on our projects**. We have identified our challenges and outlined what needs to be done. Additionally, **we're making changes to how we approach engineering and project management to ensure our projects are staying in sequence with work not commencing until the appropriate reviews are complete**.

259.     Although the Individual Defendants repeatedly assured that they conducted routine project reviews at least every quarter, defendant Hernandez revealed there were several unresolved matters that had been building up within Fluor's fixed-price projects.  He stated that "the [C]ompany met with a number of our clients, subcontractors and suppliers" in order to resolve "ongoing disputes, pending change orders, schedule extensions, close out items, unpaid receivables, and our position on outstanding claims."  Specifically, defendant Hernandez stated:

> During the second quarter, the company met with a number of our clients, subcontractors and suppliers, in an attempt to resolve a number of matters. These include ongoing disputes, pending change orders, schedule extensions, closeout items, unpaid receivables and our position on outstanding claims.

As a result of these discussions, client settlements and revised estimates to complete projects, the company evaluated its position on a number of projects, which resulted in a pretax charge of $714 million. These charges impact a broad range of projects, including certain projects that remain profitable.

260.    On this news, Fluor's market capitalization fell by more than 26%, or $8.24 per share, on August 2, 2019, to close at $22.67 per share, compared to the previous day's closing of $30.91 per share, erasing $1.1 billion in market capitalization in a single day.

261.    On September 24, 2019, the Company held its Strategic Review Webcast, during which defendants Hernandez, Steuert, and Boeckmann discussed their strategic review of Fluor's business and financial position.   During the webcast, defendant Hernandez announced the Company was planning to sell its Government segment.   He commented that the business "is not strategically enabling to the rest of Fluor" and "[t]here is a favorable [mergers and acquisitions] market with the opportunity to exit with low execution risk."   Defendant Steuert then revealed the decision to slash Fluor's quarterly dividend from $0.21 to $0.10 per share in order to "reset the divided to a level that we currently feel is sustainable and appropriate with the level of earnings post restructuring and post asset sales."   Defendant Steuert also disclosed there would be further charges on the Company's fixed-price projects, including the Radford Plant and the Warren Project.   However, he assured stockholders that he and defendants Hernandez and Boeckmann were monitoring "everything in our backlog, and especially the fixed price lump sum projects" "very, very carefully."   Defendant Steuert further tempered stockholder concerns by stating, "overall, we're very comfortable with the performance … of the rest of the backlog."

262.    On the news of the dividend cut and additional charges, Fluor's market capitalization fell by $244.8 million in a single day.   The fallout would have been worse if stockholders had known about the accounting errors, internal control issues, and SEC investigation

that was already well underway.  However, the Individual Defendants continued to suppress this information.

263.    The full truth about the Company's accounting and internal control issues finally emerged on February 18, 2020, as Fluor issued a press release disclosing that the SEC had launched an investigation into its "past accounting and financial reporting."  In particular, the press release revealed that the SEC "has requested documents and information related to the projects for which the Company recorded charges in the second quarter of 2019."  Additionally, Fluor announced that it was conducting its own internal review of its previous financial reports and internal controls while revealing that there may be material errors in its financial statements.  The press release further stated that, "[g]iven the ongoing internal review and recent developments on two projects, the Company does not expect to complete and file its annual report on Form 10-K prior to the end of February."

264.    On the same day, the Company held an earnings conference call with analysts and investors.  During his opening remarks, defendant Boeckmann elaborated that the Company "is looking at its prior revenue recognition charges and related control environment, focusing initially on the Radford contract."  He further explained that Fluor was investigating whether it had recorded revenue and subsequent charges during the appropriate reporting period.  Defendant Boeckmann went on to state that "a special committee of the Board of Directors has been formed and will complete a review with the assistance of external advisers."  Defendant Hernandez also announced on the call that the Company would no longer be selling the Government segment.

265.    On this news, Fluor's market capitalization plunged more than 24%, or $4.75 per share, on February 18, 2020, to close at $14.79 per share, compared to the previous trading day's closing of $19.54 per share, erasing $655.8 million in market capitalization in a single day.

266.     On May 8, 2020, Fluor filed a Current Report on Form 8-K with the SEC disclosing that it had received a subpoena from the DOJ.  The Form 8-K stated that the DOJ subpoena "seek[s] documents and information related to the second quarter 2019 charges; certain of the projects associated with those charges; and certain project accounting, financial reporting and governance matters."  The Individual Defendants further reported in the Form 8-K that both the SEC investigation and internal review remain ongoing.

267.     To date, the Company still has not filed its Annual Report for 2019.

### REPURCHASES DURING THE PERIOD OF WRONGDOING

268.     Throughout the period of wrongdoing, the Board approved repurchases of the Company's common stock at artificially inflated prices that substantially damaged Fluor.  In particular, the Board approved the following stock repurchase plans:

- on November 3, 2011, for up to twelve million shares of common stock, with no expiration date;

- on February 6, 2013, for an additional eight million shares of common stock;

- on February 6, 2014, for an additional six million shares of common stock;

- on November 18, 2014, for an additional ten million shares of common stock; and

- on February 4, 2016, for an additional ten million shares of common stock.

