**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| IN RE FLUOR CORPORATION STOCKHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 3:20-cv-01442-X<br><br>(Consolidated with Case Nos. 3:20-CV-01558-X and 3:21-CV-00353-X) |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' UNOPPOSED**
**MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

## **TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................... 1

II.    BACKGROUND ............................................................................................... 4

       A.     Factual and Procedural History ........................................................... 4

              1.     The Actions ............................................................................... 4

              2.     The Books and Records Requests ............................................. 5

              3.     The Mediation and Settlement Negotiations ............................ 5

       B.     The Parties Support the Settlement ..................................................... 7

III.   THE TERMS OF THE SETTLEMENT ........................................................... 8

IV.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL .......... 12

       A.     The Standard for Preliminary Approval ............................................ 12

       B.     The Court Should Grant Preliminary Approval of the Settlement ......................... 13

              1.     The Settlement Confers Substantial Benefits on Fluor ............................ 13

              2.     The Proposed Settlement Is a Product of Arm's-Length
                     Negotiations ........................................................................... 16

              3.     The Complexity, Expense, and Likely Duration of the Litigation ........... 17

              4.     Plaintiffs Had Sufficient Information to Evaluate the Case and
                     Value the Settlement .............................................................. 19

              5.     Challenges to Plaintiffs Prevailing on the Merits ...................... 20

              6.     The Range of Possible Recovery and Certainty of Damages ................... 21

              7.     The Opinions of Plaintiffs' Counsel, Plaintiffs, and Stockholders ........... 21

V.     THE COURT SHOULD APPROVE THE FORM AND MANNER OF NOTICE .......... 22

VI.    PROPOSED SCHEDULE OF EVENTS ....................................................... 23

VII.   CONCLUSION ............................................................................................... 24

i

# <u>TABLE OF AUTHORITIES</u>

PAGE(S)

CASES

*Bell Atl. Corp. v. Bolger*,
    2 F.3d 1304 (3d Cir. 1993)..................................................................................................13

*Cohn v. Nelson*,
    375 F. Supp. 2d 844 (E.D. Mo. 2005)............................................................................14, 16

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d. Cir. 2001)...............................................................................................17

*George v. Acad. Mortg. Corp. (UT)*,
    369 F. Supp. 3d 1356 (N.D. Ga. 2019)...............................................................................17

*Handschu v. Special Servs. Div.*,
    787 F.2d 828 (2d Cir. 1986)...............................................................................................22

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)..........................................................................................................16

*In re Activision Blizzard, Inc. S'holder Litig.*,
    124 A.3d 1025 (Del. Ch. 2015)..........................................................................................19

*In re Apple Comput., Inc., Derivative Litig.*,
    No. C 06–4128, 2008 WL 4820784 (N.D. Cal. Nov. 5, 2008)...............................................13

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching,
Grades 7-12 Litig.*,
    447 F. Supp. 2d 612 (E.D. La. 2006)..................................................................................20

*In re Heelys Inc. Derivative Litig.*,
    No. 3:07-cv-1682, 2009 WL 10704478 (N.D. Tex. Nov. 17, 2009) .................................20, 23

*In re NVIDIA Corp. Derivative Litig.*,
    Master File No. C-06-06110, 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) .........................14

*In re OCA, Inc. Sec. and Derivative Litig.*,
    No. 05–2165, 2009 WL 512081 (E.D. La. Mar. 2, 2009)......................................................20

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ...............................................................................................20

*In re Pfizer Inc. S'holder Derivative Litig.*,
    780 F. Supp. 2d 336 (S.D.N.Y. 2011)..................................................................................14

*In re Southern Co. S'holder Derivative Litig.*,
  No. 1:17-CV-725, 2022 WL 4545614 (N.D. Ga. June 9, 2022)...........................................17

*Ingram v. The Coca-Cola Co.*,
  200 F.R.D. 685 (N.D. Ga. 2001)...................................................................................16

*Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen.
  Motors Corp.*,
  497 F.3d 615 (6th Cir. 2007) ......................................................................................22

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991)........................................................................................................20

*Lelsz v. Kavanagh*,
  783 F. Supp. 286 (N.D. Tex. 1991) ..............................................................................21

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) ................................................................................ *passim*

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970).......................................................................................................14

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950).......................................................................................................22

*Pearson v. Ecological Sci. Corp.*,
  522 F.2d 171 (5th Cir. 1975) ........................................................................................13

*Reed v. Gen. Motors Corp.*,
  703 F.2d 170 (5th Cir. 1983) ........................................................................................13

*Sved v. Chadwick*,
  783 F. Supp. 2d 851 (N.D. Tex. 2009) ................................................................. *passim*

*Unite Nat'l Ret. Fund v. Watts*,
  No. Civ.A. 04CV3603, 2005 WL 2877899 (D.N.J. Oct. 28, 2005) ...........................14

*Evans ex rel. United Dev. Funding IV v. Greenlaw*,
  No. 3:16-CV635, 2018 WL 2197780 (N.D. Tex. May 14, 2018) ..............................16, 18, 20

*Unitrin, Inc. v. Am. Gen. Corp.*,
  651 A.2d 1361 (Del. 1995) ...........................................................................................17

*Zapata Corp. v. Maldonado*,
  430 A.2d 779 (Del. 1981) .............................................................................................17

**STATUTES, RULES, AND REGULATIONS**

Federal Rules of Civil Procedure

    Rule 23.1 ................................................................................................18, 20, 23
    Rule 23.1(c) ...........................................................................................12, 22, 23

8 *Del. C.*

    §220 ...............................................................................................................5, 19

**OTHER AUTHORITIES**

MANUAL FOR COMPLEX LITIGATION (FOURTH) §13.14 (2004) ......................................12

MANUAL FOR COMPLEX LITIGATION §30.41 (3d ed. 1995) .........................................12

MANUAL FOR COMPLEX LITIGATION §30.44 (2d ed. 1985) .........................................16

Lead Plaintiffs Jay Lee and Joan Goodman (the "Texas Federal Court Lead Plaintiffs"), on behalf of all Plaintiffs (as defined in the concurrently filed Stipulation and Agreement of Settlement, dated April 20, 2023 (the "Stipulation" or "Stip.")) (hereinafter, collectively, the "Plaintiffs"),[1] hereby submit this memorandum of law in support of their Unopposed Motion for Preliminary Approval of Settlement and the entry of the proposed Order Preliminarily Approving Settlement and Setting Settlement Hearing (the "Preliminary Approval Order"), attached to the Stipulation as Exhibit A, and enclosed as a proposed order to the Motion.  The proposed Preliminary Approval Order: (i) grants preliminary approval of the Settlement; (ii) approves the form of the Notice, Summary Notice, and Postcard Notice attached to the Stipulation as Exhibits B-D; and (iii) sets a time and date for a final settlement hearing (the "Settlement Hearing").

