**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| IN RE FLUOR CORPORATION STOCKHOLDER DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 3:20-cv-01442-X<br><br>(Consolidated with Case Nos. 3:20-CV-01558-X and 3:21-CV-00353-X) |

**LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT, AWARD OF ATTORNEYS' FEES AND EXPENSES, AND PAYMENT OF PLAINTIFFS' SERVICE AWARDS, AND MEMORANDUM OF LAW IN SUPPORT**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL AND PROCEDURAL HISTORY; SETTLEMENT TERMS ........................3

III.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE, AND
       WARRANTS FINAL APPROVAL ..........................................................................3

       A.      Applicable Legal Standards .........................................................................3

       B.      The Settlement Is Fair, Reasonable and Adequate and Warrants Approval............5

             1.      The Settlement Confers Substantial Benefits on Fluor...............................5

             2.      The Proposed Settlement Is the Product of Arm's-Length
                    Negotiations ........................................................................10

             3.      Attempting to Improve upon the Settlement Benefits through
                    Further Litigation Would be Risky, Costly, and Time-Consuming..........11

             4.      Plaintiffs Had Sufficient Information to Evaluate the Case......................15

             5.      The Opinion of Plaintiffs, Plaintiffs' Counsel, and Fluor
                      Stockholders........................................................................16

IV.    THE SEPARATELY NEGOTIATED AND AGREED-TO FEE AND EXPENSE
       AMOUNT IS FAIR AND REASONABLE AND SHOULD BE APPROVED ...............17

       A.      The Fee and Expense Amount Was Negotiated and Agreed to at Arm's-
             Length .................................................................................17

       B.      The Applicable Factors Support Approval of the Fee and Expense Amount........19

              1.      The Substantial Benefits Conferred on Fluor ...........................................20

              2.      Fees Awarded in Other Derivative Cases .................................................21

              3.      The Time and Labor Involved .................................................................21

              4.      The Skill Required to Perform the Legal Services ....................................22

              5.      The Preclusion of Other Employment Due to Acceptance of the
                      Case.....................................................................................23

              6.      The Contingent Nature of Plaintiffs' Counsel's Undertaking....................23

              7.      The Novelty and Difficulty of Questions Involved in the Actions............24

V.      THE PROPOSED SERVICE AWARDS TO PLAINTIFFS ARE REASONABLE ........25

VI.     CONCLUSION...................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*Allred v. Walker*,
    2021 WL 5847405 (S.D.N.Y. Dec. 9, 2021) ......................................................................19

*Bacas v. Way*,
    2008 WL 746825 (S.D. Tex. Mar. 20, 2008)......................................................................5

*Bell Atl. Corp. v. Bolger*,
    2 F.3d 1304 (3d Cir. 1993).................................................................................................5

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*,
    2015 WL 965696 (W.D. La. Mar. 03, 2015) ....................................................................22

*Clark v. Lomas & Nettleton Fin. Corp.*,
    79 F.R.D. 641 (N.D. Tex. 1978) .......................................................................................24

*Cohen v. Beneficial Indus. Loan Corp.*,
    337 U.S. 541 (1949).........................................................................................................24

*Cohn v. Nelson*,
    375 F. Supp. 2d 844 (E.D. Mo. 2005)..................................................................5, 9, 17, 23

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ..............................................................................4, 15, 17

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d. Cir. 2001)..............................................................................................11

*Fla. Trailer & Equip. Co. v. Deal*,
    284 F.2d 567 (5th Cir. 1960) ...........................................................................................11

*George v. Acad. Mortg. Corp. (UT)*,
    369 F. Supp. 3d 1356 (N.D. Ga. 2019) ............................................................................11

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983).........................................................................................................17

*In re Activision Blizzard, Inc. S'holder Litig.*,
    124 A.3d 1025 (Del. Ch. 2015).........................................................................................15

*In re Apollo Grp., Inc. Sec. Litig.*,
    2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 WL
    5927988 (9th Cir. June 23, 2010) ....................................................................................15

*In re Apple Comput., Inc., Derivative Litig.*,
    2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) .....................................................................5

*In re Ashanti Goldfields Sec. Litig.*,
  2005 WL 3050284 (E.D.N.Y. Nov. 15, 2005)........................................................22

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996)...................................................................13, 24

*In re Cendant Corp., Derivative Action Litig.*,
  232 F. Supp. 2d 327 (D.N.J. 2002)...............................................................25

*In re Education Testing Service Praxis Principles of Learning & Teaching,
Grades 7-12 Litigation*,
  447 F. Supp. 2d 612 (E.D. La. 2006)...........................................................16

*In re Emerson Radio S'holder Derivative Litig.*,
  2011 Del. Ch. LEXIS 50 (Del. Ch. Mar. 28, 2011) ...........................................7

*In re Heelys Inc. Derivative Litig.*,
  2009 WL 10704478 (N.D. Tex. Nov. 17, 2009)......................................12, 17, 25

*In re Lear Corp. S'holder Litig.*,
  967 A.2d 640 (Del. Ch. 2008)......................................................................14

*In re Lloyd's Am. Tr. Fund Litig.*,
  2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002)...................................................14

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ......................................................................25

*In re OCA, Inc. Sec. & Derivative Litig.*,
  2009 WL 512081 (E.D. La. Mar. 2, 2009) ................................................15, 19

*In re Pac. Enters. Sec. Litig.*,
  47 F.3d 373 (9th Cir. 1995) .......................................................................24

*In re Pfizer Inc. S'holder Derivative Litig.*,
  780 F. Supp. 2d 336 (S.D.N.Y. 2011).............................................................5

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*,
  1994 WL 202394 (E.D. La. May 18, 1994).......................................................23

*In re Rambus Inc. Derivative Litig.*,
  2009 WL 166689 (N.D. Cal. Jan. 20, 2009)......................................................20

*In re Southern Co. S'holder Derivative Litig.*,
  2022 WL 4545614 (N.D. Ga. June 9, 2022).....................................................11

*In re Walt Disney Co. Derivative Litig.*,
  907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) ...........................14

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ..................................22

*Johnson v. Ga. Highway Exp., Inc.*,
    488 F.2d 714 (5th Cir. 1974) *abrogated by Blanchard v. Bergeron*, 489 U.S.
    87 (1989).....................................................................................................17, 19, 21, 23

*Jones v. Dominion Res. Servs., Inc.*,
    601 F. Supp. 2d 756 (S.D.W. Va. 2009)...............................................................24

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991)...............................................................................................24

*Kreischer v. Kerrison Dry Goods Co.*,
    2000 WL 1157805 (4th Cir. 2000) .......................................................................20

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) ........................................................................ *passim*

*Malchman v. Davis*,
    761 F.2d 893 (2d Cir. 1985) *abrogated by Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..............................................................................................18

*McKittrick v. Gardner*,
    378 F.2d 872 (4th Cir. 1967) ...............................................................................23

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)..........................................................................................5, 20

*Officers for Just. v. Civ. Serv. Comm'n of City and Cnty. of S.F.*,
    688 F.2d 615 (9th Cir. 1982) .........................................................................12, 17