269.     In total, the Company spent an aggregate amount of over $1.6 billion to repurchase 27.3 million shares of its own common stock at artificially inflated prices from November 2013 to November 2018, at an average price of $61.29 per share, as detailed by the table below:

| Repurchase Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| Nov-13 | 2,591,557 | $77.17 | $199,990,454 |
| Jan-14 | 762,700 | $79.60 | $60,710,920 |
| Feb-14 | 822,100 | $77.65 | $63,836,065 |
| Mar-14 | 877,000 | $77.16 | $67,669,320 |

| Apr-14 | 194,141 | $76.70 | $14,890,615 |
| May-14 | 1,183,020 | $74.70 | $88,371,594 |
| Jun-14 | 373,724 | $75.76 | $28,313,330 |
| Jul-14 | 110,135 | $77.37 | $8,521,145 |
| Aug-14 | 109,217 | $73.40 | $8,016,528 |
| Sep-14 | 999,151 | $70.24 | $70,180,366 |
| Oct-14 | 337,200 | $66.05 | $22,272,060 |
| Nov-14 | 2,982,361 | $66.20 | $197,432,298 |
| Dec-14 | 4,580,653 | $60.16 | $275,572,084 |
| Jan-15 | 714,841 | $58.31 | $41,682,379 |
| Feb-15 | 409,156 | $56.17 | $22,982,293 |
| Mar-15 | 816,000 | $57.54 | $46,952,640 |
| Apr-15 | 494,756 | $58.75 | $29,066,915 |
| May-15 | 488,097 | $59.04 | $28,817,247 |
| Jun-15 | 799,826 | $55.86 | $44,678,280 |
| Jul-15 | 570,013 | $51.04 | $29,093,464 |
| Aug-15 | 683,806 | $46.26 | $31,632,866 |
| Sep-15 | 1,912,036 | $44.20 | $84,511,991 |
| Oct-15 | 744,777 | $44.01 | $32,777,636 |
| Nov-15 | 773,500 | $48.31 | $37,367,785 |
| Dec-15 | 1,698,180 | $47.04 | $79,882,387 |
| Jan-16 | 202,650 | $47.94 | $9,715,041 |
| Nov-18 | 1,097,126 | $45.57 | $49,996,032 |
| **TOTAL** | **27,327,723** | | **$1,674,933,734** |

270.    Through the repurchases, the Director Defendants signaled to the market that they believed Fluor's shares were undervalued and that the repurchases were the best use of the Company's cash.   Because share repurchases lower the number of outstanding shares, the repurchases also increased the Company's earnings per share, return on equity, return on assets, and other metrics.   Collectively, these actions artificially inflated Fluor's share price with each repurchase, and increased the price for each subsequent repurchase.

271.    When the truth about the Company's fixed-price project problems was fully disclosed and after Fluor announced the SEC investigation, the Company's stock price fell to approximately $14.79 per share.   As a result, the 27.3 million shares the Company repurchased between November 2013 and November 2018 were worth approximately $404.1 million, or

approximately 25% of what the Company paid for them, an overpayment of approximately $1.2 billion.

**INSIDER SALES BY DEFENDANTS SEATON, STANSKI, PORTER, SMALLEY, HERNANDEZ, AND CHOPRA**

272.     Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Fluor's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Fluor, defendants were privy to material, nonpublic information about the Company's true business health.

273.     While in possession of this knowledge, defendant Seaton sold 471,745 shares of his personally held Fluor stock for proceeds of $30.9 million.  Defendant Seaton's sales were timed to maximize profit from Fluor's then artificially inflated stock price.  In March 2018, for example, defendant Seaton sold 50,000 shares at $56.72 per share.  These sales are suspicious given that they occurred just three months prior to May 3, 2018, when Fluor disclosed a $125 million charge on the Citrus County Plant and defendant Seaton specifically admitted to "fatal flaws in the bidding process," sending the Company's stock price down to $44.49 per share by May 7, 2018.  Defendant Seaton's additional sales also occurred while the Company's stock price traded at or near all-time highs.  Defendant Seaton's stock sales are further suspect given that they represented 57% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 94,716 |
| Shares Sold During the Sales Period ("SP") | 471,745 |
| Shares Disposed (Other) During SP | 153,845 |
| Total Shares Held During SP | 820,454 |
| Shares Remaining SP | 194,864 |
| **Total Proceeds from Sales** | **$30,968,576.01** |
| **% of Total Ownership Sold During SP** | **57.50%** |

274.    While in possession of material, nonpublic information, defendant Stanski sold 63,488 shares of his personally held Fluor stock for proceeds of $4.2 million.  Defendant Stanski's sales were timed to maximize profit from Fluor's then artificially inflated stock price.  Defendant Stanski's stock sales are suspicious given that they represented 55% of his holding as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 11,992 |
| Shares Sold During SP | 63,488 |
| Shares Disposed (Other) During SP | 17,885 |
| Total Shares Held During SP | 115,245 |
| Shares Remaining SP | 33,872 |
| **Total Proceeds from Sales** | **$4,249,001.40** |
| **% of Total Ownership Sold During SP** | **55.09%** |