## I.      INTRODUCTION

Texas Federal Court Lead Plaintiffs are pleased to report that, after months of hard-fought negotiations overseen by an experienced mediator, and more than four years since derivative litigation was commenced on behalf of Fluor Corporation's ("Fluor" or the "Company"), the Parties have reached a settlement that requires Fluor to enact and maintain a suite of corporate reforms that address the alleged wrongdoing, will enhance the Company's risk management and governance, and will foster a culture of compliance at the Company.

Specifically, Fluor has agreed to implement and maintain, for a period of at least four years, governance measures at the management- and Board of Directors ("Board") -level relating to risk management and performance-based compensation safeguards, including the following: (i) a management-level Project Execution Group, responsible for the standards, practices, and oversight

---

[1]      All capitalized terms, unless otherwise defined herein, have the same meaning given to them in the Stipulation.  The Stipulation is attached as Exhibit 1 to the Declaration of Geoffrey M. Johnson in Support of Lead Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement (the "Motion"), which was filed concurrently therewith.

of all project execution support functions; (ii) an executive-level management team responsible for overseeing risk management and mitigation for high-risk-level projects; (iii) an internal audit review to be conducted within 12 months of the Effective Date to assess whether the applicable risk processes under the Corporate Risk Group are being followed; (iv) a Board-level Commercial Strategies and Operational Risk Committee, responsible for reviewing Fluor's strategic and operational project risks and coordinating with the Audit Committee of the Board; and (v) a clawback policy that ensures the Board has discretion to initiate a clawback in the event of a material restatement of the Company's financial results.  Lead Plaintiffs also negotiated Company funding of the risk management and corporate governance enhancements, estimated to be approximately $10 million over four years (at least $2.5 million per year over that time period), which will help ensure that the Reforms are embedded in the Company's practices and that the Company reaps the benefits of the Settlement.[2]  The Reforms and their funding, taken together, will reduce the chances that Fluor and its stockholders will suffer a loss of investor confidence and legal exposure moving forward; will enhance the value of the Company through enhanced risk management and decision-making; and will help ensure investor confidence in the integrity of the Company's management and the effectiveness of the Company's corporate governance and Board oversight.

After the material substantive terms of the Settlement were determined and agreed upon, a fair and reasonable amount of attorneys' fees and expenses was negotiated.  In recognition of the

---

[2]    In addition to this Action, the Settlement will resolve the following related shareholder derivative actions pending in other courts: (i) *In re Fluor Corp. S'holder Deriv. Litig.*, No. 1:20-cv-00499 (D. Del.); (ii) *In re Fluor Corp. Deriv. Litig.*, No. DC-18-13236 (116th Jud. Dist. Ct., Dallas Cnty., Tex.); (iii) *Smith v. Hernandez*, No. DC-20-10706 (116th Jud. Dist. Ct., Dallas Cnty., Tex.); (iv) *Schifano v. Barker*, No. DC-20-06727 (44th Jud. Dist. Ct., Dallas Cnty., Tex.); (v) *Atchison v. Hernandez*, C.A. No. 2020-0655-JTL (Del. Ch.); and (vi) *Hickok v. Boeckmann*, C.A. No. 2021-1001-PAF (Del. Ch.).

benefits the Reforms will provide to Fluor as a result of Plaintiffs' Counsel's efforts, Defendants have agreed to pay (or cause their insurers to pay) Plaintiffs' Counsel a maximum fee and expense amount of $2,400,000 (the "Fee and Expense Amount"), subject to Court approval.  Stip. ¶¶4.1-4.2.[3]

Defendants acknowledge that the changes to Fluor's risk management structure are in direct response to the events at issue in the derivative complaints and that the commencement and settlement of the derivative actions were a material cause of the changes provided for in the Settlement.  *Id.* ¶¶4.1, 1.5.  The Board, including its independent, non-defendant members, have determined, in an exercise of their business judgment, that the Reforms are in the best interests of the Company and have approved their implementation and maintenance.  *Id.* ¶1.5.

In sum, the Settlement – reached after informal exchanges of information, multiple mediation sessions, and extended arm's-length, good faith negotiations overseen by an independent and experienced mediator – provides significant benefits to Fluor and its shareholders, and satisfies the standard to support preliminary approval, which focuses on whether the Settlement is within the range of what might be approved as fair, reasonable, and adequate at a final approval hearing.  Accordingly, for the reasons discussed herein, Plaintiffs respectfully request that the Court: (i) grant preliminary approval of the proposed Settlement; (ii) direct that notice of the proposed Settlement be given to Fluor's shareholders in the proposed form and manner set forth in the Stipulation; and (iii) schedule a hearing for the Court to consider final approval of the Settlement.

---

[3]     At this stage of the settlement approval process, the Court is not asked to evaluate or approve the agreed-to Fee and Expense Amount beyond determining that the Settlement, as a whole, falls within a range that might be approved as fair and reasonable, such that notice should issue to current Fluor stockholders and a hearing should be set for final settlement review and approval.