*Pearson v. Ecological Sci. Corp.*,
    522 F.2d 171 (5th Cir. 1975) .................................................................................4

*Polk v. Good*,
    507 A. 2d 531 (Del. 1986) ...................................................................................16

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)..............................................................................................11

*Reed v. Gen. Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) ............................................................................4, 16

*Schimmel v. Goldman*,
    57 F.R.D. 481 (S.D.N.Y. 1973) .............................................................................4

*Schwartz v. TXU Corp.*,
    2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ..........................................................................10

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006) ...........................................................................................13

*Surowitz v. Hilton Hotels Corp.*,
    383 U.S. 363 (1966)....................................................................................................24

*Sved v. Chadwick*,
    783 F. Supp. 2d 851 (N.D. Tex. 2009) .............................................................4, 12, 14, 15

*Unite Nat'l Ret. Fund v. Watts*,
    2005 WL 2877899 (D.N.J. Oct. 28, 2005)......................................................................6

*Evans ex rel. United Dev. Funding IV v. Greenlaw*,
    2018 WL 2197780 (N.D. Tex. May 14, 2018) ....................................................10, 12, 16, 22

*United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-*
    *State Pension Fund v. Zuckerberg*,
    262 A.3d 1034 (Del. 2021) .........................................................................................12

*Unitrin, Inc. v. Am. Gen. Corp.*,
    651 A.2d 1361 (Del. 1995) .........................................................................................11

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 .............................................................................................................22

*Zapata Corp. v. Maldonado*,
    430 A.2d 779 (Del. 1981) .....................................................................................11, 13

**Statutes**

8 Del. C. §102(b)(7)..........................................................................................................14

**Other Authorities**

Fed. R. Civ. P. 23.1 .........................................................................................................1, 3

Jay Lee ("Lead Plaintiff"), on behalf of all Plaintiffs[1] in all of the related stockholder derivative Actions brought on behalf of Fluor Corporation ("Fluor" or the "Company"), respectfully submits this memorandum in support of the motion for final approval of the Settlement of the above-captioned stockholder derivative Action, pursuant to Fed. R. Civ. P. 23.1.[2] Defendants do not oppose this motion.

## I.   INTRODUCTION

The proposed Settlement resolves breach of fiduciary duty and related stockholder claims predicated on allegations that certain members of Fluor's management and Board of Directors ("Board") failed to implement a system of internal controls and reporting to adequately monitor the Company's bidding on, and the execution of, fixed-price contracts; and, as a result, (i) failed to exercise adequate project or risk management and oversight; and (ii) falsely assured stockholders that the Company's fixed price projects were more profitable than they actually were.

The proposed Settlement directly addresses the alleged wrongdoing by committing Fluor to adopt and maintain for a period of at least four (4) years a set of management- and Board-level measures addressing project and risk management and oversight and performance-based compensation safeguards ("Reforms").  The Settlement also requires Fluor to allocate adequate funding for the risk management and corporate governance enhancements, which are estimated to be approximately $10 million over four years.  The Reforms, taken together, will reduce the chances that Fluor and its stockholders will suffer a loss of investor confidence and legal exposure moving forward; enhance the value of the Company through improved project and risk

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning given to them in the Stipulation and Agreement of Settlement dated April 20, 2023 (the "Stipulation" or "Stip."), filed with the Court on May 12, 2023.  ECF No. 42-3.

[2] On August 17, 2023, Scott+Scott, counsel for Co-Lead Plaintiff Joan Goodman, learned of the May 24, 2023 death of Ms. Goodman.  Co-Lead Counsel are submitting a suggestion of death on the record concurrent with this filing.

management, oversight, and decision-making; and help boost investor confidence in the integrity of the Company's management and the effectiveness of its governance and oversight regime.

Defendants acknowledge that the changes to Fluor's risk management structure are in direct response to the events at issue in the derivative complaints and that the commencement and settlement of the Actions were a material cause of the corporate governance changes provided for in the Settlement.  Stip., ¶¶1.5, 4.1.  The Board, including its independent, non-defendant members, has determined, in an exercise of its business judgment, that the Reforms are in the best interests of the Company, and has approved their implementation and maintenance.  *Id.*, ¶1.5.

The Settlement was reached in a fair, non-collusive process through months of arm's-length negotiations among sophisticated parties represented by skilled counsel, with the assistance of an experienced neutral, Gregory Lindstrom, Esq., of Phillips ADR Enterprises (the "Mediator"),[3] triggering the presumption of fairness and deference courts afford in such circumstances.

After the material substantive terms of the Settlement were agreed upon, Texas Federal Court Lead Plaintiffs' Counsel and Defendants separately negotiated Plaintiffs' Counsel's attorneys' fees in good faith, on an informed basis, and with the oversight and assistance of the Mediator.  Stip., ¶¶4.1-4.2.  In recognition of the benefits the Reforms will provide to Fluor as a result of Plaintiffs' Counsel's efforts, Defendants have agreed to pay (or cause their insurers to pay) Plaintiffs' Counsel attorneys' fees and expenses in the maximum amount of $2,400,000 (the "Fee and Expense Amount"), subject to Court approval.  The Fee and Expense Amount is a small fraction of the probable range of value of the Settlement benefit to Fluor and its stockholders and warrants the deference traditionally accorded to these types of agreed-to fees.

In connection with preliminary approval, the Court approved the proposed notice program,

---

[3] *See* Declaration of Gregory P. Lindstrom, Esq. in Support of Lead Plaintiffs' Motion for Final Approval of Settlement filed concurrently herewith ("Lindstrom Decl.") (Sanders Decl., Ex. 24).

finding that it satisfied Rule 23.1 and due process standards.  ECF No. 46.  Plaintiffs understand that Fluor timely disseminated notice.  In addition, the numerous firms comprising Plaintiffs' Counsel posted the notice on their respective firm websites in accordance with the Court's preliminary approval Order.  Declaration of Shane P. Sanders in Support of Lead Plaintiff's Motion for Final Approval of Derivative Settlement, Award of Attorneys' Fees and Expenses, and Payment of Plaintiffs' Service Awards ("Sanders Decl."), ¶23.[4]  To date, no objections from any Fluor stockholders have been received.  *Id.*, ¶24.

Lead Plaintiff respectfully requests that the Court approve the Settlement and the agreed-to Fee and Expense Amount, and enter the proposed Order and Judgment.

## II.     FACTUAL AND PROCEDURAL HISTORY; SETTLEMENT TERMS

The Sanders Declaration is an integral part of this submission, and, for the sake of brevity, Lead Plaintiff respectfully refers the Court thereto for a detailed description of: (i) the factual background and procedural history of the Actions (¶¶9-13); (ii) the Parties' settlement negotiations (¶¶14-21); (iii) Notice (¶¶22-23); and (iv) a summary of the terms of the Settlement (¶¶25-29).[5]

## III.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE, AND WARRANTS FINAL APPROVAL

### A.     Applicable Legal Standards

Public policy strongly favors the settlement of stockholder derivative actions.  *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ("Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'")

---

[4] Plaintiffs' Counsel and counsel for Defendants will file formal declarations concerning the issuance of notice on or before September 12, 2023, in accordance with the Preliminary Approval Order.