275.    While in possession of material, nonpublic information, defendant Porter sold 58,974 shares of his personally held Fluor stock for proceeds of $3.3 million.  Defendant Porter's sales were timed to maximize profit from Fluor's then artificially inflated stock price.  Suspiciously, these sales occurred when the Company's stock traded at or near all-time highs.  Defendant Porter's stock sales are suspicious given that they represented 41% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 10,799 |
| Shares Sold During SP | 58,974 |
| Shares Disposed (Other) During SP | 26,634 |
| Total Shares Held During SP | 143,736 |
| Shares Remaining SP | 58,128 |
| **Total Proceeds from Sales** | **$3,382,461.07** |
| **% of Total Ownership Sold During SP** | **41.03%** |

276.    While in possession of material, nonpublic information, defendant Smalley sold 15,400 shares of his personally held Fluor stock for proceeds of $1 million.  Defendant Smalley's sales were timed to maximize profit from Fluor's then artificially inflated stock price.  Suspiciously, these sales occurred while Fluor's stock traded at or near all-time highs.  Defendant

Smalley's stock sales are further suspicious given that they represented 56% of his holding as demonstrated by the table below:

| Total Shares Before Sales | 18,589 |
|---|---|
| Shares Sold During SP | 15,400 |
| Shares Disposed (Other) During SP | 2,005 |
| Total Shares Held During SP | 27,099 |
| Shares Remaining SP | 9,694 |
| **Total Proceeds from Sales** | **$1,064,925.45** |
| **% of Total Ownership Sold During SP** | **56.83%** |

277.    While in possession of material, nonpublic information, defendant Hernandez sold 44,054 shares of his personally held Fluor stock for proceeds of $2.8 million.  Defendant Hernandez's sales were timed to maximize profit from Fluor's then artificially inflated stock price. Suspiciously, these sales occurred while Fluor's stock traded at or near all-time highs.  Several of defendant Hernandez's sales occurred in late February 2018, when Fluor's stock continued to trade at near all-time highs and shortly before the truth started to emerge.  Defendant Hernandez's stock sales are further suspicious given that they represented 25% of his holding as demonstrated by the table below:

| Total Shares Before Sales | 29,493 |
|---|---|
| Shares Sold During SP | 44,054 |
| Shares Disposed (Other) During SP | 27,899 |
| Total Shares Held During SP | 172,250 |
| Shares Remaining SP | 100,297 |
| **Total Proceeds from Sales** | **$2,893,912.00** |
| **% of Total Ownership Sold During SP** | **25.58%** |

278.    While in possession of material, nonpublic information, defendant Chopra sold 11,242 shares of his personally held Fluor stock for proceeds of $640,506.  Defendant Chopra's sales were timed to maximize profit from Fluor's then artificially inflated stock price. Suspiciously, these sales occurred while Fluor's stock traded at or near all-time highs.  Several of defendant Chopra's sales occurred in March 2018, when Fluor's stock continued to trade at near all-time highs and shortly before the truth started to emerge.  Defendant Chopra's stock sales are

further suspicious given that they represented 33% of his holding as demonstrated by the table below:

| | |
|---|---:|
| Total Shares Before Sales | 5,834 |
| Shares Sold During SP | 11,242 |
| Shares Disposed (Other) During SP | 3,955 |
| Total Shares Held During SP | 33,164 |
| Shares Remaining SP | 17,967 |
| **Total Proceeds from Sales** | **$640,506.00** |
| **% of Total Ownership Sold During SP** | **33.90%** |

279.    In sum, the Insider Selling Defendants sold over $43 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---:|---|---:|
| **CHOPRA** | 3/14/2017 | 1,800 | $53.85 | $96,935.04 |
| | 2/23/2018 | 2,589 | $57.48 | $148,809.77 |
| | 2/23/2018 | 2,964 | $57.49 | $170,411.62 |
| | 3/9/2018 | 2,589 | $57.71 | $149,409.12 |
| | 3/9/2018 | 1,300 | $57.65 | $74,940.45 |
| | | **11,242** | **Total (Sales)** | **$640,506.00** |
| | | | | |
| **HERNANDEZ** | 1/17/2014 | 13,797 | $82.00 | $1,131,354.00 |
| | 2/26/2018 | 30,257 | $58.25 | $1,762,558.00 |
| | | **44,054** | **Total (Sales)** | **$2,893,912.00** |
| | | | | |
| **PORTER** | 11/3/2013 | 13,078 | $76.83 | $1,004,735.66 |
| | 5/3/2015 | 8,685 | $58.70 | $509,809.50 |
| | 2/5/2016 | 15,638 | $44.84 | $701,207.92 |
| | 3/6/2016 | 4,399 | $49.17 | $216,298.83 |
| | 2/6/2017 | 17,174 | $55.34 | $950,409.16 |
| | | **58,974** | **Total (Sales)** | **$3,382,461.07** |
| | | | | |
| **SEATON** | 11/7/2013 | 9,195 | $77.025 | $708,244.88 |
| | 11/8/2013 | 132,131 | $76.00 | $10,041,956.00 |
| | 2/28/2014 | 29,732 | $77.69 | $2,309,879.08 |
| | 8/21/2014 | 92,384 | $74.144 | $6,849,719.30 |
| | 2/28/2015 | 27,889 | $58.00 | $1,617,562.00 |
| | 2/5/2016 | 58,282 | $44.84 | $2,613,364.88 |
| | 2/6/2017 | 72,132 | $55.34 | $3,991,784.88 |
| | 3/1/2018 | 50,000 | $56.72 | $2,836,065.00 |
| | | **471,745** | **Total (Sales)** | **$30,968,576.01** |
| | | | | |
| **SMALLEY** | 11/5/2013 | 6,393 | $75.6254 | $483,473.18 |
| | 2/28/2014 | 2,099 | $77.69 | $163,071.31 |