## II.     BACKGROUND

### A.     Factual and Procedural History

#### 1.     The Actions

Beginning in late 2018, Plaintiffs filed their respective Actions, alleging breaches of fiduciary duty against certain of the Individual Defendants, stemming from alleged material lapses of oversight over risk management functions and internal controls, which led to the Company issuing a series of allegedly false and misleading statements to the public, and resulting in the alleged harm to Fluor and its stockholders when the alleged truth was revealed.

Specifically, the Actions allege as follows:

Fluor performs the majority of its work under fixed-price contracts, through which Fluor submits a bid for services based on specifications provided by its client, paid in a "lump-sum" to perform the contract.  As a result, the ability to appropriately gauge the cost of a contract, submit an accurate bid allowing the Company to profit from work performed, and afterwards, manage and execute on the project, is mission-critical to Fluor's ongoing success.  The nature of Fluor's fixed-price contracts subjects it to significant financial and reputational risks.

Despite the severe financial and reputational consequences, the Board failed to implement a system of internal controls and reporting to adequately monitor bidding on, and execution of, fixed-price contracts.  As a result, Fluor failed to accurately monitor existing fixed-price contracts, operate with sufficient internal controls over financial reporting and internal auditing practices, and institute adequate project or risk management for a period of six years.  And as a result of Fluor's critical internal control failures, Fluor repeatedly and falsely assured shareholders that the Company's fixed price projects were far more profitable than they actually were.  Fluor began to take repeated impairment charges related to its fixed-price contracts, which eventually ballooned

into roughly three years of restatements of Fluor's financial reporting and significant previously undetected losses and impairments.

Several of the Actions were consolidated in their respective venues, and each of the Actions was stayed pending either a final decision on the motion to dismiss or other developments (or completion of) the related Securities Action,[4] and/or pending ongoing settlement discussions among Plaintiffs' Counsel and Defendants' Counsel.

Defendants have always and continue to deny any liability or wrongdoing.

### 2.     The Books and Records Requests

Prior to commencing their litigation, certain Plaintiffs made demands on the Company for books and records pursuant to 8 *Del. C.* §220.  The demands sought to investigate breaches of fiduciary duty by officers and directors of Fluor.  In response to the demands, the Company produced documents responsive to such books and records requests.  These documents included, among other things, minutes, agendas, board packages, and other materials relating to regularly conducted and special meetings of the Board and its committees.

### 3.     The Mediation and Settlement Negotiations

Plaintiffs' Counsel engaged in extensive settlement negotiations with Defendants, over the course of many months.  In or around September 2021, Texas Federal Court Lead Plaintiffs' Counsel and Defendants agreed to enter into discussions to look for opportunities to resolve the Actions.  Defendants then informed all Plaintiffs' Counsel of a mediation set in the related Securities Action for September 30, 2021, and invited them to participate.  On September 24, 2021, Plaintiffs sent a unified settlement demand to Fluor, proposing certain corporate governance enhancements to address claims made in the Actions.

---

[4]     *Kin-Yip Chun v. Fluor Corp.*, Case No. 3:18-cv-01338 (N.D. Tex.).

The settlement negotiations were mediated through Greg Lindstrom of Phillips ADR, a respected and experienced mediator in derivative and other complex litigation.

Plaintiffs' Counsel engaged in a full-day mediation via Zoom with Defendants' counsel on September 30, 2021.  No final resolution was reached at that mediation, but the Parties continued their dialogue, with Mr. Lindstrom's ongoing assistance.  On May 10, 2022, Plaintiffs' Counsel and Defendants' Counsel held a second full-day mediation session with Mr. Lindstrom.  The session was productive, but no final agreement was reached.  In response to the last settlement proposal made by the Plaintiffs at that mediation session, Defendants prepared a settlement counterproposal which they sent to the mediator and Texas Federal Court Lead Plaintiffs' Counsel on June 9, 2022.  The reforms comprised in the settlement counterproposal made by Defendants set forth the material terms of the Settlement.  Texas Federal Court Lead Plaintiffs' Counsel and Defendants' counsel thereafter continued to negotiate and eventually reached an agreement on all remaining terms of settlement.  The final agreed-upon reforms are set forth in Exhibit E to the Stipulation.

After reaching an agreement in principle, Texas Federal Court Lead Plaintiffs and Defendants engaged in another mediation session to negotiate the matter of attorneys' fees and costs.  That mediation session was successful, with the Texas Federal Court Lead Plaintiffs and Defendants reaching an agreement on the total, maximum amount of attorneys' fees and costs that Defendants would agree to pay for all Plaintiffs' Counsel in all of the Actions, subject to court approval.  Texas Federal Court Lead Plaintiffs' Counsel and Defendants' counsel thereafter negotiated a Memorandum of Understanding (the "MOU"), setting forth the material terms of the Settlement.  On September 12, 2022, Texas Federal Court Lead Plaintiffs' Counsel and Defendants' counsel signed the MOU.

As to the legal merits of the claims asserted in the Actions, the Parties have expended significant time and resources participating in multiple full-day mediation sessions and pre- and post-mediation conference calls and meetings, where the merits of the claims asserted in the Actions and defenses thereto were extensively discussed between the Parties and independently with the mediator, Mr. Lindstrom.

The Parties have now reached a definitive agreement to settle the Actions, upon the terms and subject to the conditions set forth in the Stipulation.

### B.     The Parties Support the Settlement

Plaintiffs' Counsel have reviewed and analyzed data from numerous sources specific to this matter, including, but not limited to: (1) confidential, non-public internal documents of Fluor; (2) the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, announcements, transcripts of investor conference calls, and news articles; (3) securities analyst, business, and financial media reports about Fluor; and (4) the proceedings in the Securities Action.  Plaintiffs' Counsel have also researched the applicable law with respect to the claims asserted (or which could be asserted) in the stockholder derivative actions and the potential defenses thereto; researched, drafted, and filed complaints; prepared detailed mediation statements, as well as a settlement demand; participated in mediations and additional calls and meetings; and engaged in months-long settlement discussions with Defendants' counsel.  Based on their evaluation, and in light of what Plaintiffs' Counsel believe to be significant benefits conferred upon Fluor as a result of the Settlement, Plaintiffs and Plaintiffs' Counsel have determined the Settlement is in the best interests of Fluor and its stockholders and have agreed to settle the Actions upon the terms and subject to the conditions set forth in the Stipulation.