[5] The factual and procedural background and a description of the parties' settlement negotiations also were previously set forth in the preliminary approval brief filed on May 12, 2023 (ECF No. 43).

(quoting *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973)).[6]  Derivative settlements "will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits." *Pearson v. Ecological Sci. Corp.*, 522 F.2d 171, 176 (5th Cir. 1975).

The Court's role is to review the proposed settlement to "determine that there has been no fraud or collusion in arriving at the settlement agreement, and that it is fair, reasonable, and adequate." *Maher*, 714 F.2d at 455.  The Court should not attempt to rewrite the settlement reached by the parties, or try the case by resolving issues intentionally left unresolved.  *See Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("The trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'"); *Maher*, 714 F.2d at 455 ("the court should not decide the merits of the action or attempt to substitute its own judgment for that of the parties").

Courts in the Fifth Circuit look to the following six factors in evaluating a proposed settlement: "(1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to plaintiffs prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of plaintiff's counsel, the derivative plaintiff, and absent shareholders." *Sved v. Chadwick*, 783 F. Supp. 2d 851, 860-61 (N.D. Tex. 2009); *Reed v. Gen. Motors Corp.*, 703 F.2d 170 (5th Cir. 1983).  In addition, courts consider the reaction of stockholders (including objections, if any) and whether the settlement was the result of arm's-length negotiations and an informed evaluation of the lawsuit by the parties and experienced counsel.  *Maher*, 714 F.2d at 456-57.

---

[6] Here, as throughout, all emphasis is added and citations and footnotes are omitted unless otherwise noted.

**B.      The Settlement Is Fair, Reasonable and Adequate and Warrants Approval**

**1.      The Settlement Confers Substantial Benefits on Fluor**

In evaluating a stockholder derivative settlement, "[t]he principal factor ... is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (omission in original); *see In re Apple Comput., Inc., Derivative Litig.*, 2008 WL 4820784, at \*2 (N.D. Cal. Nov. 5, 2008) ("principal factor to consider ... is the benefit to [the real party in interest] as compared to the risks posed by derivative litigation").

"[A] corporation may receive a 'substantial benefit' from a derivative suit … regardless of whether the benefit is pecuniary in nature." *Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 395 (1970); *Maher*, 714 F.2d at 461 ("[T]he effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor."); *Bacas v. Way*, 2008 WL 746825, at \*2 (S.D. Tex. Mar. 20, 2008) (non-pecuniary settlement of a stockholder derivative action which consisted of corporate reforms that directly addressed the allegations conferred a substantial corporate benefit).  Courts, therefore, approve settlements supported by consideration in the form of corporate governance reforms "specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws[.]" *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005).  Among other benefits, such reforms make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors." *Id*.[7]

---

[7] *See In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011). (approving settlement of stockholder derivative action where the corporate benefits included "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing

Here, the Settlement confers substantial benefits on Fluor and its stockholders in the form of corporate governance reforms that directly address the alleged governance deficiencies that Plaintiffs contend permitted the alleged wrongdoing to occur.  Stip., ¶¶1.1-1.5; *id.*, Ex. E.  As set forth in the Stipulation and discussed in the Sanders Declaration, the Reforms involve governance measures at both Board- and management-levels relating to project and risk management and oversight, and performance-based compensation safeguards, including the following:

- A management-level Project Execution Group ("PEG"), which shall be responsible for the standards, practices, and oversight of all Project execution support functions, and shall oversee Fluor's risk management and mitigation processes.  The PEG will report to the CEO, and be reported to by the Corporate Risk Group (led by the Corporate Risk Officer).  The PEG, through the Corporate Risk Group, shall (i) coordinate with the Legal Department, the Board-level Commercial Strategies and Operational Risk Committee of the Board of Directors ("CSOR"), and the Audit Committee to provide information necessary to assess any enterprise risk stemming from Projects; and (ii) implement enhanced Risk Level designations for all Projects.  Three-person "Assessment Teams" (comprised of representatives of the Corporate Risk Group, the Legal Department, and the Business Group) shall evaluate each Project's risk profile and determine the Risk Level for each Project, and monitor and reevaluate the Risk Level of each Project on a continuous basis during the pursuit, bidding, and execution phases.

- An executive-level team responsible for overseeing risk management and mitigation for all Risk Level 2 and Risk Level 3 Projects – the Fluor Management Team ("FMT").  The FMT – comprised of the Company's CEO, CFO, PEG President, Chief Legal Officer, Corporate Risk Officer, and Group President for Corporate Development – together with the Business Group presidents, shall meet at least quarterly to discuss the performance and metrics of Risk Level 2 and 3 Projects, and shall meet more frequently as needed.  The FMT shall update the CSOR or shall cause the CSOR to be updated, on a quarterly basis regarding the performance and metrics of Risk Level 3 Projects.  The FMT also shall require the Corporate Risk Group to prepare an annual report on the Company's fixed price contract risk.

- Within the 12-month period following final approval of the Settlement, Fluor's Internal Audit department will conduct an audit to assess whether the applicable risk processes under the Corporate Risk Group are being followed.

- At least quarterly, the Corporate Risk Officer shall report to the Board-level CSOR concerning Project performance and metrics for Risk Level 3 Projects.  In addition, the Group President for Corporate Development shall report to the CSOR quarterly for Risk Level 3 Project Pursuits, looking ahead up to 4 to 6 quarters.  Further, the CSOR shall review the FMT annual

---

that have, in recent years, caused extensive harm to the company"); *Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005) (non-monetary benefits support settlement where "the relief is intended to prevent future harm").

report on the Company's fixed price contract risk and report on its activity to the full Board.

• Fluor's clawback policy shall, in the event of a material restatement of the Company's financial results, provide the Board with discretion to initiate a clawback. The clawback may consist of the portion of any performance-based compensation earned during the periods materially affected by the restatement that would not have been earned had performance been measured on the restated basis, without requiring a finding of fault. Upon any material restatement of the Company's financial results, the Board shall direct an internal investigation to determine whether any performance-based compensation should be subject to the clawback policy. Fluor shall post its clawback policy on the Company's website alongside other corporate governance documents.

Stip., Ex. E; Sanders Decl., ¶27. In addition, Fluor must provide funding of what it estimates to be at least $10 million (at least $2.5 million per year) over the Commitment Period for the costs of implementing and maintaining its new risk management structure, detailed in Ex. E. Stip., ¶1.3.

The Reforms confer lasting economic value on Fluor in at least three ways.