| | | | | |
|---|---|---|---|---|
| | 5/6/2014 | 1,261 | $74.2855 | $93,674.02 |
| | 2/28/2015 | 1,764 | $58.00 | $102,312.00 |
| | 3/10/2015 | 3,883 | $57.274 | $222,394.94 |
| | | **15,400** | **Total (Sales)** | **$1,064,925.45** |
| | | | | |
| **STANSKI** | 11/5/2013 | 35,247 | $75.6908 | $2,667,873.63 |
| | 2/28/2014 | 4,441 | $77.69 | $345,021.29 |
| | 2/28/2015 | 3,928 | $58.00 | $227,824.00 |
| | 2/5/2016 | 8,708 | $44.84 | $390,466.72 |
| | 2/6/2017 | 11,164 | $55.34 | $617,815.76 |
| | | **63,488** | **Total (Sales)** | **$4,249,001.40** |
| | | | | |
| | | **664,903** | **Total (Sales)** | **$43,199,381.92** |

## THE INDIVIDUAL DEFENDANTS FAIL TO HOLD AN ANNUAL MEETING OF STOCKHOLDERS IN VIOLATION OF FLUOR'S BYLAWS AND DELAWARE LAW

280.    Article II, Section 2.01 of the Company's Amended and Restated Bylaws provides that "the Board shall determine by resolution" the time, date, and place of "*[a]nnual meetings* of the stockholders of the Corporation for the purpose of electing directors and for the transaction of such other proper business."  Further, under Section 211, Delaware corporations like Fluor are required to hold an annual stockholders meeting within thirteen months of the previous meeting.[19]

281.    The Company has not held an Annual Meeting of Stockholders since May 2, 2019, thirteen months ago, and the Board has not filed a Proxy Statement or otherwise scheduled an upcoming meeting of stockholders since then.  Thus, Fluor is in violation of its Bylaws and Delaware law, wrongfully denying the Company's stockholders their important rights to voice their frustrations at annual meetings and withhold their votes for the directors that have breached their fiduciary duties.

---

[19] Delaware law allows the Company to hold virtual stockholder meetings, negating any concerns regarding the recent spread of COVID-19.

282.     The Company's Corporate Governance Guidelines state that the Board "is elected by the shareholders" and that "[t]he Company's bylaws provide for majority voting in the election of directors[.]"   The Corporate Governance Guidelines also state that "[a]ll directors stand for election annually."   The Individual Defendants' failure to hold an annual meeting despite these requirements is troubling given that stockholders have not had the opportunity to reelect, or even elect, three current directors, effectively circumventing Fluor's mandates regarding stockholders' annual election of directors.   In particular, the Board appointed defendants Hernandez, Leppert, and Constable to serve as directors after the 2019 Annual Meeting of Stockholders.[20]   Accordingly, stockholders have been deprived of their authority to elect defendants Hernandez, Leppert, and Constable to the Board.

## DAMAGES TO FLUOR

283.     As a result of the Individual Defendants' improprieties, Fluor disseminated improper, public statements concerning its bidding practices, project execution, financial results, internal controls, and future prospects.   These improper statements have devastated Fluor's credibility as reflected by the Company's stock price falling by *80%* during the period of wrongdoing, from its January 2014 high of $83.65 per share to its December 2019 low of $16.10 per share.   Since then, investor confidence has only been further ruined, as Fluor still has not filed its Annual Report for 2019.   On March 18, 2020, the Company's stock price sunk to a low of just $3.40 per share, representing an evaporation of *95%*, or *$13.1 billion* in Fluor's market capitalization since January 2014.

---

[20] Defendants Sultan, Swann, and Locklear all suspiciously resigned from the Board during the month of August 2018.