Fluor's Board, including its independent, non-defendant members, have determined, in an exercise of their business judgment, that the Reforms are in the best interests of the Company and have approved their implementation and maintenance. Stip. ¶1.5.

## III.   THE TERMS OF THE SETTLEMENT

In consideration of the Settlement and the releases provided therein, and subject to the terms and conditions of the Stipulation, the Parties agree that the Company will implement and maintain certain management and governance measures relating to risk management and performance-based compensation safeguards. Stip. ¶¶1.1-1.5; *Id.*, Ex. E. The Reforms will remain in place for a minimum period of four years (the "Commitment Period"), offering Fluor and its stockholders the benefit of material, immediate, and lasting risk management internal controls, oversight, and policies and practices. Stip. ¶1.2.[5]

Defendants acknowledge that the changes to Fluor's risk management structure are in direct response to the events at issue in the derivative complaints and that the commencement and settlement of the derivative actions were a material cause of the changes provided for in the Settlement. *Id.* ¶1.5. The Board, including its independent, non-defendant members, have determined, in an exercise of their business judgment, that the Reforms are in the best interests of the Company and have approved their implementation and maintenance. *Id.*

Fluor shall fund the costs of implementing and maintaining the Reforms during the Commitment Period and estimates that the cost of maintaining the personnel and processes required to support its enhanced risk management structure, detailed herein, will be at least $2.5

---

[5]   The Reforms may be modified or eliminated only to the extent the Board makes a good faith determination that doing so is necessary to comply with any applicable law(s), rule(s), or regulation(s) (including of any national securities exchange or interdealer quotation system), or the reasonable exercise of the directors' and/or officers' fiduciary duties (a "Modification"). Stip. ¶1.6. In the event of any Modification, the Board must use best its efforts to adopt a replacement provision that accomplishes substantially the same objective. *Id.* ¶1.7

million per year over the next four years.  Stip. ¶1.3.  One or more designee(s) of Fluor will oversee the implementation of the Reforms and periodically report to the Board, or an appropriate Board committee, regarding the implementation of the Reforms until they are fully implemented.  *Id.* ¶1.4.  The Reforms of the Settlement are as follows:

**<u>Management-Level Enhancements</u>**

- The Project Execution Group ("PEG") shall be responsible for the standards, practices, and oversight of all Project execution support functions.  The PEG shall oversee Fluor's risk management and mitigation processes.

- The PEG shall be led by the Project Execution Group President and include the Corporate Risk Officer and the SVPs of Projects and some or all of the following groups: Office of Technology, Chief Engineer, Construction & Fabrication, Supply Chain, Commercial Strategies, Health, Safety & Environment, Corporate Security, and Quality and Continuous Performance Improvement.

- The PEG shall report directly to the CEO on an ongoing basis regarding the standards and practices of all corporate risk Projects.

- The Corporate Risk Group, led by the Corporate Risk Officer, shall report directly to the PEG on an ongoing basis as it relates to Fluor's project risk profile.

- The PEG, through the Corporate Risk Group, shall coordinate with the Legal Department, the Commercial Strategies and Operational Risk Committee of the Board of Directors ("CSOR"), and the Audit Committee of the Board of Directors to provide information necessary to assess any enterprise risk stemming from Projects (either due to issues with Level 3 Projects or macro-issues likely to affect a broad variety of Projects).  The PEG shall also guide management in addressing any newly identified enterprise risks.

- The PEG, through the Corporate Risk Group, shall implement enhanced Risk Level designations for all Projects.

- These designations shall be assigned on a project-by-project basis by three-person Assessment Teams.  For each Project, the Assessment Team shall be comprised of representatives of the Corporate Risk Group, the Legal Department, and the Business Group, and the Assessment Team shall evaluate each Project's risk profile and determine the Risk Level for each Project.

- The Assessment Teams shall monitor and reevaluate the Risk Level of each Project, considering certain standard criteria, on a continuous basis during the pursuit, bidding, and execution phases.

**Risk Levels**

- **Risk Level 0.** These Projects shall be low value Projects, including reimbursable work with revenue up to $20 million* and fixed price work with revenue up to $10 million*. Risk Level 0 Projects shall be managed by the applicable business line throughout the life of the Project.

- **Risk Level 1.** If the Risk Level for a Project is higher than 0 (*i.e.*, if it does not meet the strict criteria for a Risk Level 0 Project), it shall be at least a Risk Level 1. Risk Level 1 Projects shall be Projects unlikely to have a material impact on the Business Group's annual performance, including fixed price work with revenue up to $150 million*, and shall be managed by the applicable business line throughout the life of the Project with additional monitoring and review by the applicable Business Group and the Corporate Risk Group.

- **Risk Level 2.** These Projects shall be Projects that could have a material impact on the Business Group's annual performance, including fixed price work with revenue of over $150 million* but less than $250 million*. Projects in Risk Level 2 shall require bidding approval by the business line, the Business Group, the PEG, the Corporate Risk Group, and the Fluor Management Team (as defined below). Risk Level 2 Projects shall be managed by the applicable business line throughout the life of the Project with additional monitoring and review by the applicable Business Group, the Corporate Risk Group, and the Fluor Management Team.

- **Risk Level 3.** These Projects shall be Projects that could have an enterprise-wide material impact, including fixed price work with revenue of $250 million* or greater. Risk Level 3 Projects shall require bidding approval by the business line, the Business Group, the PEG, the Corporate Risk Group, and the Fluor Management Team. Risk Level 3 Projects shall be managed by the applicable business line throughout the life of the Project with additional monitoring and review by the applicable Business Group, the Corporate Risk Group, the Fluor Management Team, and the CSOR.

*Threshold revenue values for risk level designations shall be subject to change by the Fluor Management Team in consultation with the CSOR.