**First**, the Reforms substantially reduce the likelihood that the alleged project management and risk oversight and disclosure failures will recur and that Fluor and its stockholders will suffer the potential loss of investor confidence and legal and/or regulatory exposure as a result of similar allegations in the future.[8]

**Second**, more rigorous, independent, and effective oversight will improve corporate decision-making, project and risk management, and execution of key corporate strategies; improve the Company's business prospects; ensure accurate disclosures to investors and the public at large; and

---

[8] While the value of preventing future alleged missteps cannot be determined with precision, the market's swift and dramatic discount of Fluor's market capitalization when the alleged truth was revealed in this case—as well as the significant harm the Company likely will suffer if faced with another securities fraud class action for alleged false and misleading statements or any other future legal actions pertaining to Fluor's practices relating to the estimation and accounting for fixed-price contracts or other unlawful business practices in the near term—suggests that the Reforms are worth at least tens of millions of dollars (if not more). *See, e.g., In re Emerson Radio S'holder Derivative Litig.*, 2011 Del. Ch. LEXIS 50, at *17-18 (Del. Ch. Mar. 28, 2011) (in approving derivative settlement, quantifying benefit of therapeutics intended to prevent recurrence of misconduct by multiplying damages flowing from original misconduct by estimated risk of recurrence but-for new governance reforms).

reduce the costs associated with failure to comply with disclosure and other legal or regulatory requirements.

**Third**, the Reforms confer economic value by laying the foundation necessary to enhance investor confidence in the integrity of its project and risk management, the accuracy of the Company's public disclosures, and the effectiveness of the Company's corporate governance and Board oversight more generally.

Numerous studies have confirmed that investors are willing to pay a premium for stock in well-governed corporations, thus driving substantial increases in long-term stockholder value. *See* Sanders Decl., Ex. 27 (P. Gompers, J. Ishii, et al., Corporate Governance and Equity Prices, 118 Quarterly J. Econ. (2003)); *id*., Ex. 28 (Lawrence D. Brown, et al., The Correlation between Corporate Governance and Company Performance, Institutional Shareholder Services (2004)); *id*., Ex. 29 (V. Cunant, et al., The Vote Is Cast: The Effect of Corporate Governance on Shareholder Value, 67 J. Finance 68 (Oct. 2012)). McKinsey & Company sought to quantify this effect in a survey of more than 200 large institutional investors with more than a combined $3.25 trillion under management. *See id*., Ex. 30 (McKinsey & Company Investor Opinion Survey, McKinsey & Company (June 2000)). Seventy-five percent of respondents in the survey ranked governance attributes as more important than financial issues, and 80% said they would pay substantially more for the company with strong governance. The U.S. respondents were willing to pay an average premium of 18.3%. Based on these results, McKinsey & Company concluded that while "it remains difficult to measure the impact on market prices of the premium investors say they are willing to pay for well-governed companies, the amounts they are prepared to pay leave little doubt that good governance does feed through"—"[i]f companies could capture but a small portion of the governance premium that is apparently available, they would create

significant shareholder value." *Id.*[9]

Fluor has agreed to maintain the Reforms for a minimum of four years—a meaningful amount of time intended to ensure the Reforms become embedded in the Company's policies, practices, and corporate culture, thus protecting against discontinuation of these measures following the four-year period.  Stip., ¶1.2; *id.*, Ex. E; *see also*, *e.g.*, *Cohn*, 375 F. Supp. 2d at 850 (finding that corporate governance measures that must be in place for no less than three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").  Fluor has also agreed to fund the Reforms at an estimated annual cost of at least $2.5 million over a four-year period, reflecting the fact that (at the bare minimum) more than $10 million of corporate governance therapeutics will flow from the Settlement to the benefit of Fluor and its stockholders.  Stip., ¶1.3.

Even if the Reforms' precise value cannot be quantified, there is every reason to believe it ranges at least well into the tens of millions of dollars (and likely more than that).  Fluor's current market capitalization is approximately $5 billion.  Even an extremely conservative estimate that the Reforms would unlock a premium of 1% (the average premium reported in the McKinsey & Company survey was 18.3%) suggests a value of more than $50 million, over and above the value of preventing recurrence of the alleged harm and improving corporate decision-making and risk management, overall.  Sanders Decl., ¶37.

_____

[9] *See also* Sanders Decl., Ex. 25 (Bebchuk & Hamdani, The Elusive Quest for Global Governance Standards, 157 U. Pa. L. Rev. 1263, 1266 (May 2009) ("There is now widespread [acceptance] that adequate investor protection can substantially affect not only the value of public firms and their performance but also the development of capital markets and the growth of the economy as a whole.")); *id.*, Ex. 26 (Robert Adamson, Corporate Governance, Risk Management and Corporate Social Responsibility in Emerging Markets: A Symbiotic Relationship, Corporate Governance & Risk Management Blog, Simon Fraser University, Beedie School of Business (Mar. 22, 2011) ("Investors, particularly large institutional investors, are … focused on corporate governance[.]… Paying attention to corporate governance issues is becoming an important part of investment decisions[.]")).

## 2.    The Proposed Settlement Is the Product of Arm's-Length Negotiations

In evaluating a proposed settlement for approval, courts assess whether the settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with[in] the range of possible approval."  Manual for Complex Litigation, §30.44 (2d ed. 1985); *see Maher*, 714 F.2d at 457 (court must determine that the Settlement is "free from collusion or fraud").  "In the absence of contrary evidence, the [c]ourt presumes there was no fraud or collusion behind the settlement."  *Evans ex rel. United Dev. Funding IV v. Greenlaw*, 2018 WL 2197780, at *4 (N.D. Tex. May 14, 2018).

Here, the Settlement was reached after extensive arm's-length negotiations among counsel for the Parties.  Sanders Decl., ¶38; *see Maher*, 714 F.2d at 457 (a finding that the "settlement was the result of arm's-length negotiation" is a factor in approving the settlement); *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *20-21 (N.D. Tex. Nov. 8, 2005) (applying the arm's-length nature of the settlement as a factor in its evaluation).

The assistance of a well-respected mediator—Gregory P. Lindstrom of Phillips ADR—provides further assurances that the Settlement was reached fairly.  *See* Sanders Decl., ¶41; Lindstrom Decl., ¶¶4-10 (describing the settlement negotiations and noting that they "were conducted at arm's-length and were adversarial and hard fought[,]" and that the Parties "based their evolving settlement positions on substantive, well-informed assessments of the relative strengths and weaknesses of the derivative claims, realistic assessments of the potential range of recoverable damages, and the value and benefits of potential corporate governance reforms"), ¶14 ("there was no rush to judgment or hint of collusion in any aspect of the settlement negotiations in which I was involved[,]" and the mediation efforts "required significant perseverance and creativity to forge a compromise among parties who contested nearly every proposal that was presented"), ¶15 (the

"advocacy I observed was of the highest caliber[,]" the "decision to settle on the terms presented was reasonable and well-informed[,]" and "[t]he Parties' efforts produced a sound and reasonable compromise that I respectfully can recommend for this Court's approval"); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d. Cir. 2001) ("mediator's involvement … helps to ensure that the proceedings were free of collusion and undue pressure"); *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1370 (N.D. Ga. 2019) ("mediation with an experienced mediator … further confirms that the process was procedurally sound and not collusive").