284.     The Company's unlawful practices and the Individual Defendants' gross failures to timely address, remedy, or even disclose such practice also damaged Fluor's reputation within the business community and in the capital markets.  In addition to price, Fluor's current and potential clients consider a company's ability to accurately account for revenues, evaluate its own financial results, and timely file its financial results.  Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions and are unable to perform on contracts.  In addition, Fluor's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

285.     Further, as a direct and proximate result of the Individual Defendants' actions, Fluor has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from the Company's internal investigations and review of its accounting and insider sales;

(b)     costs incurred from reviewing and potentially revising or restating the Company's financial statements;

(c)     costs incurred from defending and paying any settlement or adverse judgment in the Securities Class Actions;

(d)     costs incurred in complying with the investigations by the SEC and DOJ, including any fines or penalties resulting therefrom;

(e)     excessive sums paid to repurchase the Company's stock at inflated prices;

(f)      excessive compensation paid to the executives under Fluor's compensation plan, including the VDI awards; and

(g)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to Fluor.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

286.    Plaintiff brings this action derivatively in the right and for the benefit of Fluor to redress injuries suffered, and to be suffered, by Fluor as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to compel an Annual Meeting of Stockholders as well as the aiding and abetting thereof, by the Individual Defendants.  Fluor is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

287.    Plaintiff will adequately and fairly represent the interests of Fluor in enforcing and prosecuting its rights.

288.    Plaintiff was a stockholder of Fluor at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Fluor stockholder.

289.    The current Board of Fluor consists of the following twelve individuals: defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, Constable, and Leppert.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act.  Specifically, as set forth below, a majority of the Board (i) faces a substantial likelihood of liability or (ii) otherwise cannot impartially consider a demand.

**Demand Is Excused Because Defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, Constable, and Leppert Face a Substantial Likelihood of Liability for Their Misconduct**

290.     As alleged above, defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, Constable, and Leppert breached their fiduciary duties they owed to Fluor and its stockholders by failing to oversee the Company's risks and by failing to remedy ongoing improper statements and accounting improprieties.  As detailed above, these fiduciaries adequately estimating project costs on an ongoing basis was critical to Fluor's operational viability and compliance with relevant securities and accounting law and regulation.  Yet, the Board failed to implement a control system to enable its oversight of the Company's current and prospective projects.  The Board was also repeatedly warned about internal control failures, bidding and execution problems, and accounting improprieties.  Nonetheless, the Board ignored these warnings and instead allowed the wrongdoing to continue for nearly seven years.  As a result, defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, Constable, and Leppert face a substantial likelihood of liability for acting in bad faith in breach of their fiduciary duty of loyalty by consciously failing to oversee Fluor's major risks, ignoring red flags, and thereby allowing the Company to violate securities and accounting law and regulation.  As a result, demand upon them is futile.

291.     As alleged above, defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, and Constable breached their fiduciary duties of loyalty by making improper statements in the Company's press releases, SEC filings, and during earnings conference calls regarding Fluor's bidding and execution issues, financial results, and internal controls.  As indicated by the table below, defendants P. Fluor, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, and Hackett, each signed most, if not all, of the Company's Forms 10-K from 2013 to 2018 and thus made the improper statements in those reports and detailed herein:

| Defendant | The 2013 Form 10-K | The 2014 Form 10-K | The 2015 Form 10-K | The 2016 Form 10-K | The 2017 Form 10-K | The 2018 Form 10-K |
|---|---|---|---|---|---|---|
| Barker | X | X | X | X | X | X |
| Bennett | X | X | X | X | X | X |
| Berkery | X | X | X | X | X | X |
| P. Fluor | X | X | X | X | X | X |
| Hackett | X | X | - | X | X | X |
| McWhinney | - | X | X | X | X | X |
| Olivera | X | X | X | X | X | X |
| Rose | - | X | X | X | X | X |
| *X indicates the subject defendant signed the form 10-K | | | | | | |

Defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, and Constable caused or allowed the improper statements detailed herein and knowingly or recklessly misstated and/or omitted material, adverse facts concerning the Company's bidding practices, project execution, financial performance and condition, as well as the effectiveness of Fluor's internal controls and disclosure procedures. Accordingly, defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, and Constable face a substantial likelihood of liability for their breaches of duty, making any demand upon them futile.

292.     Defendants Barker, Bennett, Olivera, McWhinney, Rose, Hackett, and Leppert, as members of the Audit Committee, reviewed and approved Fluor's Annual Reports, Quarterly Reports, and earnings press releases and guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants

breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Barker, Bennett, Olivera, McWhinney, Rose, Hackett, and Leppert face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

293.    As explained above, defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, and Constable authorized, permitted, or directed the repurchase of $1.6 billion worth of the Company's stock at inflated prices while selling over $40 million worth of their personally held stock.  Accordingly, defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, and Constable face a substantial likelihood of liability and cannot consider a demand.

294.    Defendant Hernandez sold Fluor stock under highly suspicious circumstances. Defendant Hernandez, as the current CEO and former Executive Vice President, Chief Legal Officer and Secretary, possessed material, nonpublic company information and used that information to benefit himself.  Defendant Hernandez sold stock based on this knowledge of material, nonpublic company information regarding the Company's bidding and execution issues, inflated financial results, and internal control failures, and the impending decrease in the value of his holdings of Fluor.  Accordingly, defendant Hernandez faces a substantial likelihood of liability for breach of his fiduciary duty of loyalty.  Any demand upon defendant Hernandez is futile.