- Fluor shall have an executive level team responsible for overseeing risk management and mitigation for all Risk Level 2 and Risk Level 3 Projects. The Fluor Management Team ("FMT") shall include for the purposes noted herein: (1) the CEO, (2) the CFO, (3) the Project Execution Group President; (4) the Chief Legal Officer; (5) the Corporate Risk Officer; and (6) the Group President for Corporate Development.

- Fluor shall create a charter for the FMT that requires at least the following, which shall be in addition to the responsibilities of each applicable business line and Business Group:

- The FMT shall oversee risk management and mitigation for all Risk Level 2 and 3 Projects.

- The FMT together with the Business Group presidents shall meet at least quarterly to discuss the performance and metrics of Risk Level 2 and 3 Projects, and shall meet more frequently as needed.

- The FMT shall update the CSOR, or shall cause the CSOR to be updated, on a quarterly basis regarding the performance and metrics of Risk Level 3 Projects.

- The FMT shall require the Corporate Risk Group to prepare an annual report on the Company's fixed price contract risk.

- Within the 12-month period following final approval of this settlement, Fluor's Internal Audit department will conduct an audit to assess whether the applicable risk processes under the Corporate Risk Group are being followed.

## Board-Level Enhancements

The CSOR:

- The CSOR is a Board-level committee comprised of at least three Directors, all of whom shall be Independent Directors as defined by the New York Stock Exchange.

- The CSOR shall be responsible for reviewing the Company's strategic and operational project risks, discussing those risks with management, and coordinating with the Audit Committee about risks that are relevant to the Audit Committee.

- The CSOR shall meet at least quarterly, and shall meet more frequently as needed.

- At least quarterly, the Corporate Risk Officer shall report to the CSOR on Project performance and metrics for Risk Level 3 Projects.

- The Group President for Corporate Development shall report to the CSOR quarterly for Risk Level 3 Project Pursuits, looking ahead up to four to six quarters.

- The CSOR shall be empowered to investigate any matters relevant to its duties with full access to the records and personnel of the Company.

- The CSOR, in consultation with the full Board of Directors, shall have authority to engage outside legal counsel, consultants, and other advisors to assist in the performance of its oversight role.

- The CSOR shall review the FMT annual report on the Company's fixed price contract risk and shall report on this activity to the full Board of Directors.

- The CSOR shall report to the full Board of Directors on its activities at regularly scheduled Board quarterly meetings.

11

- Any updated versions of the CSOR charter will be made accessible to the public on the Company's website.

**Clawback Policy Adjustments**

- Fluor's clawback policy shall, in the event of a material restatement of the Company's financial results, provide the Board with discretion to initiate a clawback.  The clawback may consist of the portion of any performance-based compensation earned during the periods materially affected by the restatement that would not have been earned had performance been measured on the restated basis, without requiring a finding of fault.

- Upon any material restatement of the Company's financial results, the Board shall direct an internal investigation to determine whether any performance-based compensation should be subject to the clawback policy.

- Fluor shall post its clawback policy on the Company's website alongside other corporate governance documents.

## IV.   THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

### A.   The Standard for Preliminary Approval

Under Rule 23.1(c) of the Federal Rules of Civil Procedure, "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval."  Before approving the settlement of a shareholder's derivative action, the court must determine that there has been no fraud or collusion in arriving at the settlement agreement, and that it is fair, reasonable, and adequate.  *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983).[6]  Thereafter, stockholders must be given notice of the proposed settlement and a hearing must be held to determine whether the settlement is fair, adequate, and reasonable.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) §13.14 (2004) (setting forth the approval procedure for settlement of a shareholder derivative action).  At the preliminary approval stage, a court need only assess whether the proposed Settlement falls "within the range of possible approval."  MANUAL FOR COMPLEX LITIGATION §30.41, at 236-37 (3d ed. 1995).

---

[6]      Unless otherwise noted, citations are omitted and emphasis is added.

### B.     The Court Should Grant Preliminary Approval of the Settlement

Settlements of shareholder derivative actions are particularly favored because such litigation "is notoriously difficult and unpredictable." *Maher*, 714 F.2d at 455n.6. Indeed, because of their highly favored status, derivative settlements "will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits." *Pearson v. Ecological Sci. Corp.*, 522 F.2d 171, 176 (5th Cir. 1975); *see also Maher*, 714 F.2d at 455.

Courts in the Fifth Circuit look to six factors in assessing whether a proposed settlement of a derivative action is fair, reasonable, and adequate: "(1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to plaintiffs prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of plaintiff's counsel, the derivative plaintiff, and absent shareholders." *Sved v. Chadwick*, 783 F. Supp. 2d 851, 860–61 (N.D. Tex. 2009); *Reed v. Gen. Motors Corp.*, 703 F.2d 170 (5th Cir. 1983). Consideration of these factors shows that the proposed Settlement is indeed fair, reasonable, and adequate, and satisfies the threshold for preliminary approval.

### 1.     The Settlement Confers Substantial Benefits on Fluor

In determining whether to approve a shareholder derivative settlement, "[t]he principal factor ... is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (omission in original); *see In re Apple Comput., Inc., Derivative Litig.*, No. C 06–4128, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008) ("principal factor to consider [. . .] is the benefit to [the real party in interest] as compared to the risks posed by derivative litigation"). Weighed against the substantial risk that continued litigation would yield no benefit for Fluor, the recovery here is plainly fair, reasonable, and adequate.

"Strong corporate governance is fundamental to the economic well-being and success of a corporation"[;] accordingly, courts have long "recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies." *In re NVIDIA Corp. Derivative Litig.*, Master File No. C-06-06110, 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008); *see also Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970) ("[A] corporation may receive a 'substantial benefit' from a derivative suit [. . .] regardless of whether the benefit is pecuniary in nature."); *Maher*, 714 F.2d at 461 ("[T]he effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor.").