The Settlement also has the support of the Board, which warrants deference to its decision to settle. *See In re Southern Co. S'holder Derivative Litig.*, 2022 WL 4545614, at *6 (N.D. Ga. June 9, 2022) ("The directors' exercise of business judgment with respect to the Settlement warrants substantial judicial deference."); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981); *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386 (Del. 1995) ("courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness").

### 3.      Attempting to Improve upon the Settlement Benefits through Further Litigation Would be Risky, Costly, and Time-Consuming

The evaluation of the fairness of a settlement requires the Court to balance the likely rewards of litigation with its risks and costs, against the benefits obtained by the settlement. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968) ("Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation."). Due to the inherent uncertainty of litigation, a settlement should be approved where "it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end." *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir.

1960).  What constitutes a reasonable recovery depends on the facts of each case, and an evaluation of the benefits of settlement must be tempered by recognition that any compromise involves concessions by all settling parties.  Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Just. v. Civ. Serv. Comm'n of City and Cnty. of S.F.*, 688 F.2d 615, 624 (9th Cir. 1982).

While Plaintiffs believe the allegations and claims in the Actions are meritorious, continued litigation would be complex, costly, and of substantial duration, and significant risks would remain. Sanders Decl., ¶44; *see Evans*, 2018 WL 2197780, at *4 ("Defendants filed multiple dispositive motions in what appeared to be the start of a lengthy and hard-fought litigation. If litigation were to proceed, this case would likely continue to be hotly contested.  This factor weighs in favor of … approval.").  Plaintiffs here would have to overcome all of those hurdles in the context of stockholder derivative litigation, which is "notoriously difficult and unpredictable."  *Maher*, 714 F.2d at 455; *see also Sved*, 783 F. Supp. 2d at 861 (finding derivative action was complex where stockholder alleged claims against several defendants for breaches of fiduciary duty and insider selling); *In re Heelys Inc. Derivative Litig.*, 2009 WL 10704478, at *8 (N.D. Tex. Nov. 17, 2009) ("'derivative lawsuits are rarely successful'").

First, to have standing to pursue this stockholder derivative litigation on behalf of Fluor, Plaintiffs would have to allege particularized facts showing that a pre-suit demand on the Board would have been futile because a majority of the Board members either (i) received "a material personal benefit from the alleged misconduct," (ii) "face[] a substantial likelihood of liability on" the claims, or (iii) "lack[] independence."  *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).  To establish a substantial likelihood of liability based on alleged director oversight failures, Plaintiffs would have to show that "(a) the directors utterly failed to implement any reporting or information

system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention"—"[i]n either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  As courts have recognized, this claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

Making matters more difficult for Plaintiffs, this Court dismissed with prejudice 63 out of the 64 alleged misstatements in the related Securities Action, including all statements concerning Fluor's risk management and the project bidding process, all statements concerning Fluor's internal controls, procedures, and reported revenue, and all but one of the alleged misstatements concerning construction progress on its gas-fired power plants. *See Chun v. Fluor Corp.*, No. 3:18-cv-01338 Memorandum and Order at 7-18 (N.D. Tex. May 5, 2021) (ECF No. 140).  The Court permitted only a single alleged misstatement (concerning the status of certain fixed-price contracts) to proceed. *Id.* at 10-16.  This threatened to substantially limit the scope of the derivative claims and damages in the Actions and presented challenges to Plaintiffs' ability to establish a substantial likelihood of liability and, thus, to plead demand futility.  Sanders Decl., ¶47.

Even if Plaintiffs adequately pleaded demand futility, the Board could wrest control of the derivative claims by establishing a committee of independent directors to investigate and determine whether to prosecute the claims. *See Zapata*, 430 A.2d at 786.  If the committee determined it was not in Fluor's best interest to pursue the claims at issue in the Actions, it could terminate this derivative litigation so long as it could establish that its investigation was independent, reasonable, and conducted in good faith. *Id.* at 788-89; Sanders Decl., ¶48.

In the event Plaintiffs surpassed all of the above pleadings challenges, significant questions

would remain about whether Plaintiffs could overcome motions for summary judgment predicated on the "business judgment rule," which affords directors the presumption that they acted on an informed basis and in the good faith belief that the actions taken were in the best interest of the company,[10] and the exculpation and indemnification rights granted to directors, absent a demonstration of intentional misconduct and disloyalty.[11]   While Plaintiffs believe the Actions have merit, the claims likely would rest on circumstantial evidence, and the claims center on alleged oversight failures.  Sanders Decl., ¶49.  Additional discovery required to bring this case to trial also would be costly, complex, and time-consuming.  *Id.*

The challenges involved in proving damages are equally daunting.  *Sved*, 783 F. Supp. 2d at 863 ("In a complex litigation such as this [derivative] one, the parties often provide difficult and conflicting expert testimony at trial."); *In re Lloyd's Am. Tr. Fund Litig.*, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages … is a complicated and uncertain process, typically involving conflicting expert opinions.  The reaction of a jury to such complex expert testimony is highly unpredictable.").  As noted, the court's ruling in the related Securities Action further limited the amount of potentially recoverable damages here.  Sanders Decl., ¶50.

Even assuming Plaintiffs established damages and secured a judgment at trial, it is unclear if a monetary recovery would have the same long-term benefits as the Reforms negotiated here.  *See Maher*, 714 F.2d at 461 ("[T]he effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar

---

[10] *See, e.g.*, *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746-47 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[11] *See* 8 Del. C. §102(b)(7) (corporations may exculpate directors from personal liability for damages except where they fail to act in good faith); *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 647-48 (Del. Ch. 2008) (where corporate charter contains Section 102(b)(7) provision, plaintiffs must plead a non-exculpated claim that the defendants knowingly breached duty of loyalty).

amount of any likely judgment in its favor in the particular action[.]").  And, absent the Settlement, the Court likely would not be able to order the same types of long-term corporate governance reforms as relief.  *See, e.g.*, *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1067 (Del. Ch. 2015) (finding that "non-monetary consideration" conferred "important additional benefits" that could not have been secured through trial).[12]

The Settlement eliminates these and other risks and costs of continued multi-jurisdictional derivative litigation—including the risk of no recovery for Fluor—and permits Fluor to return its attention to its operations and to restoring its reputation among investors.  Sanders Decl., ¶53.

### 4.    Plaintiffs Had Sufficient Information to Evaluate the Case

In considering whether the parties had sufficient information to evaluate the merits, courts "look[] not to the amount of discovery, but rather to 'whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it.'"  *Sved*, 783 F. Supp. 2d at 861 (quoting *In re OCA, Inc. Sec. & Derivative Litig.*, 2009 WL 512081, at *12 (E.D. La. Mar. 2, 2009)).[13]

Here, Plaintiffs' Counsel reviewed and analyzed data from numerous sources specific to this matter, including, but not limited to: (1) confidential, non-public internal documents of Fluor, obtained through pre-suit inspection demands; (2) the Company's public filings with the U.S.

---

[12] Even a victory at trial is no guarantee that the judgment would avoid reversal on appeal.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd & remanded*, 2010 WL 5927988 (9th Cir. June 23, 2010) (holding evidence insufficient to support jury verdict for stockholders of $277 million).