295.    Any suit by the current directors of Fluor to remedy these wrongs would expose defendants Hernandez, Steuert, Chopra, McSorley, Seaton, Stanski, Porter, and Smalley, and the Company to liability for violations of the federal securities laws in the pending Securities Class Actions, and would result in civil actions being filed against one or more of the other Individual Defendants.  The Securities Class Actions allege violations of sections 10(b) and 20(a) of the

Exchange Act.  If the Board elects for the Company to press forward with its right of action against defendants Hernandez, Steuert, Chopra, McSorley, Seaton, Stanski, Porter, and Smalley in this action, then Fluor's efforts would compromise its defense of the Securities Class Actions. Accordingly, demand on the Board is excused.

296.    Defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, Constable, and Leppert have failed to hold the Annual Meeting of Stockholders within the time period required under law in breach of their fiduciary duties. Accordingly, demand upon them is futile.

**Demand Is Excused on Defendant Hernandez Because He Lacks Independence**

297.    The principal professional occupation of defendant Hernandez is his employment with Fluor, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.  Accordingly, defendant Hernandez lacks independence from defendants P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, Constable, and Leppert due to his interest in maintaining his executive position at Fluor.  This lack of independence renders defendant Hernandez incapable of impartially considering a demand to commence and vigorously prosecute this action.  Fluor paid defendant Hernandez the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $651,346 | $2,942,476 | - | $334,200 | $124,827 | $4,052,849 |
| 2017 | $630,032 | $1,588,728 | $643,788 | $278,500 | $117,117 | $3,258,165 |
| 2016 | $630,032 | $1,533,437 | - | $380,300 | $120,558 | $2,664,327 |
| 2015 | $650,724 | $1,474,183 | $726,046 | $562,300 | $116,370 | $3,529,623 |
| 2014 | $607,084 | $1,340,212 | $660,062 | $613,500 | $109,373 | $3,336,578 |
| 2013 | $582,632 | $1,000,099 | $499,990 | $559,800 | $102,811 | $2,745,332 |

Accordingly, defendant Hernandez is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Hernandez.

### Demand Is Excused Against Defendants Boeckmann, Hackett, P. Fluor, and Leppert Because They Cannot Act Impartially with Respect to Defendant Seaton

298.    Defendants Boeckmann, Hackett, P. Fluor, and Leppert are each closely tied to defendant Seaton, who is named as a defendant in the Securities Class Actions and is interested in the outcome of this litigation.  These ties, as detailed below, amount to conflicts that prevent defendants Leppert, Hackett, Boeckmann, and P. Fluor from being able to independently consider whether to commence litigation against defendant Seaton.

299.    **Defendant Boeckmann**: Defendants Boeckmann and Seaton have known one another since at least 1985, when defendant Seaton began serving various positions within the Company.  Defendant Boeckmann, who had been serving Fluor since 1974, began forming a close relationship with defendant Seaton upon his arrival and their ties have strengthened over the years. During the course of their thirty-five-year-old relationship and while he was serving as the Company's Chairman and CEO, defendant Boeckmann was also a member of the National Petroleum Council ("NPC"), from at least May 2002 to at least October 2011.  Defendant Boeckmann trusted defendant Seaton to succeed him as Fluor's CEO.  As *D CEO* reported in its May-June 2015 issue, defendant Seaton "credits [defendant] Boeckmann, who allowed him to assume increasingly responsible management positions, for his ascension to the corner office."  As a result of these long-standing professional ties, as well as the mentorship role he played in defendant Seaton's career, defendant Boeckmann is unable to independently consider whether to initiate proceedings against defendant Seaton.

300.    **Defendant Hackett**:  Defendant Hackett lacks independence from defendant Seaton for similar reasons.  Defendants Hackett and Seaton have known one another for at least twenty years and have developed strong professional ties with one another that continue to date during that time.  Defendant Hackett joined the Board in 2001, and concurrently served the Company with defendant Seaton up until his abrupt resignation in May 2019.   In addition to serving positions together at Fluor since 2001, defendants Hackett and Seaton also served concurrent roles at the American Petroleum Institute ("API").  Formed in 1919, API is a standards-setting organization that represents all segments of America's oil and natural gas industry.  Defendant Hackett served as an API Board member from at least December 2003 to at least August 2013.  Defendant Seaton was also an API Board member, from at least November 2009 to at least February 2012.  In addition to Fluor and API, defendants Seaton and Hackett also concurrently served as members of the NPC.  The NPC is a federally chartered and privately funded advisory committee established by the Secretary of the Interior in 1946 under the Truman Administration and subsequently transferred to the Department of Energy in 1977.  Defendant Hackett was a member of the NPC from at least May 2002 to at least February 2020.  Defendant Seaton was also a member of the NPC from at least November 2011 to at least February 2020.  Due to their interwoven business relationship and prestigious advisory roles they share together, defendant Hackett cannot act independently in considering whether to initiate proceedings against defendant Seaton.