Courts, therefore, approve settlements supported by consideration in the form of corporate governance reforms "specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws[.]" *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005). Among other benefits, such reforms make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors." *Id.  See In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving settlement of shareholder derivative action where the corporate benefits included "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company"); *Unite Nat'l Ret. Fund v. Watts*, No. Civ.A. 04CV3603, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005) (non-monetary benefits support settlement where "the relief is intended to prevent future harm").

Here, the Settlement confers substantial benefits on Fluor and its stockholders in the form of governance reforms that directly address the alleged deficiencies that Plaintiffs contend

permitted the alleged wrongdoing to occur in the first place.  Stip. ¶¶1.1-1.5; *id.*, Ex. E.  The Reforms involve management and governance measures relating to risk management and performance-based compensation safeguards, including, *inter alia*: (i) a management-level Project Execution Group, responsible for the standards, practices, and oversight of all project execution support functions; (ii) an executive-level management team responsible for overseeing risk management and mitigation for high-risk-level projects; (iii) an internal audit review to be conducted within 12 months of the Effective Date to assess whether the applicable risk processes under the Corporate Risk Group are being followed; (iv) a Board-level Commercial Strategies and Operational Risk Committee, responsible for reviewing Fluor's strategic and operational project risks and coordinating with the Audit Committee of the Board; and (v) a clawback policy that ensures the Board has discretion to initiate a clawback in the event of a material restatement of the Company's financial results.  Stip., Ex. E.  Moreover, Fluor must provide funding of what it estimates to be at least $10 million (at least $2.5 million per year) over the Commitment Period for the costs of implementing and maintaining its new risk management structure, detailed in Ex. E.  Stip. ¶1.3.

Taken together, the Reforms will help to ensure enhanced risk management and oversight – issues at the heart of this litigation.  This will help: (i) reduce the chances that Fluor and its stockholders will suffer the consequences of a loss of investor confidence and legal/regulatory exposure by materially improving the Company's internal controls and oversight, risk management, and other business practices; (ii) enhance the value of the Company through rigorous management decisions; and (iii) ensure investor confidence in the accuracy of the Company's risk management and oversight, the integrity of its executives, and the effectiveness of the Company's corporate governance and Board oversight, generally.

Fluor has agreed subject to the terms of the Stipulation to maintain the Reforms for a minimum of four years – a meaningful amount of time intended to ensure the Reforms become embedded in the Company's policies, practices, and corporate culture, thus protecting against discontinuation of these measures following the four-year period.  Stip. ¶1.2; *id.*, Ex. E; *see also, e.g.*, *Cohn*, 375 F. Supp. 2d at 850 (finding that corporate governance measures that must be in place for no less than three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

## 2.    The Proposed Settlement Is a Product of Arm's-Length Negotiations

To decide whether to grant preliminary approval, courts assess whether "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with[in] the range of possible approval."  MANUAL FOR COMPLEX LITIGATION §30.44 (2d ed. 1985).  "In the absence of contrary evidence, the [c]ourt presumes there was no fraud or collusion behind the settlement."  *Evans ex rel. United Dev. Funding IV v. Greenlaw*, No. 3:16-CV635, 2018 WL 2197780, at *4 (N.D. Tex. May 14, 2018).  Here, the Settlement was reached after extensive arm's-length negotiations between and among counsel for the Parties and provides substantial benefits to the Company and its stockholders, while eliminating the expense, risk, and delay inherent in such complex litigation, including the very real risk of no recovery.[7]

---

[7]      While the Court need not address the agreed-to Fee and Expense Amount until final approval, it bears mention that courts afford similar deference to arm's-length fee negotiations. *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (noting that negotiated fees are strongly preferred over contested fee applications, as "[a] request for attorney's fees should not result in a second major litigation"); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (where there is no evidence of collusion and no detriment to the parties, "the Court should give substantial weight to a negotiated fee amount").

The assistance of a neutral, well-respected mediator – Greg Lindstrom of Phillips ADR – provides further assurances that the Settlement was reached fairly.  *See, e.g.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d. Cir. 2001) ("mediator's involvement [. . .] helps to ensure that the proceedings were free of collusion and undue pressure"); *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1370 (N.D. Ga. 2019) ("mediation with an experienced mediator [. . .] further confirms that the process was procedurally sound and not collusive").

Finally, the exercise of business judgment by independent directors is traditionally afforded deference by courts.  *See, e.g.*, *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981); *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386 (Del. 1995) ("courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness"); *In re Southern Co. S'holder Derivative Litig.*, No. 1:17-CV-725, 2022 WL 4545614, at *6 (N.D. Ga. June 9, 2022) ("The directors' exercise of business judgment with respect to the Settlement warrants substantial judicial deference.").

In sum, Plaintiffs, by and through Plaintiffs' Counsel, and the Company and the Individual Defendants, by and through their respective counsel, with the assistance and oversight of the Mediator Lindstrom, have independently considered the Settlement and all agree that it is in the best interests of Fluor and its stockholders.  This weighs heavily in favor of settlement approval.

### 3.    The Complexity, Expense, and Likely Duration of the Litigation

As mentioned above, shareholder derivative actions are "notoriously difficult and unpredictable."  *Maher*, 714 F.2d at 455.  Litigation of the complex facts and issues presented in the Actions would not likely be an exception. *See Sved*, 783 F. Supp. 2d at 861 (finding derivative action was complex where shareholder alleged claims against several defendants for breaches of fiduciary duty and insider selling).  Plaintiffs acknowledge that Defendants would continue to vigorously dispute the claims asserted, and Plaintiffs recognize the significant risk, expense, and

length of continued proceedings necessary to prosecute this litigation though trial, and potentially through appeals.  *See Evans*, 2018 WL 2197780, at \*4 ("Defendants filed multiple dispositive motions in what appeared to be the start of a lengthy and hard-fought litigation. If litigation were to proceed, this case would likely continue to be hotly contested.  This factor weighs in favor of [. . .] approval.").  Were the litigation to continue, numerous complex issues of law and fact would need to be resolved at considerable time and expense to Fluor, the Parties, and the Court, including whether pre-suit demand on the Board was wrongfully refused or whether Rule 23.1 was satisfied and demand was excused.