[13] *See Cotton*, 559 F.2d at 1332 (finding that although "very little formal discovery was conducted and that there is no voluminous record in the case ... the lack of such does not compel the conclusion that insufficient discovery was conducted" because the parties engaged in informal discovery and plaintiffs "achieved the desired quantum of information necessary to achieve a settlement").

Securities and Exchange Commission, press releases, announcements, transcripts of investor conference calls, and news articles; (3) securities analyst, business, and financial media reports about Fluor; and (4) the relevant proceedings in and documents filed in the related Securities Action. Plaintiffs' Counsel also researched the applicable law with respect to the claims asserted (or which could be asserted) in the Actions and the potential defenses thereto; researched, drafted, and filed complaints; conducted damages analyses; researched Fluor's corporate governance structure; prepared settlement demands and detailed mediation submissions; participated in mediations and additional calls and meetings; and engaged in months-long settlement discussions and exchanges of information with Defendants' counsel. Stip., §III; Sanders Decl., ¶54. In sum, Plaintiffs took affirmative steps to gather data on the claims at issue (*In re Education Testing Service Praxis Principles of Learning & Teaching, Grades 7-12 Litigation*, 447 F. Supp. 2d 612, 621 (E.D. La. 2006)) and had "sufficient information to gauge the strength and weaknesses of [their] claims and the probability of [their] success on the merits" and to determine that the Settlement benefits outweigh the substantial risk and uncertainty of litigation. *Evans*, 2018 WL 2197780, at *4.

### 5. The Opinion of Plaintiffs, Plaintiffs' Counsel, and Fluor Stockholders

An additional factor the Court should consider in determining the fairness of the Settlement is the view and opinion of experienced counsel. *Reed*, 703 F.2d at 175; *Polk v. Good*, 507 A. 2d 531, 536 (Del. 1986); *Maher*, 714 F.2d at 457. Plaintiffs' Counsel have extensive experience litigating stockholder derivative actions and are familiar with this area of the law. Sanders Decl., ¶57; *id.* Ex. 1 & Ex. 1 attached to Exs. 2-13. Counsel for the Individual Defendants and Fluor are highly respected and noted for vigorously representing their clients. Sanders Decl., ¶57. The Parties are well-informed and believe the Settlement should be approved, and the Board, based upon its independent review of the Actions and Settlement, also endorses the Settlement. Stip.,

16

¶1.5.  The assessments of counsel as to the fairness of the Settlement are entitled to deference.  *See Maher*, 714 F.2d at 457 (settlement reached after "intelligent evaluation of the lawsuit by the parties and their capable counsel").

Finally, the lack of any objections to the Settlement from Current Fluor Stockholders to date further supports final approval of the Settlement.  *Id.* at 456 ("minimal nature of shareholder objection" is a factor favoring approval of settlement); *Cotton*, 559 F.2d at 1331 ("number of objectors is a factor to be considered" in the settlement of stockholder actions).[14]

## IV.  THE SEPARATELY NEGOTIATED AND AGREED-TO FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE AND SHOULD BE APPROVED

### A.    The Fee and Expense Amount Was Negotiated and Agreed to at Arm's-Length

The U.S. Supreme Court has endorsed the consensual resolution of attorneys' fees in representative litigation.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation.  Ideally … litigants will settle the amount of a fee.").  "[T]he court's intrusion upon what is otherwise a private consensual agreement … must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate...."  *Officers for Just.*, 688 F.2d at 625.

Where the fee negotiations were conducted at arm's-length and there is no evidence of collusion, courts accord "substantial deference" to the parties' agreement.  *Cohn*, 375 F. Supp. 2d at 861; *Heelys*, 2009 WL 10704478, at *9 (where there is no evidence of collusion, "a negotiated fee is entitled to deference"); *Johnson v. Ga. Highway Exp., Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) *abrogated by Blanchard v. Bergeron*, 489 U.S. 87 (1989) ("In cases of this kind, we encourage

---

[14] The deadline for stockholder objections is September 5, 2023.  To the extent any stockholder objections are submitted, Plaintiffs will respond to such objections (if any) by September 12, 2023, in accordance with the Preliminary Approval Order.

counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorneys' fees."); *Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985) *abrogated by Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) (noting that courts should be hesitant to interfere in fee arrangements between settling parties in stockholder actions); *Ayers Thompson*, 358 F.3d 356, 375 (5th Cir. 2004) ("[P]rohibiting agreement between the parties on attorneys' fees 'might well preclude the settlement of a substantial number of cases.'").

Here, the Court is not being called upon to fashion a fee and expense award; rather, it is being asked to determine whether the Fee and Expense Amount agreed to by well-represented parties at arm's-length, with the assistance and oversight of the Mediator, falls within the range of reasonableness.

After negotiating the substance of the Settlement, Texas Federal Court Lead Plaintiffs' Counsel and Defendants separately negotiated and agreed upon an appropriate amount of attorneys' fees for Plaintiffs' Counsel (subject to Court approval), with the substantial assistance of the Mediator. Texas Federal Court Lead Plaintiffs' Counsel and Defendants, working with the Mediator, considered the Settling Parties' respective valuations of the benefits conferred upon Fluor as a result of the Actions and Settlement, attorneys' fees approved by courts in similar stockholder derivative action settlements, and the amount that would fairly compensate Plaintiffs' Counsel for the risk they undertook and the results obtained. Texas Federal Court Lead Plaintiffs' Counsel negotiated with counsel for Defendants, attorneys who are employed by one of the most respected firms in this country, have litigated complex stockholder actions, know the applicable law pertaining to attorneys' fees and expenses, and witnessed Plaintiffs' Counsel's efforts in the Actions first-hand. The end result of these negotiations is a market-driven, arm's-length Fee and Expense Amount that is entitled to deference and warrants judicial approval. Sanders Decl., ¶57; Lindstrom Decl., ¶11 (the fee negotiations "were arm's-length, adversarial, hard fought, and were

based on substantive assessments of the relevant legal standards, case law and the range of awards in other derivative cases, which I discussed in detail with both sides"), ¶16 ("I support the agreed-upon Fee and Expense Amount as the product of arm's-length, adversarial and hard-fought negotiations that appropriately focused on the value of the Settlement benefit, Plaintiffs' Counsel's role in securing the benefit, and the other relevant factors governing contingency fee awards in representative litigation....").[15]

###### B.   The Applicable Factors Support Approval of the Fee and Expense Amount

When determining the reasonableness of attorneys' fees, Fifth Circuit courts consider several factors, including: (i) the amount involved and the results obtained; (ii) fee awards in similar cases; (iii) the time and labor required; (iv) the skill required to perform the legal service properly, and the experience, reputation, and ability of the attorneys; (v) the preclusion of other employment due to acceptance of the case; (vi) whether the fee is contingent; and (vii) the novelty and difficulty of the questions involved and the undesirability of the case.  *Johnson*, 488 F.2d at 717-19.  Because not all of the *Johnson* factors are always applicable, the Court may engage in a balancing and weighing of factors, and the relative degree of importance of any one factor will depend upon and be dictated by the nature of the claims advanced, the types of relief sought, and the unique facts and circumstances presented by the individual case.  *OCA*, 2009 WL 512081, at *21.[16]

---

[15] *See also, e.g.*, *Allred v. Walker*, 2021 WL 5847405, at *5-6 (S.D.N.Y. Dec. 9, 2021) ("[G]reat, and potentially dispositive, weight should be given to a fee amount not to be paid from a common fund negotiated at arm's length between sophisticated counsel after the substantive terms of a settlement have been agreed…. The fact that the fee is not to be paid from the common fund eliminates the concern, present in many securities class action settlements, that the fees to be awarded to counsel will deplete the funds available to pay injured class members who have released their claims.").