301.    **Defendant P. Fluor**: As indicated by his last name, defendant P. Fluor is a descendent of the Company's founder and has served on the Board for over thirty-five years.  During his tenure on the Board, defendant P. Fluor formed a close relationship with defendant Seaton.  When the Board appointed defendant Seaton to serve as the Company's CEO in 2011,

defendant P. Fluor stated the Board was "especially pleased" to support defendant Seaton in his new role, and added that "we have every confidence that he will lead the company to great places in the future."  In light of defendant P. Fluor's praise of defendant Seaton, as well as his confidence in defendant Seaton to serve in the highest role of the Company founded by his ancestors, defendant P. Fluor cannot impartially consider a demand with respect to defendant Seaton.  In fact, defendant P. Fluor's relationship with defendant Seaton has caused him to act nonindependently before.  In particular, defendant P. Fluor was the Chair of the Company's Organization and Compensation Committee from at least 2012 to September 2020, when the Committee approved and oversaw a nefarious executive compensation plan that directly benefited defendant Seaton for obtaining "new awards."  Defendant P. Fluor permitted this compensation scheme despite acknowledging that it was not tied to long-term value creation and even though it rewarded defendant Seaton for underbidding on contracts at the Company's expense.

302.    **Defendant Leppert**: Defendant Leppert unsuccessfully ran for the U.S. Senate in 2012 and previously served as the Mayor of Dallas from June 2007 to 2011.  While defendant Leppert was Mayor, Fluor was awarded a $416 million contract to construct a major transportation project in the Dallas-Forth area.  During the 2012 election cycle, the Fluor Corporation Political Action Committee (the "Fluor PAC") made a $10,000 donation to defendant Leppert's Senate campaign.  According to the Company's Code, the Fluor PAC "was established by our employees to make political contributions to organizations and campaigns that are viewed as being in the best interests of Fluor."  As revealed by OpenSecrets.org, the $10,000 contribution originated "from members, employees, or owners of the organization, and those individuals' immediate family members."  In particular, defendants Seaton, Hernandez, Stanski, Smalley, Boeckmann, Steuert,

P. Fluor, Barker, and Berkery, each made individual contributions to the Fluor PAC during the 2012 election cycle in the following amounts:

| Individual Contributions ($200+) to the Fluor PAC Made During the 2012 Election Cycle (2011 - 2012) | | |
|---|---|---|
| Donor | Date | Amount |
| Alan L. Boeckmann | 3/4/2011 | $5,000 |
| Bruce A. Stanski | 3/31/2011 | $384 |
| Bruce A. Stanski | 2/28/2011 | $384 |
| Carlos M. Hernandez | 3/4/2011 | $5,000 |
| David T. Seaton | 3/4/2011 | $5,000 |
| Gary G. Smalley | 2/28/2011 | $230 |
| Gary G. Smalley | 3/31/2011 | $230 |
| James T. Hackett | 5/10/2011 | $3,000 |
| D. Michael Steuert | 3/4/2011 | $5,000 |
| Peter J. Fluor | 5/14/2012 | $5,000 |
| Peter J. Fluor | 5/4/2011 | $2,500 |
| Peter K. Barker | 6/1/2012 | $1,000 |
| Peter K. Barker | 5/10/2011 | $1,000 |
| Rosemary T. Berkery | 7/11/2012 | $5,000 |
| Rosemary T. Berkery | 5/10/2011 | $5,000 |

303.   Each of these defendants, including defendant Seaton, therefore contributed to defendant Leppert's Senate campaign through the Fluor PAC.  In addition to the $10,000 donation he received through the Fluor PAC, defendant Seaton made a separate $2,500 donation directly to defendant Leppert's campaign on August 26, 2011.  Defendant Boeckmann also made a separate donation directly to his campaign in the same amount on March 21, 2011.  These significant donations confirm that defendant Leppert has close personal relationships with defendants Seaton and Boeckmann.  As a result, defendant Leppert is unable to impartially consider a demand and therefore demand on him is excused.

304.   Plaintiff has not made any demand on the other stockholders of Fluor to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   Fluor is a publicly held company with over 140 million shares outstanding and thousands of stockholders as of October 25, 2019;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act

305.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

306.    During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Fluor, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and the Individual Defendants' course of conduct artificially inflated the price of the Company's common stock.

307.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Individual Defendants, they caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to their false or misleading statements.  The Individual Defendants engaged in a scheme to defraud Fluor by causing the Company to purchase over $1.6 billion in shares of its stock at artificially inflated prices.

308.    The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Fluor in connection with the Company's purchases of its stock during the period of wrongdoing.

309.    The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Fluor stock, which were intended to, and did: (a) deceive Fluor and its stockholders regarding, among other things, the Company's operations and financial prospects; (b) artificially inflate and maintain the market price of Fluor stock; and (c) cause Fluor to purchase its stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the period of wrongdoing, the Individual Defendants were in possession of material, nonpublic information regarding the above.

310.    The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the period of wrongdoing, as alleged above.

311.    As described above, the Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that they should

have been aware of them.  Throughout the period of wrongdoing, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

312.    The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase of the Company's stock by the Company itself.

313.    As a result of the Individual Defendants' misconduct, Fluor has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

314.    Fluor would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

315.    By reason of the Individual Defendants' wrongful conduct, they are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

316.    Plaintiff brings this claim within two years of his discovery of the facts constituting the violation and within five years of the violation.