Even if Plaintiffs prevailed on motions to dismiss, numerous substantive issues would remain, requiring intensive discovery, extensive motion practice, expert testimony, a lengthy trial, and the possibility of appeals – with Defendants fighting every step of the way to reduce or eliminate their liability.  Establishing a factual record sufficient to defeat a motion for summary judgment or to prevail at trial would be complicated by the passage of time, the faulty memories of witnesses, and, in some cases, the inability to access key witnesses due to relocation or death. This likelihood of a long slog of costly litigation is another reason that the Settlement is in the best interests of the Company and its shareholders.

Further, even if Plaintiffs were to prevail on their claims and establish liability, whether Defendants' actions proximately caused the damages, and the amount of recoverable damages would have posed significant issues and would have been subject to further litigation.  *See Sved*, 783 F. Supp. 2d at 863 ("[i]n a complex litigation such as this [derivative] one, the parties often provide difficult and conflicting expert testimony at trial.").  And assuming Plaintiffs established damages, it is unclear if further litigation would have the same long-term benefits as the corporate governance reforms and monetary payment achieved here.  *See Maher*, 714 F.2d at 461 ("[. . .] the

18

effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor in the particular action[.]").  Outside of a settlement, it is unclear if the Court would be able to grant the same types of long-term corporate governance reforms as relief – as opposed to monetary damages and an injunction that merely prohibits future bad behavior.  *See, e.g.*, *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1067 (Del. Ch. 2015) (finding that "non-monetary consideration" conferred "important additional benefits" that could not have been secured through trial).

### 4.    Plaintiffs Had Sufficient Information to Evaluate the Case and Value the Settlement

Before reaching an agreement, the Parties "obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it."  *See Sved*, 783 F. Supp. 2d at 861.  Here, Plaintiffs conducted a comprehensive investigation prior to filing suit. This investigation consisted of a review of publicly available documents, including SEC filings, media and analyst reports, and court filings, including in the related Securities Action.

In addition, as described above, prior to commencing litigation, certain Plaintiffs made demands on the Board for books and records pursuant to 8 *Del. C.* §220 and received documents in response, including various relevant Board-level materials.  Certain Plaintiffs received the Company's books and records through court-approved negotiated agreements.  Review of these documents helped inform Plaintiffs' view of the wrongdoing alleged, as well as the strengths and weaknesses in their case.  Plaintiffs' Counsel agreed to participate in settlement negotiations and ultimately agreed to the proposed Settlement only after developing a strong sense of the nature of the claims.

"The Fifth Circuit has explicitly rejected the proposition that the parties must always undertake extensive formal discovery and build a voluminous record before settlement." *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 621 (E.D. La. 2006). "The question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it." *In re OCA, Inc. Sec. and Derivative Litig.*, No. 05–2165, 2009 WL 512081, at *12 (E.D. La. Mar. 2, 2009*)*. Here, Plaintiffs' Counsel took affirmative steps to gather data on the claims at issue. *Educ. Testing Serv.*, 447 F. Supp. 2d at 621. The stage of proceedings thus supports preliminary approval, as the informal discovery provided Plaintiffs with "sufficient information to gauge the strength and weaknesses of [their] claims and the probability of [their] success on the merits." *Evans*, 2018 WL 2197780, at *4.

### 5.     Challenges to Plaintiffs Prevailing on the Merits

While Plaintiffs believe that their claims are meritorious, establishing liability would be difficult. Navigating the Actions to and through victory at trial was never guaranteed. Indeed, while all litigation is inherently risky, "derivative lawsuits are rarely successful." *In re Heelys Inc. Derivative Litig.*, No. 3:07-cv-1682, 2009 WL 10704478, at *8 (N.D. Tex. Nov. 17, 2009) (quoting *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995)). Plaintiffs acknowledge the risk that the Actions would not have withstood Defendants' motions to dismiss, especially given the heightened pleading requirements under Rule 23.1 for demand futility, which is satisfied only under "extraordinary conditions." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991). Even were this hurdle overcome, establishing the requisite level of causation and damages would also be complex and difficult. *See Sved*, 783 F. Supp. 2d at 863 ("[i]n a complex litigation such

as this [derivative] one, the parties often provide difficult and conflicting expert testimony at trial."). Thus, this factor also supports the Settlement's approval.

### 6.    The Range of Possible Recovery and Certainty of Damages

Though Plaintiffs faced risks in pursuing litigation, the best evidence that the Defendants took the shareholders' claims seriously is that they agreed to a Settlement comprised of substantial corporate governance reforms, oversight, and funding.  The Settlement provides benefits to Fluor and its stockholders, through mandating a series of corporate governance reforms, guaranteed oversight to ensure the reforms are effectively implemented, and an estimated $10 million in funding over four years to ensure that the Company is devoting adequate resources to implement the risk management practices described in detail in the Stipulation.

While it is always theoretically possible that Plaintiffs might obtain more for Fluor through further litigation, this litigation may have exhausted the limited proceeds under the Company's Director & Officer Liability Insurance policy.  Moreover, Fluor did not agree to all of the corporate governance reforms proposed by Plaintiffs during the course of the Parties' negotiations.

### 7.    The Opinions of Plaintiffs' Counsel, Plaintiffs, and Stockholders

"[A] presumption of correctness is said to attach to a class settlement reached in arms [sic] length negotiations between experienced, capable counsel after meaningful discovery."  *Lelsz v. Kavanagh*, 783 F. Supp. 286, 297 (N.D. Tex. 1991).  Here, all counsel are in favor of the Settlement.  Counsel for the Parties have extensive experience in complex litigation of this nature and believe that the Settlement is fair, reasonable, and adequate in light of the circumstances of this case.  Because the Settlement was reached only after extensive arm's-length negotiations with a firm understanding of the factual and legal issues presented, and the relative strengths and weaknesses of their respective claims and defenses, the assessments of counsel on the fairness of

21

the Settlement is entitled to deference.  *See Maher*, 714 F.2d at 457 (settlement reached after

"intelligent evaluation of the lawsuit by the parties and their capable counsel.").