[16] Other factors, including "time limitations imposed by the client or the circumstances" and "the nature and length of the professional relationship with the client," are not relevant to the Actions.

### 1.    The Substantial Benefits Conferred on Fluor

Under the "substantial benefit" doctrine, counsel who prosecute a stockholder derivative action that generates substantial benefits for the corporation are entitled to an award of reasonable attorneys' fees and expenses commensurate with the value of those benefits and the risks of proceeding on a contingency basis.  *See Mills*, 396 U.S. at 394-96.  "[A] corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature.... [P]rivate stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders[.]"  *Id.* at 395-96; *see Maher*, 714 F.2d at 466 ("[A] settlement may fairly, reasonably, and adequately serve the best interest of a corporation, on whose behalf the derivative action is brought, even though no direct monetary benefits are paid by the defendants to the corporation.").[17]

Here, as discussed in section III.B.1., *supra*, and in paragraphs 25-37 of the Sanders Declaration, the Reforms—which will help to prevent a recurrence of similar alleged wrongdoing in the future, improve the Company's governance related to (among other things) critical project and risk management and oversight at both the management- and Board-level, and lay the foundation for enhancing investor confidence—confer substantial benefits with real economic value, which, even conservatively discounted (as discussed above), exceed the agreed Fee and Expense Amount of $2,400,000 by at least an order of magnitude.  Sanders Decl., ¶62.

---

Moreover, this memorandum groups together certain factors with the same underlying analyses in order to avoid repetition of the analyses.  *Id.* at *17.

[17] *See also Kreischer v. Kerrison Dry Goods Co.*, 2000 WL 1157805, at *4 (4th Cir. 2000) (noting applicability of *Mills* to derivative actions in justifying attorneys' fees paid for substantial benefit conferred on corporation regardless of whether benefit obtained is pecuniary); *In re Rambus Inc. Derivative Litig.*, 2009 WL 166689, at *3 (N.D. Cal. Jan. 20, 2009) ("Following *Mills*, courts consistently have approved attorneys' fees and expenses in shareholder actions where the plaintiffs' efforts resulted in significant corporate governance reforms but no monetary relief").

### 2.      Fees Awarded in Other Derivative Cases

"The reasonableness of a fee may also be considered in light of awards made in similar litigation within and without the court's circuit." *Johnson*, 488 F.2d at 719.  Courts routinely approve agreed-to fees in derivative litigation involving corporate governance reforms like those secured here, underscoring the reasonableness of the agreed-to Fee and Expense Amount.  *See, e.g.*, *In re Alphatec Holdings, Inc. Derivative S'holder Litig.*, No. 37-2010-58586-CU-BT-NC, slip op. (Cal. Super. Ct.-San Diego Cnty. Aug. 18, 2014) ($5.25 million fee for corporate governance) (Sanders Decl., Ex. 32); *In re F5 Networks, Inc. Derivative Litig.*, 2011 WL 13195985, at *1 (W.D. Wash. Jan. 6, 2011) ($5 million fee for corporate governance); *In re Southern Co. S'holder Derivative Litig.*, No. 1:17-cv-00725-MHC, slip op. (N.D. Ga. June 9, 2022) ($3.5 million fee for corporate governance) (Sanders Decl., Ex. 34); *Cnty. of York Emps. Ret. Plan v. Jung*, Index No. 651304-2010, slip op. (N.Y. Sup. Ct., N.Y. Cnty. Aug. 1, 2016) ($4 million fee for corporate governance) (Sanders Decl., Ex. 36); *In re MiMedx Group, Inc. S'holder Derivative Litig.*, No. 1:18-cv-04486-WMR, slip op. (N.D. Ga. Dec. 21, 2020) ($3.5 million for corporate governance) (Sanders Decl, Ex. 38); *Nixon-Crenshaw v. Coley*, No. 1:18-cv-25289-AHS, slip op. (S.D. Fla. Oct. 1, 2021) ($2.5 million fee for corporate governance) (Sanders Decl., Exs. 41-42).

### 3.      The Time and Labor Involved

The Fee and Expense Amount is also reasonable in light of Plaintiffs' Counsel's investments of time and expenses on a wholly contingent basis.  Over the past approximately four years, Plaintiffs' Counsel collectively devoted a total of 4,670.84 hours to the prosecution and resolution of the Actions, incurring a total lodestar of $3,285,095.10.  Sanders Decl., ¶¶64-76 & Exs. 2-13.  Plaintiffs' Counsel's time was spent on (among other things) foundational factual and legal research prior to the commencement of the Actions, including pre-suit inspection demands and the review of confidential corporate books and records of the Company; efforts to organize and coordinate the related derivative

actions in the interest of efficiency and to conserve the resources of the Company and the Court; ongoing factual investigations and legal research into the claims and defenses and potential damages; preparation of damages analyses, corporate governance research memoranda, and settlement demands and mediation submissions; and mediation efforts and settlement negotiations. *Id.*

In addition to the collective total lodestar of $3,285,095.10, Plaintiffs' Counsel also have unreimbursed litigation costs totaling approximately $63,271.36. *Id.*, ¶75. The Fee and Expense Amount (after deducting expenses) equates to a fractional lodestar multiplier of approximately 0.71. *Id.*, ¶¶75-76. This multiplier is eminently reasonable, especially given the substantial benefits achieved, and is well below the multipliers typically applied in other securities, derivative, and other complex litigation. *See, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, 2015 WL 965696, at *10 (W.D. La. Mar. 03, 2015) (acknowledging that multipliers of up to four frequently are awarded and approving 1.92 multiplier, noting that it was "on the lower end of approved multipliers"); *Evans*, 2018 WL 2197780, at *3 (applying multiplier of 3.06 in stockholder derivative settlement); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051-52, Appendix & n.6 (9th Cir. 2002) (upholding a multiplier of 3.65 in a stockholder settlement and analyzing twenty-three approved stockholder settlements, with an average multiplier of 3.28).

### 4. The Skill Required to Perform the Legal Services

Courts reward counsel who bring complex matters to a successful early resolution. *See, e.g.*, *In re Ashanti Goldfields Sec. Litig.*, 2005 WL 3050284, at *4 (E.D.N.Y. Nov. 15, 2005) ("The 'quality of representation' factor is designed to reward 'particularly resourceful' legal work that 'secures a substantial benefit … with a minimum of time invested.'") (omission in original). "The quality of opposing counsel is also important in evaluating the quality of plaintiff's counsels' work." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986). Plaintiffs' Counsel have extensive experience and have achieved significant results for

companies and stockholders across the country.  Sanders Decl., Ex. 1 & Ex. 1 attached to Exs. 2-13.