## **COUNT II**

### **Against the Individual Defendants for Breach of Fiduciary Duty**

317.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

318.    The Individual Defendants owed and owe Fluor fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Fluor the highest obligation of good faith, fair dealing, loyalty, and due care.

319.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Fluor, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

320.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company was aggressively bidding on fixed-price contracts and underestimating project costs; (ii) Fluor was facing execution issues on those projects; (iii) the Company was overstating its revenues; (iv) Fluor lacked adequate internal controls over accounting and financial reporting; and (v) as a result of the foregoing, the Company's representations concerning its financial results, business prospects, and internal controls were improper.  The Officer Defendants further breached their duties by failing to ensure the timely filing of Fluor's financial statements.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

321.     The Director Defendants, as directors of the Company, owed Fluor the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.  The Director Defendants knew or were reckless in not knowing that: (i) (i) the Company was aggressively bidding on fixed-price contracts and underestimating project costs; (ii) Fluor was facing execution issues on those projects; (iii) the Company was overstating its revenues; (iv) Fluor lacked adequate internal controls over accounting and financial reporting; and (v) as a result of the foregoing, the Company's representations concerning its financial results, business prospects, and internal controls were improper.   The Director Defendants further

breached their fiduciary duties by failing to ensure the timely filing of Fluor's financial statements. Accordingly, these defendants breached their duty of loyalty to the Company.

322.   The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.   The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

323.   The Insider Selling Defendants breached their duty of loyalty by selling Fluor stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.   The information described above was material, nonpublic information concerning the Company's future business prospects.   It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Fluor common stock.

324.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Fluor has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

325.   Plaintiff, on behalf of Fluor, has no adequate remedy at law.

<u>**COUNT III**</u>

**Against the Individual Defendants for Waste of Corporate Assets**

326.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

327.     As a result of the wrongdoing detailed herein, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Actions that they brought on with their improper statements.  In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to revisiting and potentially restating its financial statements.  Finally, as a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused Fluor to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

328.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

329.     Plaintiff, on behalf of Fluor, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Unjust Enrichment**

330.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

331.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Fluor.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Fluor.

332.     The Insider Selling Defendants sold Fluor stock while in possession of material, nonpublic information that artificially inflated the price of Fluor stock.  As a result, the Insider

Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

333.    Plaintiff, as a stockholder and representative of Fluor, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

334.    Plaintiff, on behalf of Fluor, has no adequate remedy at law.

<u>**COUNT V**</u>

**Against Defendants Hernandez, P. Fluor, Boeckmann, Barker,
Berkery, Bennett, Olivera, McWhinney, Rose, Hackett, Constable,
and Leppert to Compel an Annual Meeting of Stockholders**

335.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

336.    The Company's last Annual Meeting of Stockholders was held on May 2, 2019.

337.    Pursuant to Section 211, Fluor is required to hold an Annual Meeting of Stockholders at least once every thirteen months.  Further, the Company's Bylaws and Corporate Governance Guidelines mandate that stockholders reelect directors during the Annual Meeting of Stockholders.

338.    As a result of the Individual Defendants' wrongdoing and failures, defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Constable, and Leppert have caused Fluor to fail to hold an Annual Meeting of Stockholders to elect directors.

339.    To remedy defendants Hernandez, P. Fluor, Boeckmann, Barker, Berkery, Bennett, Olivera, McWhinney, Rose, Constable, and Leppert's decision to cause Fluor's foregoing violation

of Delaware law and the Company's Bylaws, the Court should order the Board to promptly schedule, provide notice of, and hold an Annual Meeting of Stockholders.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Fluor, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and to compel an Annual Meeting of Stockholders;

B.      Directing Fluor to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Fluor and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Board's oversight over Fluor's bidding practices and cost estimates;

2.      a proposal to strengthen the Company's controls over financial reporting and disclosure procedures;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.      a proposal to strengthen the Company's determination and approval of executive compensation;

5.      a provision to control insider selling; and

6.      a provision to permit the stockholders of Fluor to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Fluor has an effective remedy;

D.      Awarding to Fluor restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 05, 2020                                BALON B. BRADLEY LAW FIRM

                                                                    /s/*Balon B. Bradley*
                                                                    BALON B. BRADLEY

                                                    State Bar No. 02821700
                                                    11910 Greenville Avenue, Suite 220
                                                    Dallas, TX 75234
                                                    Telephone: (972) 992-1582
                                                    Facsimile: (972) 755-0424
                                                    E-mail: balon@bbradleylaw.com

                                                    ROBBINS LLP
                                                    BRIAN J. ROBBINS
                                                    CRAIG W. SMITH
                                                    SHANE P. SANDERS
                                                    JONATHAN D. BOBAK
                                                    5040 Shoreham Place
                                                    San Diego, CA 92122

- 152 -

Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
      csmith@robbinsllp.com
      ssanders@robbinsllp.com
      jbobak@robbinsllp.com

Attorneys for Plaintiff

1438065