## V.      THE COURT SHOULD APPROVE THE FORM AND MANNER OF NOTICE

Federal Rule of Civil Procedure 23.1(c) requires notice of a proposed shareholder

derivative settlement be given to stockholders "in the manner that the court orders."  Fed. R. Civ.

P. 23.1(c).  "The notice should be 'reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to present their

objections.'"  *Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen.*

*Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007) (quoting *Mullane v. Cent. Hanover Bank & Tr.*

*Co.*, 339 U.S. 306, 314 (1950)).  The district court "has virtually complete discretion as to the

manner of giving notice to class members."  *Handschu v. Special Servs. Div.*, 787 F.2d 828, 833

(2d Cir. 1986).

The Stipulation provides that within 30 calendar days of the Court's entry of the

Preliminary Approval Order, Fluor shall make a good faith effort to: (i) cause the Postcard Notice

to be mailed to all stockholders of record or nominees, substantially in the form of Exhibit D to

the Stipulation; (ii) cause the Summary Notice to be published in *Investor's Business Daily*,

substantially in the form of Exhibit C to the Stipulation; and (iii) post the Notice and Stipulation

on a settlement website until the Judgment becomes final, substantially in the form of Exhibit B to

the Stipulation.  The proposed Notice, Summary Notice, and Postcard Notice describe in plain

English the terms and conditions of the proposed Settlement, including: (i) the facts and

considerations that caused the Settling Parties and their respective counsel to conclude that the

proposed Settlement is fair, reasonable, adequate, and in Fluor's best interests; (ii) the agreed

amount of attorneys' fees and expenses being presented to the Court for approval; (iii) the

procedure for objecting to the proposed Settlement; and (iv) the date, place, and time of the Settlement Hearing. *See* Stip., Exs. B-D.

The use of website posting coupled with other publications has gained broad acceptance in light of the rapid transition of the investment community from a paper-based to a web-based disclosure system. *See* Use of Electronic Media for Delivery Purposes, SEC Release No. 33-7233, 60 Fed. Reg. 53458, 53459 (Oct. 6, 1995) ("The Commission believes that the use of electronic media should be at least an equal alternative to the use of paper-based media."). As such, courts regularly find that the publication of notice to shareholders on the website of a company and/or in an investor publication, such as *Investor's Business Daily*, is sufficient. *See, e.g.*, *Heelys*, 2009 WL 10704478, at *4-5 (finding publication of notice in *Investor's Business Daily* and posting on the company's website met the requirements of Fed. R. Civ. P. 23.1 and due process); *Karstedt v. Isenberg*, No. 4:07-cv-00509, slip op. (S.D. Tex. Mar. 13, 2008) (same). Here, the proposed notice program goes even further by also providing for the physical mailing of the Postcard Notice to stockholders of record or nominees.

The form and manner of the proposed notice program – including mailing, publication in *Investor's Business Daily*, and website posting – constitute sufficient notice to Fluor Stockholders and satisfy the requirements of Fed. R. Civ. P. 23.1(c) and due process.

## VI.    PROPOSED SCHEDULE OF EVENTS

In connection with preliminary approval of the Settlement, Plaintiffs request that the Court establish dates by which the Notice will be disseminated to Fluor Stockholders and by which Fluor Stockholders may comment on the Settlement, and a date for the Final Settlement Hearing. As set forth in the Preliminary Approval Order, Plaintiffs propose the following:

| The Final Settlement Hearing | Sixty (60) calendar days from the date when the Court enters the Preliminary Approval Order |
|---|---|
| The Company shall make a good faith effort to cause the Postcard Notice to be mailed to all stockholders of record or nominees, cause the Summary Notice to be published in ***Investor's Business Daily***, and post the Notice and Stipulation on a settlement website until the Judgment becomes final | Thirty (30) calendar days from the date when the Court enters the Preliminary Approval Order |
| All papers in support of the Settlement and the Fee and Expense Amount filed with the Court and served upon all Parties | At least twenty-eight (28) calendar days prior to the Settlement Hearing |
| Counsel for the Company shall file with the Court proof, by affidavit or declaration, of dissemination of the Notice | At least seven (7) calendar days prior to the Settlement Hearing |
| All objections or papers in opposition to the Settlement or the Fee and Expense Amount filed with the Court and served upon all parties | At least fourteen (14) calendar days prior to the Settlement Hearing |
| Any reply papers in support of the Settlement or Fee and Expense Amount and response(s) to objections filed with the Court and served upon all parties | At least seven (7) calendar days prior to the Settlement Hearing |

This schedule, similar to those used in numerous derivative settlements, affords due process to the Company's stockholders concerning their rights with respect to the Settlement.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order: (i) granting preliminary approval of the proposed Settlement; (ii) directing that notice of the proposed Settlement be given to Fluor Stockholders in the proposed form and manner; and (iii) scheduling a hearing before the Court to determine whether the proposed Settlement should be finally approved.

Dated: May 12, 2023

Respectfully Submitted,

**SCOTT+SCOTT ATTORNEYS
  AT LAW LLP**

*/s/ Geoffrey M. Johnson*           
GEOFFREY M. JOHNSON
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile:  (216) 229-6092
E-mail: gjohnson@scott-scott.com

**ROBBINS LLP**
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
E-mail: brobbins@robbinsllp.com
       csmith@robbinsllp.com
       ssanders@robbinsllp.com

*Co-Lead Counsel for Texas Federal Court Lead
Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of May, 2023, the foregoing document was filed using the Court's CM/ECF system.  In addition, (1) the filing is available for viewing and downloading via the CM/ECF system, and (2) the CM/ECF system will send notification of this filing to all attorneys of record who have registered for CM/ECF updates.

 */s/ Geoffrey M. Johnson*
Geoffrey M. Johnson (admitted *pro hac vice*)