Here, despite facing the daunting challenges of establishing demand futility and then establishing

liability and damages on a director oversight theory—particularly in the face of the Court's dismissal

of all but one of the alleged misstatements in the related Securities Action—Plaintiffs' Counsel

successfully negotiated an outstanding settlement with experienced Defendants' counsel, which

minimized Fluor's financial burden associated with protracted litigation while securing immediate

and substantial benefits for the Company.  Sanders Decl., ¶77.

### 5.   The Preclusion of Other Employment Due to Acceptance of the Case

Plaintiffs' Counsel undertook risk in terms of opportunity cost, as lawyers who otherwise

would handle different matters focused instead on this litigation.  Sanders Decl., ¶78.  This

supports approval of the Fee and Expense Amount.  *See Johnson*, 488 F.2d at 718 ("preclusion of

other employment by the attorney due to acceptance of the case" supports a fee award).

### 6.   The Contingent Nature of Plaintiffs' Counsel's Undertaking

Courts recognize that the contingent nature of the fee is an important factor in considering

approval of attorneys' fees.  *Johnson*, 488 F.2d at 718-19; *see also In re Prudential-Bache Energy

Income P'ships Sec. Litig*., 1994 WL 202394, at *8 (E.D. La. May 18, 1994) (contingent fee awards

should "fairly and … adequately compensate counsel for the  risks of pursuing such litigation and

the benefits which would not otherwise have been achieved but for their … efforts").[18]  Here,

Plaintiffs' Counsel took on the risk of receiving little or no recovery—a major factor supporting an

award of attorneys' fees.  Sanders Decl., ¶79; *see Cohn*, 375 F. Supp. 2d at 863, 865-66 ("[I]t is

imperative that the filing of contingent class action and derivative lawsuits not be chilled by the failure

---

[18] *McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967) ("The effective lawyer will not win
all of his cases, and any determination of the reasonableness of his fees in those cases in which his
client prevails must take account of the lawyer's risk of receiving nothing for his services.").

to award attorneys' fees or by the imposition of fee awards that fail to adequately compensate counsel for the risks of pursuing such litigation.… [B]ecause of the complexity and societal importance of stockholder and derivative litigation, the most able counsel should be obtained. The attorney's fees awarded should reflect this goal.").[19] Derivative actions play an important role in "protect[ing] the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991).[20] The Actions substantially benefitted Fluor and its stockholders. This would not have been possible had courts not properly incentivized skilled and experienced counsel to focus on high-risk stockholder derivative litigation.[21]

### 7.     The Novelty and Difficulty of Questions Involved in the Actions

As discussed in section III.B.3., *supra*, Plaintiffs faced an exceedingly difficult path in first establishing derivative standing by alleging demand futility as to a majority of the Board with sufficient particularity, and then proving liability and damages based on alleged director oversight failures—"possibly the most difficult theory in corporation law upon which a plaintiff might hope to win judgment." *Caremark*, 698 A.2d at 967; *see In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("the odds of winning [a] derivative lawsuit [are] extremely small"); *Clark v. Lomas & Nettleton Fin. Corp.*, 79 F.R.D. 641, 654 (N.D. Tex. 1978) (recognizing that stockholder

---

[19] *See Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 762 (S.D.W. Va. 2009) ("[A]ttorneys undertaking class actions bear substantial risks that the litigation will not result in payment. The attorneys risk defeat at several stages of litigation: class certification, dispositive motions, and finally, trial.").

[20] *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966) ("derivative suits have played a rather important role in protecting shareholders of corporations from the designing schemes and wiles of insiders"); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949) (derivative action is "the chief regulator of corporate management … without it there would be little practical check on [management] abuses").

[21] *See AOL*, 2010 WL 363113, at *23 (attorneys' fees should incentivize "future counsel to devise remedies as an alternative to money, strengthening corporate America in the long run through innovation and prophylaxis").

24

derivative actions are complex by their very nature). Despite these challenges, Plaintiffs' Counsel were able to negotiate a resolution that confers substantial benefits on Fluor. Sanders Decl., ¶80.

## V.      THE PROPOSED SERVICE AWARDS TO PLAINTIFFS ARE REASONABLE

Plaintiffs each seek a $2,500 Service Award in recognition of their respective roles in this derivative litigation and in securing the benefits provided for in the Settlement.[22] Any service awards approved by the Court will come out of Plaintiffs' Counsel's attorneys' fees. Stip., ¶4.7; Sanders Decl., ¶81.[23] Courts typically award service awards to representative plaintiffs who expend additional efforts to benefit the lawsuit and have approved similar service awards to plaintiffs who have participated similarly in litigation. *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (approving a $5,000 service award to a representative plaintiff); *Heelys*, 2009 WL 10704478, at *13 (approving service awards of $4,000 per plaintiff). The modest requested Service Awards are reasonable and should be approved.

## VI.     CONCLUSION

Texas Federal Court Lead Plaintiff respectfully requests that the Court grant the motion and approve the Settlement in its entirety, and enter the Final Judgment as presented.

Dated: August 22, 2023                                  Respectfully submitted,

                                                        ROBBINS LLP

                                                        /s/ Shane P. Sanders
                                                        SHANE P. SANDERS
                                                        BRIAN J. ROBBINS

---

[22] *See* declarations of plaintiffs Jay Lee, Alyson Bottoni, Kasey King, Sindy Wei-Mester, Thomas French, Jr., Hakyung Kim, Elsie Schifano, Thomas Smith, April Atchison, and Jonathan Woods filed concurrently herewith (Sanders Decl., Exs. 14-23). Plaintiffs Donna Hickok and Omid Yousofi are not seeking a service award.

[23] In derivative litigation where, as here, the service award is paid out of the awarded attorney's fees, the award "need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected." *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002).

CRAIG W. SMITH
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
E-mail: brobbins@robbinsllp.com
          csmith@robbinsllp.com
          ssanders@robbinsllp.com

**SCOTT+SCOTT ATTORNEYS**
  **AT LAW LLP**
GEOFFREY M. JOHNSON
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile:  (216) 229-6092
E-mail: gjohnson@scott-scott.com

*Co-Lead Counsel for Texas Federal Court Lead*
*Plaintiffs*

## **CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule 7.1, I hereby certify that a conference among all parties was held regarding the instant Motion and the instant Motion is unopposed.

/s/ Shane P. Sanders
Shane P. Sanders (admitted *pro hac vice*)

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of August, 2023, the foregoing document was filed using the Court's CM/ECF system.  In addition, (1) the filing is available for viewing and downloading via the CM/ECF system, and (2) the CM/ECF system will send notification of this filing to all attorneys of record who have registered for CM/ECF updates.

/s/ Shane P. Sanders
Shane P. Sanders (admitted *pro hac vice*)